UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

BANK OF AMERICA, NATIONAL ASSOCIATION, :
and BANC OF AMERICA SECURITIES LLC, :
                               :

                 Plaintiffs,     :      Civil Action No. 08 Civ. 9265
                               :

       - against -                :      ECF Case
                               :

BEAR STEARNS ASSET MANAGEMENT INC.,   :      **COMPLAINT**
RALPH CIOFFI, MATTHEW TANNIN, and       :
RAYMOND McGARRIGAL,                  :
                               :

                 Defendants.     :
-----------------------------------------------------------------x

       Plaintiffs Bank of America, National Association ("BANA") and Banc of America

Securities LLC ("BAS," and together with BANA, "Bank of America" or the "Bank"),

through their attorneys, for their Complaint against Defendants Bear Stearns Asset

Management Inc. ("BSAM"), Ralph Cioffi, Matthew Tannin, and Raymond McGarrigal

state as follows:

## NATURE OF THE ACTION

       1.   This is an action for breach of contract, fraud, and related causes of action arising

out of Defendants' egregious misconduct in connection with a securitization transaction

structured and marketed by Bank of America, as well as certain financing transactions with

the Bank in the spring of 2007. Time and again, throughout extensive dealings, Defendants

knowingly misled the Bank and breached contractual obligations.

       2.   More specifically: In May 2007, at the request of Defendant BSAM, Bank of

America structured and marketed a $4 billion securitization, known as a "CDO-squared"

transaction, in which mortgage-backed assets, primarily ones owned by two hedge funds

managed by BSAM, were pooled and structured to support the sale of certain securities.

3.  Over the course of many months, BSAM and its officers and employees, including the named individual defendants, concealed from Bank of America (as well as from the two hedge funds' investors and other creditors) that the hedge funds were suffering substantial withdrawal requests from investors and by the spring of 2007 were in imminent danger of collapse. The eventual collapse of the funds in June 2007 – an event that contributed to the ultimate demise of Bear Stearns – predictably caused an enormous decline in the value of both the assets underlying the CDO-squared transaction and the securities issued in the transaction. As a direct and foreseeable consequence of Defendants' misconduct, the Bank sustained significant losses.

4.  Defendants – two of whom have been indicted by a federal grand jury and sued by the Securities and Exchange Commission for their conduct as managers of the two funds – breached their contractual and other duties to Bank of America for one overarching reason: They were desperate to secure liquidity to prop up the failing hedge funds. Defendants not only misled the Bank into structuring, marketing, and closing the CDO-squared transaction, but they compounded the Bank's damages: in May of 2007, Defendants caused the hedge funds to enter into a series of short-term financing transactions to obtain nearly $1 billion from Bank of America, again without apprising the Bank of the funds' precarious financial condition. When the hedge funds were unable to meet their obligations to repay the Bank for the short-term financing, the Bank suffered significant additional losses.

## PARTIES

5.  Plaintiff Bank of America, National Association is a national banking association organized under the laws of the United States. Its main office as set forth in its articles of

association (as amended and restated) is located in North Carolina. BANA brings this action both in its individual capacity and in its capacity as Successor Trustee under an Indenture dated as of May 24, 2007 (the "Indenture") between LaSalle Bank National Association ("LaSalle") and High Grade Structured Credit CDO 2007-1 (the "Issuer"), an exempted company with limited liability incorporated under the laws of the Cayman Islands. The Indenture assigns to LaSalle, and through succession by merger to BANA as Successor Trustee, all of the Issuer's legal rights and property for the benefit of the holders of the notes issued by the Issuer.

6. Plaintiff Banc of America Securities LLC is a Delaware limited liability company. Its sole member is a Delaware corporation with its principal place of business in North Carolina.

7. Defendant Bear Stearns Asset Management Inc. is a New York corporation with its principal place of business in New York. At all relevant times, BSAM, a wholly-owned subsidiary of The Bear Stearns Companies Inc. ("BSC", and together with BSAM and all other subsidiaries and affiliates, "Bear Stearns"), was an asset-management unit of Bear Stearns.

8. Defendant Ralph Cioffi is a resident of the State of New Jersey. Cioffi at all relevant times was a Senior Managing Director at BSAM, a member of BSAM's board of directors, and Senior Portfolio Manager for the two Bear Stearns hedge funds at issue.

9. Defendant Matthew Tannin is a resident of New York State. Tannin at all relevant times was a Senior Managing Director or Managing Director at BSAM and Chief Operating Officer for the two Bear Stearns hedge funds at issue.

10. Cioffi and Tannin have been indicted by a federal grand jury and sued by the Securities and Exchange Commission ("SEC") in large part based on their deception regarding the financial condition, performance, and assets of the two Bear Stearns hedge funds at issue. The indictment and SEC complaint, both filed in the U.S. District Court for the Eastern District of New York on June 19, 2008, charge, between them, wire fraud and securities fraud.

11. Defendant Raymond McGarrigal is a resident of New York State. McGarrigal at all relevant times was a Senior Managing Director or Managing Director at BSAM and Senior Portfolio Manager for the two Bear Stearns hedge funds at issue.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

**I.     BSAM Engages Bank of America to Structure and Market a $4 Billion Securitization**

14. At the time of the transactions at issue in this action, BSAM was widely regarded as a preeminent asset manager. It was known for sophisticated risk management practices. Defendants Cioffi, Tannin, and McGarrigal managed two of BSAM's most prominent hedge funds, Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the "High-Grade Fund") and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (the "Enhanced Leverage Fund," and, together with the High-Grade Fund, the "Bear Stearns Funds" or the "Funds").

4

15. The Funds invested principally in highly structured securities, including securities backed by subprime mortgages. Many of these securities were collateralized debt obligations, or CDOs. (A CDO is a type of security backed, or collateralized, by a pool of securities that themselves are usually backed by other assets, often mortgages. A CDO-squared is a "CDO of CDOs," meaning that it is a CDO the collateral for which consists of other CDOs.)

16. BSAM had a longstanding and extensive business relationship with Bank of America, which was interested in working with BSAM on structured products transactions precisely because of the stellar reputation enjoyed by BSAM, Cioffi, Tannin, and McGarrigal as (among other things) managers of CDO portfolios. Defendants and the Bank were in regular communication about potential business opportunities.

17. In or about late 2006, BSAM and the Bank began to discuss, among other possible deals, a CDO-squared transaction (the "CDO-squared Transaction") in which a special-purpose entity (the Issuer) would acquire a diversified portfolio of mortgage-related securities (the "Collateral"), including CDOs purchased from the Bear Stearns Funds, and then issue multiple classes, or "tranches," of securities backed by the Collateral (the "Securities"). The Securities would consist of the most senior tranche, the so-called Super-Senior Notes, the most junior tranche (the "Equity"), and several intermediate tranches (the "Mezzanine Notes").

18. BAS and BSAM executed an engagement letter agreement dated March 9, 2007 (the "Engagement Letter"). The Engagement Letter (which is attached to this Complaint as Exhibit A) stated that BSAM had engaged Bank of America to structure and market the transaction and that BSAM would serve as "Collateral Manager" for the Issuer, meaning

that BSAM would be responsible for selecting, acquiring, managing, and monitoring the Issuer's portfolio of Collateral.

19. The parties agreed that the Super-Senior Notes would be marketed to third-party investors in the commercial-paper market – in other words, the market for short-term, relatively safe instruments. To facilitate the sale of these instruments, which would comprise about $3.2 billion of the deal's $4 billion total value, Bank of America committed to write a put option with respect to the Super-Senior Notes. The put option was designed to protect the purchasers of the Super-Senior Notes by guaranteeing, subject to certain conditions, that the Bank would buy those Notes in the event the holders of the Notes were unable to find buyers for them.

20. In structuring the CDO-squared Transaction, the parties understood that BSAM or its hedge funds would initially purchase the Equity and the Mezzanine Notes.

21. For BSAM and its hedge funds, the CDO-squared Transaction was a way of gaining much-needed liquidity: it would enable the Funds to convert certain assets into cash.

22. The financial stability and market reputation of BSAM and the Bear Stearns Funds were of paramount importance to the Bank, especially because the Bank, through the put, would be committing itself to buy approximately $3.2 billion worth of Super-Senior Notes if there were no purchasers for those Notes. Accordingly, in section 4(c) of the Engagement Letter, Bank of America insisted on a commitment that BSAM would:

> notify [Bank of America] of the occurrence of any of the following events promptly after the Collateral Manager becomes aware of such occurrence: (i) a material adverse change, or development that would reasonably be expected to result in a material adverse change, in the business, properties, financial condition or prospects of the Collateral Manager, (ii) any material statement contained in any offering memoranda or marketing materials or any material information provided by the Collateral Manager to [Bank of America], prospective investors, Rating Agencies or any other person in connection with the Offering is or becomes inaccurate or

incomplete in any material respect, or (iii) any other adverse financial, organizational or other event or change at the Collateral Manager which would reasonably be expected to impair the ability of [Bank of America] . . . to market the Securities issued in connection with the Transaction.

23. BSAM violated these contractual obligations. As described below, in April and May of 2007, and on information and belief several months earlier than that, events occurred that either were, or would reasonably have been expected to result in, material adverse changes in the business, properties, financial condition, and prospects of BSAM. These events, moreover, would reasonably have been expected to impair Bank of America's ability to market the Securities. These events, in short, plainly had to be disclosed to Bank of America under section 4(c) of the Engagement Letter.

24. Yet, although Bank of America had frequent communications throughout March, April, and May, 2007 with BSAM and with Defendants Cioffi, Tannin, and McGarrigal (among other BSAM employees) about the CDO-squared Transaction, none of Defendants apprised Bank of America of these events, changes, and developments. Defendants therefore breached section 4(c) of the Engagement Letter. They also defrauded the Bank.

## II.    Defendants Conceal Their Mounting Troubles from Investors and Bank of America

25. Cioffi and Tannin, on behalf of BSAM, launched the High-Grade Fund in October 2003. BSAM kept 20% of the profits generated by the High-Grade Fund plus 2% of the net assets under management. The High-Grade Fund was central to the financial performance of BSAM: BSAM's fees from managing that Fund alone reportedly accounted for 75% of BSAM's total revenues in 2004 and 2005.

26. Cioffi, Tannin, and McGarrigal, on behalf of BSAM, launched the Enhanced Leverage Fund in or about August 2006 and marketed it as a better version of the High-Grade Fund. The Enhanced Leverage Fund's underlying portfolio would mirror that of the

High-Grade Fund, but the Enhanced Leverage Fund would aim to generate greater returns through the "enhanced" use of "leverage," *i.e.*, money borrowed to increase the amount available for investment and thus the potential gains to be realized by that fund's investors. (The Enhanced Leverage Fund represented to investors that its additional leverage would come from Barclays Bank PLC ("Barclays"), which entered into a complex funding arrangement with that Fund.)

27. As managers of the Funds, Cioffi, Tannin, and McGarrigal worked together at BSAM's offices in New York City. Cioffi was responsible for overall strategy and risk management. Tannin was responsible for administrative issues and oversaw the structuring, funding, and documentation of deals. McGarrigal was responsible for modeling and monitoring the Funds' performance, as well as for the structuring of CDO deals (including the selection of assets to serve as collateral for CDOs).

<u>The Liquidity Problems Begin</u>

28. The High-Grade Fund began to experience serious problems with liquidity in the fall of 2006. "Liquidity" here essentially means access to cash. The Funds required liquidity to meet margin calls by lenders (i.e. requests that the funds post additional margin to their accounts with lenders or face default), to pay expenses, to satisfy investors' redemption requests (*i.e.* requests to withdraw from the fund and exchange a stake in it for cash), and to make new investments.

29. The Funds had previously obtained a significant amount of their liquidity through trades with BSAM's sister company Bear, Stearns & Co. Inc. ("BS&Co."). Many of these transactions were repurchase agreements, or "repos." A repo is a financing transaction in which the provider of the repo takes title to the asset serving as collateral. The party

receiving financing sells the asset to the provider of the financing and commits to repurchase the asset at some later time for a price higher than the sale price. A repo (like any financing) increases the recipient's outstanding obligations and thus its leverage.

30. BS&Co. was an important source of liquidity for the Funds. In trading with BS&Co., however, Defendants failed to comply with certain procedures and restrictions applicable to transactions between related parties. Accordingly, in August 2006, Bear Stearns imposed a moratorium on trading between the Funds and BS&Co. This moratorium impeded the Funds' ability to obtain further liquidity.

31. More generally, as emerged only later, Defendants' entire investment strategy – which involved enormous leverage and thinly-traded assets – was unsustainable. As *Business Week* put it in an October 22, 2007 article by Matthew Goldstein and David Henry: "[Cioffi's] investment strategy turned into subtraction soup: The more he ate, the hungrier he got. The funds' voracious buying of lightly traded bonds drove down their yields, meaning Cioffi's team had to buy more and more of them to boost returns. That meant more borrowing."

32. On September 17, 2006, Tannin sent Cioffi an e-mail titled "Liquidity game plan," warning that BSAM needed to figure out how to increase liquidity for the High-Grade Fund:

> I think we need to have a very specific idea of how we would raise 100mm in liquidity over a sixty day period. . . . While I do not 'expect' this – I think it is possible.

> …We also need to now factor in bear principal trade issues in terms of liquidity.

> And just to complete the thought we also need to look at where we plan to finance our positions as we ramp up the levered fund.

33. Cioffi responded to Tannin on the same day:

As far as liquidity we have the repo on the Rampart equity and if my numbers are correct after rampart we will have over $200M of liquidity. So unless we go into a full unwind of the short term liquidity is not an issue. What we need to figure out is how to get the majority of our LPs [*i.e.*, the investors in the High-Grade Fund] into the enhanced fund. That will take some time but once we do that we have an easy liquidity source and that's Barclays.

34. In other words, Cioffi and Tannin already knew as early as September 2006 that the High-Grade Fund's longer-term outlook was so dismal that it could be alleviated only by transferring the majority of the High-Grade Fund's investors into the new Enhanced Leverage Fund, for which they expected Barclays to provide the liquidity.

35. Tannin responded to Cioffi's email the same day, proposing three different ways to "roll our investors into Barclays":

1. Force them (I'm not really serious)
2. A sell out and sell in. This is sticky because it forces us to raise liquidity in [the High-Grade Fund] – and over time we would increase the more illiquid investments.
3. We do an in-kind exchange. The issue here is that we have to get a "real" mark on all the assets. I will speak to Jerry again about this.

36. Cioffi replied the same day by suggesting that Defendants shut down the High-Grade Fund and ask its investors to convert to the Enhanced Leverage Fund:

What I was thinking was to build up 6 [months] of returns then send a letter to all the remaining investors and tell them we are closing the [High-Grade Fund] and ask everyone to convert to [the Enhanced Leverage Fund]. We'd have to handle it like we did thru an exchange of assets[.] I would not want to have to sell everything. This is the riskiest way to go because you know some [investors] will not convert but I feel comfortable that we can get almost all of them to.

37. On September 19, 2006, McGarrigal wrote an email to Cioffi, Tannin, and a BSAM trader named Joanmarie Pusateri reflecting the fact that the termination of the repo trading relationship with Bear Stearns imperiled the Funds' liquidity:

Do we have an official mandate to terminate our relationship with Bear? This hurts our investors as it eliminates a repo counterparty (reducing liquidity) and eliminates a source of trading secondary CDOs. Bear is among the best (reducing liquidity) and further eliminates a source for assets. . . . All bad for our investors. I think we should work hard to put in place all necessary compliance procedures to allow us to continue operating as we have to date.

### Defendants Conceal Liquidity Problems and Redemptions from the Outside World

38. But while Defendants were privately becoming increasingly desperate about the liquidity problems at the Funds, they failed to disclose those problems to Bank of America, to other liquidity providers, or to their investors. To the contrary, Cioffi assured investors that the Funds would be immune from the softening credit market and would earn a profit. For instance, in February 2007, Cioffi reportedly said to his investors: "We're going to make money on this . . . We don't believe what the markets are saying."

39. Yet February in fact was a difficult month for the Funds. On March 1, 2007, according to the SEC complaint, Cioffi told an economist on his team: "Don't talk about [the Funds' February results] to anyone or I'll shoot you." And on March 2, 2007, according to the indictment, Cioffi convened a small informal meeting attended by Tannin and McGarrigal at which Cioffi remarked on how difficult February had been for the Funds, and stated that the Funds had averted disaster. Before ending the meeting, Cioffi directed the attendees not to discuss the Funds' grave condition with anyone else.

40. Throughout March 2007, according to the indictment and SEC complaint, Cioffi consistently expressed to Tannin and apparently McGarrigal that he was deeply concerned about the financial health and risk of collapse of the Funds, particularly because of their exposure to the subprime mortgage market. On March 3, Cioffi sent an email to Tannin saying "the worry for me is that sub prime losses will be far worse than any thing people have modeled . . . ." By March 11, Cioffi had already concluded that "[w]e will be hard

pressed to be up in [the High-Grade Fund] or [the Enhanced Leverage Fund] in March."
Four days later Cioffi wrote to the economist: "I'm fearful of these markets. Matt [Tannin]
said it's either a melt down or the greatest buying opportunity ever, I'm leaning more
towards the former. As we discussed it may not be a melt down for the general economy but
in our world it will be." Towards the end of the month, Cioffi indicated to a colleague that
he was "sick to my stomach over our performance in march."

41. In March 2007, Cioffi initiated the withdrawal of $2 million of his own money
from one of the Funds. Cioffi did so without the knowledge of the Funds' investors, even
though investors repeatedly asked about Cioffi's personal investments in the Funds.
Moreover, according to the SEC complaint, BSAM's sales force represented to investors
during March and April that the Funds' managers were adding to their investments.

42. Defendants had serious concerns about the Funds' liquidity and risk of collapse.
According to the indictment, internal BSAM reports showed throughout March 2007 that the
High-Grade Fund was in an extremely precarious position. Cioffi, Tannin, and McGarrigal
were so concerned about the High-Grade Fund that they discussed the possibility of merging
it with the Enhanced Fund.

43. Defendants' liquidity problems were compounded by a series of significant
redemption requests. From March 1 to May 3, according to the indictment and SEC
complaint, thirteen investors, including two of the largest investors in the Funds (and of
course, Cioffi himself), requested approximately $100 million worth of redemptions.

44. Yet Defendants remained optimistic in their discussions with investors and with
brokers whose clients invested in the Funds. In March 2007, Tannin told investors that "we
wouldn't have made money in February if we were long, or overexposed, to subprime."

(The High-Grade Fund reported a return of approximately 1.5% in February.) Tannin went on to say that he was putting more of his own money into the Funds, and that "it was a very bad time to redeem." According to the indictment and SEC complaint, Tannin, despite telling multiple salespersons for the Funds in March 2007 that he was adding more of his own money to the Funds, never did so.

45. On April 22, according to the indictment and SEC complaint, Tannin, in an effort to circumvent Bear Stearns' email system, sent an email from his personal email account to the personal email account of Cioffi or his wife and, apparently, to McGarrigal's personal email account. Tannin wrote that "over the last few months" he had believed that the Funds should either be closed or "get very very aggressive." Tannin asked "Who do we talk to about this? . . . Outside counsel? (And here we have to be careful because our outside counsel is BSAM's counsel. NOT our counsel – This is another very big issue we at least need to think about.[)]"

46. The next day, according to the indictment, Tannin cautioned Cioffi not to disclose to BSAM's employees the extent of the Funds' troubles: "I think we should be conscious of statements like 'if we sold all the assets at the mark' while we are on the desk. . . . I think it is important to keep everyone else as focused as possible."

47. Meanwhile Defendants contrived to keep their concerns and the troubling facts about the Funds well hidden. On April 25, 2007, for example, Cioffi, Tannin, and McGarrigal held an earnings conference call for investors and others. On this call, Cioffi estimated that the Funds would have a loss of less than 1% for April, and added that "[a]t this point in time, the [Enhanced Leverage Fund] has significant amounts of liquidity." Cioffi also stated that BSAM had "a plan in place that will get the funds back on track to

generate positive returns." Tannin added: "we're very comfortable with exactly where we are. . . . [T]he structure of the Fund has performed exactly the way it was designed to perform. . . . [T]here's no basis for thinking this is [a] disaster."

48. During this conference call Defendants also commented on redemptions. Cioffi stated that "[t]he next big redemption date would be June 30th, and as of now, I believe we only have a couple million of redemptions for the June 30 date." Similarly, on May 3, 2007, Tannin stated to a repo provider that the Funds anticipated no large redemptions.

49. Defendants knew that these optimistic representations – the themes of which Cioffi and Tannin repeated in numerous meetings and telephone calls with investors in late April and throughout May – were false. Both Funds had in fact suffered dramatic losses in April, as was publicly revealed only in June 2007. And the Funds in fact were facing significant redemptions for April 30 and May 31 (June 30 was therefore hardly the "next big redemption date"), as well as for June 30, when a great deal more than "a couple million" was scheduled to be redeemed. Indeed, according to the SEC complaint, at this point the total outstanding redemption requests for May through August of 2007 was $110 million.

50. Defendants lied about redemptions because they knew that news of the redemptions would trigger further redemptions by investors as well as margin calls by repo providers, and that these events could cause the Funds to collapse.

51. Indeed, BSAM and the individual Defendants knew – well before they consummated the transactions that are the subject of this lawsuit – that the Funds' liquidity problems were so severe that they threatened the Funds' viability. On May 13, 2007, according to the SEC complaint, Cioffi wrote to Tannin and McGarrigal: "I think . . . the

[Enhanced Leverage Fund] has to be liquidated which seems to be somewhat certain given the redemption activity."

52. BSAM's corporate parent and affiliates also knew of this liquidity crunch. In or about April, BS&Co. ended its moratorium on transacting with the Funds and, at BSAM's request, extended $290,000,000 of repo financing to the Enhanced Leverage Fund in order to provide the Fund with short-term liquidity until the Funds could close the CDO-squared Transaction.

<u>The Situation Becomes More Critical</u>

53. By mid- to late May, the Funds had deteriorated so extensively that Defendants were developing an undisclosed plan to sell the Funds to a private equity firm, Cerberus Capital Management. By this time, higher-level executives at BSAM and BSC had joined Cioffi, Tannin, and McGarrigal in making important decisions about the Funds.

54. On May 26, 2007, Tannin sent an email to Cioffi and McGarrigal (emphases added):

> Two years ago Ralph went to see [PIMCO executive and investment author] Bill Gross and came back with the following "Gross" observation: when involved with a trade – look around the room and determine who the chump is – and if the chump is not clear to you – assume it is YOU.
>
> Well – as I sit here thinking through the Cerberus plan that we will present to Cerberus, Warren, Rich Marin and you guys – it is easy for me to see that I am the chump. Consequently I must assume that anything I could possibly think or understand is understood better and faster by the rest of the group.
>
> 1.  Time is of the essence. The best outcome (by far) is one that we can effectuate quickly. . . .
>
> We have:
>     *-2 hedge funds (1.5 billion on capital) that are in danger of a wipe out because of a lack of liquidity.*
>     -1 hedge fund kicking ass . . .
>     -other hedge fund ideas . . .

-DPC
-Everquest
-CDO management
-SIV type things
-a very good team
-almost the necessary systems – but we have the knowledge of what that system
is and we are on the road to a solution
(*this may not sound great – but I believe there is NO ONE out there who has put it
all together.*

The first thing requires capital—and the next seven things are worth a lot . . .

The key (of course) is the first thing.
. . .
So – cerberus (and I must note here that my idea could be "sold" to another cerberus
like entity) – will "buy" the HG hedge funds and get the rest (price and value to be
determined).

What exactly is cerberus buying – and what price must they pay?

They will be buying the hedge funds which have a certain value that can't currently
be monetized because of market illiquidity.

What exactly can be monetized – and how quickly? – I guess this would have to be
done for both funds

Let's forget about upside for a moment.
. . .

This is the problem. There is simply no market. Too many variables. So you can't
sell because the only bid would be below someone's educated low ball guess . . . .

55. As this highly revealing email shows, Defendants understood precisely how
serious the situation was – and that no one outside Bear Stearns could "put it all together."
"Rich Marin" is Richard A. Marin, then the chief executive of BSAM and Cioffi's boss.
"Warren" is Warren Spector, co-president and chief operating officer at BSC, to whom
BSAM management reported. In other words, by this point Cioffi and his colleagues were
involving the head of BSAM and one of the top three executives at BSC in the fate of the
Bear Stearns Funds and the desperate search for an exit strategy.

56. Marin and Spector were enlisted to manage the emerging crisis and oversee BSAM's response to it. Marin and Spector were fully aware of the serious problems at the Funds being concealed from the outside world.

57. The liquidity crises at the Bear Stearns Funds and their impending collapse were precisely the types of events that, as set forth in the Engagement Letter, would reasonably be expected to impair Bank of America's ability to market the Securities issued in connection with the CDO-squared Transaction, assuming the Bank would even have chosen to go forward with the CDO-squared Transaction if advised of the Funds' true situation. After all, if potential investors in the Securities knew that the Collateral Manager for the CDO-squared Transaction had been mismanaging its own hedge funds, it would be far more difficult, if not impossible, for Bank of America to market the Securities.

58. These developments were also precisely the type of event that would reasonably be expected to effect a material adverse change in the business, properties, financial condition or prospects of BSAM. Like any asset manager, BSAM's revenues are based on the amount and performance of the assets it manages. Accordingly, a precipitous decline in the performance of two of its largest and most prominent Funds would severely damage BSAM economically. Moreover, there would be adverse reputational consequences to BSAM if the Funds performed poorly. This reputational harm would impair BSAM's ability to maintain the level of assets under management, to attract new investors to existing funds or open new funds. Accordingly, BSAM's business and properties, as well as its financial condition and prospects, all were clearly threatened in the spring of 2007.

59. Defendants, however, did not reveal these developments to the Bank.

### III. Defendants' Deception Leads Bank of America To Participate in the Securitization Transaction

60. Defendants wanted to enter into the CDO-squared Transaction with Bank of America because they were desperate for the liquidity it would provide. Defendants also believed that a large influx of cash might help to save their professional reputations as successful asset managers, as well as their employment. At some point before May 22, 2007, Defendants Cioffi, Tannin, McGarrigal, and others had agreed amongst themselves to use deceptive means against the Bank, as well as the CDO-squared Issuer, to try to rescue the Funds.

61. At a certain point the CDO-squared Transaction was "priced", that is, the economic terms were agreed to. The transaction was thereafter scheduled to close on May 24, 2007 – two days before Tannin's May 26 email reminding his colleagues that the Funds were "in danger of a wipe out." In the weeks and months leading up to May 24, various individuals at Bank of America were in frequent – in some cases, constant – contact with Cioffi, McGarrigal, Tannin, and others at BSAM. Defendants, however, did not reveal to the Bank the information in the May 26 e-mail.

62. In the absence of information about the Bear Stearns Funds' dire financial condition (which Defendants chose not to disclose) the Bank agreed, in order to facilitate the closing of the CDO-squared Transaction, to purchase and hold for two days before closing approximately $2.89 billion of assets that would be sold to the Issuer as the initial Collateral at closing. On May 22, 2007, BAS purchased the $2.89 billion of assets earmarked to become the Collateral from the Funds. At that point, the Bank (as Defendants well knew) bore the risk of any deterioration in value of those assets, as well as the risk that the transaction would not close.

63. Bank of America would not have agreed to purchase $2.89 billion of assets before closing had it known of the Funds' precarious financial condition. Only Defendants were in possession of and had access to information about, among other things, the financial health of the Funds, including the liquidity problems, the redemption requests, and the Funds' inability to fulfill those requests. That information was not accessible to the Bank.

64. Defendants knew that, had they made accurate disclosures about the condition of the Funds, such disclosures would have jeopardized the CDO-squared Transaction, which Defendants were depending on to provide liquidity to the Funds. Defendants knew that the Bank was proceeding on the basis of information that Defendants knew to be incomplete and incorrect.

65. Defendants thus managed, through deception, to sell the $2.89 billion of Collateral to the Bank on May 22. Late in the afternoon on May 23 (less than one day before the CDO-squared Transaction was scheduled to close), Cioffi called an employee in the Bank's structured securities group to tell him that BSAM would soon be sending a letter concerning redemption requests in one of the Bear Stearns Funds. Cioffi represented that BSAM was not required to send notice of the redemptions, and that BSAM was doing so only as a courtesy because Bank of America and BSAM were such good partners.

66. At this point the most senior bankers at Bank of America with responsibility for the CDO-squared Transaction were on a flight to New York from London, where they had been attending a conference, and thus could not be reached by the Bank employee whom Cioffi had called. On information and belief, Defendants were aware of that fact.

67. Defendants also knew that the Bank was under pressure to close the CDO-squared Transaction because the Super-Senior Notes were scheduled to be marketed to investors beginning in the morning of May 24.

68. Defendants had been aware of the redemption requests at both Funds for some time and were anticipating that those requests would continue. (See paragraph 51 above; by May 13 at the very latest, Cioffi recognized, and had told Tannin and McGarrigal, that the level of redemption requests would necessitate liquidating the Enhanced Leverage Fund.) Yet Defendants deliberately concealed all such information until after pricing had occurred, after Bank of America had purchased $2.89 billion worth of Collateral to facilitate the closing, and precisely when key decision-makers were unavailable and the Bank was imminently preparing to market the Super-Senior Notes.

69. Even then Defendants disclosed only that the Enhanced Leverage Fund had received redemption requests. Defendants failed to make any disclosures about the redemption requests at, and precarious financial condition of, the High-Grade Fund, or about the additional requests that Defendants were anticipating for both Funds.

70. At 6:30 p.m. on May 23, a BSAM Managing Director named Patrick Fleming emailed a letter to the Bank's structured securities group (copying Cioffi, Tannin, and McGarrigal). The letter was signed by Cioffi for BSAM and stated as follows:

> I write to advise you that the [Enhanced Leverage Fund] which, as you know, we manage, and is the source of approximately 65% of the initial collateral portfolio for [the Issuer], has recently received a large number of requests for redemption from its investors. As a result we expect redemptions in the months of June and July of approximately $324 million, representing 49.92% of the total equity capital of the fund. While we have not determined how to satisfy such redemption requests, we are considering all available options consistent with the best interests of the investors in the fund, including without limitation: meeting redemption requests through asset sales; implementing a gate on redemptions . . . ; and/or an orderly wind down of the fund.

> We believe that the foregoing developments will not materially affect our ability to perform our obligations as collateral manager of [the Issuer], and we further believe that the foregoing developments will not have a material adverse effect on our business, properties, financial condition or prospects. . . .

71. This letter was false and misleading, for at least three reasons. First, Cioffi and BSAM knew the full extent of their problems and accordingly *did* believe, or reasonably should have believed and disclosed, that, for reasons discussed above and below (see paragraphs 58 and 119-122), the developments reported in the May 23 letter would materially adversely affect BSAM's business, properties, financial condition, or prospects.

72. Second, the May 23 letter was misleading in that Cioffi and BSAM omitted to disclose that the High-Grade Fund (which the letter failed to mention) was likewise in dire straits and was also receiving requests for redemptions.

73. Third, Cioffi and BSAM, in echoing the language of the Engagement Letter (see paragraph 22 above) and thus representing that the types of triggering events set forth in the Engagement Letter had not occurred, omitted to disclose that events of the type described in clause (iii) of section 4(c) had occurred and were occurring. That is, as Cioffi and BSAM knew, recent occurrences and changes would in fact, for reasons explained above (see paragraph 57 above), "reasonably be expected to impair" Bank of America's "ability . . . to market the Securities issued in connection with the Transaction."

74. On the morning of May 24, the day the CDO-squared Transaction was scheduled to close, Cioffi spoke to members of the Bank's structured securities group. Cioffi acknowledged that he had known of the redemption requests for some time but stated that he had not advised Bank of America of the requests sooner because there was a possibility that investors would withdraw their requests. Cioffi stated that the redemptions would not

materially affect BSAM, and that BSAM was not going to unwind or liquidate the Enhanced Leverage Fund. Indeed, Cioffi stated that the May 23 letter overstated the risks that the Enhanced Leverage Fund would liquidate or wind down, and represented that those risks were actually quite low. Cioffi further downplayed the significance of the redemption information by stating that his own lawyers had advised him that he was not required to provide that information to the Bank.

75. Cioffi's oral representations to the Bank on May 23 and 24 were false and misleading. As Defendants well knew (or at the very least were reckless in not knowing), *both* the Enhanced Leverage Fund *and* the High-Grade Fund were on the brink of collapse and would soon have to be liquidated or unwound. Moreover, contrary to Cioffi's representation that the May 23 letter overstated the risk that one of the Funds would be liquidated, the May 23 letter actually *understated* the extent of BSAM's problems.

76. Also on May 24, a Bank official told Cioffi that Bank of America would not close the CDO-squared Transaction unless, among other things, BSAM gave the Bank certain approval rights regarding the Collateral Manager's selection of assets to be purchased following closing. In particular, the Bank required BSAM to obtain the Bank's consent before the Issuer could purchase certain high-risk assets. These rights were a means of protecting the interests of the Bank as provider of a put option on the Super-Senior Notes.

77. Cioffi, on behalf of BSAM, agreed with the Bank official that the Bank would have the right to veto the Collateral Manager's purchase of any security falling into one of the high-risk categories that Cioffi and the Bank official had discussed. Cioffi further represented that he would sign, on behalf of BSAM, a letter memorializing the terms on which he and the official had agreed (the "Side Letter"). The Bank fully expected Cioffi, on

behalf of BSAM, to sign the Side Letter shortly after the CDO-squared Transaction closed, as he had promised.

78. On May 24, 2007, Bank of America closed the CDO-squared Transaction, which included the put option from BANA on the approximately $3.2 billion worth of Super-Senior Notes.

79. Cioffi never did sign the Side Letter. Instead, after closing McGarrigal and Fleming, on behalf of BSAM, notified Bank of America's structured securities group that BSAM intended to cause the Issuer to purchase, among other things, a set of assets known as "Timberwolf." Timberwolf, which at the time was owned by the Enhanced Leverage Fund, fell into one of the high-risk categories as to which BSAM had promised to give the Bank approval rights.

80. The Bank told Cioffi that Bank of America objected to BSAM's proposed purchase of Timberwolf. BSAM disregarded that objection and caused the Issuer to purchase the Timberwolf assets for approximately $80 million. Timberwolf has since lost all of its value.

**IV.     BSAM Violates Its Obligations as Collateral Manager**

*Defendants Violate Their Fiduciary Duties to the Issuer*

81. As Collateral Manager to the Issuer – in effect, the Issuer's asset manager – BSAM and its officers owed the Issuer fiduciary duties.

82. Cioffi, Tannin, and McGarrigal (and thus BSAM) knew that, in transferring the initial $2.89 billion of assets that were to become the Collateral to Bank of America on May 22, they were selecting assets for the Issuer, because the Bank would be transferring the same assets to the Issuer two days later.

83. As part of its fiduciary duty to the Issuer, BSAM was required to disclose, to the Issuer or to the Bank, before the Bank purchased the $2.89 billion of Collateral that the sources of the Collateral (i.e. the Bear Stearns Funds) were on the brink of collapse. This was material information that would have affected the Bank's, and the Issuer's, decision to purchase the $2.89 billion of Collateral.

84. Instead, BSAM, Cioffi, Tannin, and McGarrigal remained silent. In causing the Issuer to purchase assets from the two distressed hedge funds, Defendants knowingly placed their own interests (and those of the Bear Stearns Funds) ahead of those of the Issuer, in violation of their fiduciary duties.

*BSAM Breaches A Covenant To Obtain Consent for Conflicts of Interest*

85. On or about May 24, BSAM entered into a Collateral Management Agreement with the Issuer.

86. As part of the Collateral Management Agreement (which is attached hereto as Exhibit B), BSAM committed to follow certain procedures in the event that it was acting on both sides of a transaction to which the Issuer was party. Section 5(c) of the Collateral Management Agreement provides:

> The Collateral Manager may [cause the Issuer] to acquire [Collateral] from . . . the Collateral Manager or any of its Affiliates . . . or any account or portfolio managed by the Collateral Manager or any of its Affiliates . . . ; on condition that (i) the board of directors of the Issuer has received from the Collateral Manager such information relating to such acquisition . . . as the board of directors may reasonably require and has approved such acquisition . . . and the price in advance . . . . In addition to the [preceding], any acquisition . . . made pursuant to the first sentence of this clause (c) will also be made in compliance with the [Investment] Advisers Act [of 1940].

87. Section 206 of the Investment Advisers Act of 1940 (the "Act") makes it unlawful for an investment adviser:

> acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.

88. The Act, in other words, forbids an investment adviser from engaging in certain types of transactions with (or on behalf of) the adviser's client that present conflicts of interest, unless the adviser provides written disclosure and obtains the client's consent.

89. For purposes of the Act, BSAM, as Collateral Manager, was an "investment adviser" and the Issuer was a "client."

90. Accordingly, to the extent BSAM, as Collateral Manager, caused the Issuer to engage in conflicted transactions falling with the scope of Section 206 of the Act, BSAM was required to provide written disclosure to, and obtain consent from, the Issuer.

91. Pursuant to section 5(c) of the Collateral Management Agreement, BSAM was also required to provide the Issuer's board of directors such information relating to acquisitions from BSAM-affiliated entities as the board of directors may reasonably require. Under section 5(c), the conflicted transactions could not take place unless the Issuer's board of directors approved the transaction and the price in advance.

92. After entering into the Collateral Management Agreement, BSAM, as Collateral Manager, engaged in conflicted transactions falling within the purview of section 5(c) of the Collateral Management Agreement and Section 206 of the Investment Advisers Act without providing the necessary disclosure and obtaining the necessary consent.

93. In particular, after the closing of the CDO-squared Transaction, as the Bear Stearns Funds became increasingly desperate in late May and June, and BSAM was trying to unload the Funds' assets to satisfy their need for liquidity, BSAM caused the Issuer to purchase many assets from the Bear Stearns Funds. The Bear Stearns Funds and the Issuer's portfolio of Collateral were of course both managed by BSAM, thus triggering section 5(c) of the Collateral Management Agreement and Section 206 of the Act.

94. Had BSAM complied with its disclosure obligations, the Issuer would have withheld consent to one or more of these transactions on the grounds – increasingly apparent in the first two weeks of June – that securities purchased from the Bear Stearns Funds were of questionable value and certainly were not worth the price that BSAM set for them.

95. Instead, BSAM caused the Issuer to acquire deteriorating assets that the Issuer had a right to refuse, and if given the opportunity would have refused or would have acquired only on materially different terms.

96. The assets acquired in violation of the Act and the Collateral Management Agreement have lost substantially all of their value.

**V.    Defendants Improperly Extract Short-Term Financing from Bank of America**

97. The Funds had a history of engaging in repo transactions with BAS. As part of Defendants' scheme to obtain liquidity from Bank of America, and in furtherance of their plan to use deceptive means toward that end, Defendants continued to obtain repo financing from BAS long past the point that they knew their Funds were on the verge of collapse.

98. Each repo transaction with BAS was governed by one of two master repurchase agreements between the Funds and BAS. The master agreements – which Tannin signed on the Funds' behalf – are attached hereto as Exhibit C.

99. Pursuant to its agreement, in connection with each repo with BAS, the Enhanced Leverage Fund represented, warranted, and agreed that:

> No material adverse change in its financial condition has occurred since the date of its most recent financial statements, and such financial statements are complete and correct and fairly present its financial condition . . . .

100. Similarly, pursuant to its master repurchase agreement, the High-Grade Fund represented and warranted in connection with each of its repos with BAS that:

> No material adverse change in [its] financial condition has occurred since the date of the most recent financial statements furnished by [the High-Grade Fund] to [BAS], and such financial statements are complete and correct and fairly present [the High-Grade Fund's] financial condition . . . .

101. Defendants caused the Funds to continue to enter into repo financings with BAS in late May 2007, including a $750 million repo financing on or about May 24 for the Mezzanine Notes issued in the CDO-squared Transaction.

102. The Funds were able to obtain repo financing from BAS only (1) through false representations and warranties in the master repurchase agreements that there had been no material adverse change in the financial condition of the Funds as of the date of the repo financings, and (2) by omitting to disclose what the Funds' officers (that is, Cioffi, Tannin, and McGarrigal) knew (and Bank of America did not know), namely that the representation about the financial condition of the Funds was false and that the Funds' financial condition had changed dramatically for the worse.

103. The Funds, and Defendants, knew that the representations and warranties were false as to some or all of the repo transactions entered into in May of 2007. For much or all of the time relevant here, the Funds and Defendants were in possession of information regarding the Funds' precarious financial condition, including information about serious liquidity problems, about redemption requests made by the Funds' investors, and the

inability of the Funds to fulfill those requests. The information that Defendants were in possession of was material because it bore on the Funds' ability to repay BAS for the repo financing and the value of assets used as collateral. Bank of America did not have access to this information and was proceeding, as Defendants knew, in the mistaken belief that the Funds' financial condition had not suffered any material adverse change.

104.    Defendants knowingly caused these false representations and warranties to be made, knowingly failed to correct these representations and warranties, and concealed and omitted to disclose the truth, in order to induce Bank of America to approve repo financings for the Funds. Defendants were acting pursuant to and in furtherance of their agreement to deceive Bank of America into supplying liquidity.

105.    When the two Bear Stearns Funds collapsed in mid-June, they owed BAS significant amounts on numerous outstanding repo transactions.

**VI.    The Bear Stearns Funds Collapse**

106.    Defendants concealed and manipulated the financial condition of the Funds until it was no longer possible to do so. Despite having told investors and others on an earnings conference call in late April, *see* paragraph 47 above, that the Funds were expected to have a loss of less than 1% for April, BSAM represented in a letter to investors dated May 15 – as well as in a report sent to Bank of America in May – that the Enhanced Leverage Fund was down 6.5% for April.

107.    But Cioffi and Tannin knew that even that number significantly understated the decline. BSAM's Pricing Committee, a group of professionals that oversaw the calculation of the Funds' valuation, determined that the April 2007 return was negative 18.97%. On May 31, Tannin sent Cioffi an email asking, in reference to one or more

investors, whether "we give them the -6.5 april or the larger down april?" Apparently recognizing that an e-mail exchange of this kind would leave another tell-tale sign of Defendants' deception, Cioffi replied, "that one deserves a phone call."

108.    Later that same night, Tannin debated with Cioffi via email about how much information to show about "where the losses have come from." Tannin wrote: "On the one hand it focuses attention on how bad these bonds have become – and will cast doubt upon our initial strategy where we leveraged these bonds so much – but on the other hand – it might explain the large loss – that it was the result of what amounts to a single very bad decision."

109.    Defendants also continued to conceal the facts about redemptions in an attempt to stave off collapse. On May 30, according to the indictment, Cioffi told an investor in an email that "so far we have talked any June redemptions of note (other than about $5 M) to pull their redemptions," when in fact, as Cioffi knew, the outstanding redemption requests by this point far exceeded $5 million, and many investors had not withdrawn their June redemption requests.

110.    In the morning of June 6, 2007, BSAM trader Joanmarie Pusateri called BAS' repo department to tell it that, according to rumors, an article would soon appear reporting that BSAM had suspended redemptions in the Enhanced Leverage Fund, but that the article was untrue; redemptions were not being suspended. On information and belief, Pusateri had been instructed to make this call by Cioffi, Tannin, or McGarrigal. The article was published in *Hedge Fund Alert* on June 6, after the conversation between Pusateri and BAS' repo department, and despite Pusateri's denials, the article correctly reported that BSAM was suspending redemptions. The following day, BSAM publicly acknowledged

what Defendants had concealed for some time: that the Enhanced Leverage Fund would be unable to satisfy investors' redemption requests.

111.    Around the same time Tannin and Pusateri had called Barclays and also told it that BSAM would not suspend redemptions in the Enhanced Leverage Fund and that the Fund was operating normally and could meet all margin calls.

112.    On or about June 7, Cioffi told Bank of America that the Enhanced Leverage Fund was up approximately 1.7% in May. However, on or about June 8, BSAM emailed a report to Barclays claiming that the Enhanced Leverage Fund experienced a 2.7% positive return in May. It would later emerge that the Enhanced Leverage Fund declined 38% in May.

113.    Meanwhile, Defendants knew that the High-Grade Fund was also in peril, not least because it invested in the same types of assets as the Enhanced Leverage Fund. As *Business Week* put it: "If the Enhanced Fund started dumping its holdings to pay back Barclays, that could send the prices of the securities in the High-Grade fund tumbling. A cascading event could have brought down both funds."

114.    On information and belief, Defendants were receiving redemption requests for the High-Grade Fund that they could not satisfy, and around this time also suspended redemptions in that Fund.

115.    The inevitable finally happened in the middle of June 2007. Creditors of the Funds made "margin calls" with respect to the repo financings. (Here, a "margin call" is a demand to BSAM to post additional margin due to the decline in value of the securities serving as collateral.) Over the course of one or two weeks, BSAM was forced to liquidate about $5 billion worth of the Funds' holdings.

116.    The rushed sale or attempted sale of the Funds' assets by BSAM and the Funds' creditors flooded the market with mortgage-backed securities, drove down the prices of these assets, and caused further deterioration of the market for them.

117.    During this time, Richard Marin (BSAM's chief executive officer) and the senior management of BSC, including co-president Warren Spector, chief executive officer James Cayne, chief financial officer Samuel Molinaro, and co-president Alan Schwartz, were apprised of what was happening at BSAM. These executives made or participated in many of the major strategic decisions affecting BSAM and the Funds. Marin and Spector were negotiating directly with financial institutions that served as the Funds' major repo counterparties and creditors.

118.    On July 17, 2007 BSAM informed investors that "there is effectively no value left for the investors in the Enhanced Leverage Fund and very little value left for the investors in the High-Grade Fund as of June 30, 2007." The Funds entered liquidation proceedings in the Cayman Islands on or about July 31, 2007.

119.    The demise of the Funds was devastating to BSAM and to Bear Stearns generally. As the New York Times reported on June 29, 2007, Bear Stearns' "carefully honed reputation for sound risk management and cautious investing has suffered what [BSC chief executive officer James E. Cayne] regards as a 'body blow of massive proportion' from the near collapse of two hedge funds run by its asset management division." In the wake of the fiasco, Marin and Spector were dismissed. Cioffi was relieved of his management duties in June and was subsequently terminated.

120.    On information and belief, BSAM and its financial health were severely damaged by the collapse of the Funds. BSAM's revenues are based on the amount and

performance of the assets it manages. When the performance and asset value of the Funds plummeted, BSAM suffered huge economic harm. It was foreseeable that the collapse of the Funds would have this effect on BSAM.

121.    Moreover, the collapse of the Funds has greatly damaged BSAM's reputation as a successful asset manager known for sophisticated risk management practices. Actual and potential investors in BSAM's hedge funds evaluated BSAM's competence as an asset manager based on the performance of the Funds, and inextricably linked the former to the latter. Accordingly, following the collapse of the Funds, BSAM's ability to maintain its current levels of assets under management and to raise new funds – and thus its source of revenue as an asset manager – were severely damaged. Moreover, it was foreseeable that the collapse of the Funds would impair BSAM's ability to maintain, raise, and manage funds.

122.    BSAM has suffered a material adverse change in its business, properties, financial condition, and prospects, and the Defendants concealed developments at the Funds throughout March, April, May and June 2007 that would have reasonably been expected to bring about that result.

## VII.    The Collapse of the Funds Causes Significant Losses to the Issuer and to Bank of America

123.    The collapse of the Funds immediately and foreseeably drove down the value of the securities in the Issuer's portfolio. As the Funds collapsed, BSAM and the Funds' repo counterparties sold the Funds' holdings into the market, thus increasing the supply of CDOs and driving down the prices of an already thinly-traded asset class. The rushed nature of those sales further contributed to the market-wide decline in CDO prices. Additionally, BSAM was one of the market's largest buyers of the types of CDOs owned by the Issuer. (In May of 2007, the Enhanced Leverage Fund reportedly owned approximately 9% of all

outstanding CDO-squared securities in the United States.) The collapse of the Funds thus meant significantly less demand, and therefore significantly lower prices, for those securities. Finally, the news that a respected asset manager with a focus on mortgage-related securities was in trouble contributed to the market's reassessment of the riskiness and thus the attractiveness of those securities.

124.    The Issuer was damaged by the drop in value of the securities in its portfolio.

125.    So too was the Bank. When the market for the Super-Senior Notes dried up in June 2007, BANA stepped in and, consistent with its obligations under the put option, bought all the Super-Senior Notes. The Super-Senior Notes have lost substantial value since the Bear Stearns Funds collapsed.

126.    Bank of America similarly suffered injury with respect to the repo financings. The demise of the Funds left Bank of America holding securities that had served as collateral for the Funds' repo financings with BAS. For the reasons described above, these securities lost much if not all of their value.

127.    The losses experienced by the Issuer and Bank of America were the foreseeable consequence of Defendants' misconduct.

128.    BSAM had undertaken to notify Bank of America of developments or events that would materially affect BSAM's business or prospects, or would reasonably be expected to have that result, or would reasonably be expected to affect Bank of America's ability to market the Securities. These contractual obligations were triggered when the Bear Stearns Funds were facing serious liquidity problems by at least the spring of 2007.

129.    When Defendants misrepresented, understated or omitted to disclose the deteriorating situation at the Funds, Defendants were manipulating and withholding

precisely the type of information that Bank of America needed to know about (and was entitled to know about) before structuring, marketing, and providing liquidity for the CDO-squared Transaction, and that the Issuer was entitled to know about before the initial assets were selected for inclusion in the portfolio of Collateral.

130.    Had Defendants made proper and timely disclosures, Bank of America and the Issuer would have behaved very differently because they would have been concerned, first, that the poor performance of the Bear Stearns Funds, as signified by the redemptions, was an early warning sign of trouble in the market for the asset class at issue, and second, that the poor performance of the Funds cast doubt on BSAM's reputation as an asset manager and thus on its competence as Collateral Manager.

131.    The Bear Stearns Funds' precarious condition is likewise exactly the type of development that BAS needed to know about before doing any further repo transactions with the Funds. BAS insisted that the Funds warrant, in connection with each repo, that their financial condition had not recently suffered a material adverse change precisely in order to avoid advancing funds to a potentially insolvent counterparty.

132.    Had the Defendants not engaged in their pattern of deception, and had they made the required disclosures, Bank of America and the Issuer would not have entered into the transactions described herein or would have done so only on materially different terms.

## FIRST CAUSE OF ACTION
(Breach of contract – by the Bank against BSAM)

133.    Each of the foregoing allegations is incorporated herein by reference.

134.    Pursuant to section 4(c) of the Engagement Letter appended hereto as Exhibit A, BSAM undertook to notify Bank of America of the occurrence of certain events specified in section 4(c).

135.    BSAM breached the Engagement Letter in that events specified in section 4(c) occurred and continued, and BSAM repeatedly failed to notify Bank of America.

136.    Bank of America has performed all of its obligations under the Engagement Letter, and any conditions precedent to BSAM's contractual liability have occurred or been performed.

137.    As a direct, natural, and proximate result of BSAM's breach, Bank of America has suffered significant damages.

### SECOND CAUSE OF ACTION
(Fraud and fraudulent inducement, and aiding and abetting fraud and fraudulent inducement – by the Bank against all defendants)

138.    Each of the foregoing allegations is incorporated herein by reference.

139.    As detailed above, for a period of time leading up to May 22, 2007, as part of a concerted program to gain liquidity by defrauding the Bank and others, BSAM, Cioffi, Tannin, and McGarrigal concealed, withheld, and omitted to disclose material information concerning the Funds' financial condition. By virtue of BSAM's, Cioffi's, Tannin's, and McGarrigal's positions of superior knowledge regarding the condition of the Funds and their awareness that Bank of America was acting on the basis of mistaken and inaccurate information about the condition of the Funds, BSAM, Cioffi, Tannin, and McGarrigal were obligated to disclose to the Bank, well in advance of May 22, the material information that they withheld about the Funds' financial condition.

140.    The correct information about the condition of the Funds was not available to Bank of America and was peculiarly within the knowledge of Defendants.

141.    These concealments and omissions on the part of BSAM, Cioffi, Tannin, and McGarrigal were knowing, reckless, willful and / or malicious.

142.    BSAM, Cioffi, Tannin, and McGarrigal intended and expected that Bank of America would rely on these concealments and omissions.

143.    Reasonably proceeding on the basis of information that BSAM, Cioffi, Tannin, and McGarrigal knew, but Bank of America did not know, was mistaken and inaccurate, the Bank acted to its detriment by structuring and marketing the CDO-squared Transaction, just as BSAM, Cioffi, Tannin, and McGarrigal intended. Without the material concealments and omissions, the Bank would not have written the put option or purchased $2.89 billion worth of securities to facilitate the closing of the CDO-squared Transaction.

144.    Each of the defendants participated in this fraud. Each of the individual defendants had full knowledge of the fraud and the other defendants' role in it, and each assisted or encouraged BSAM in its commission of the fraud. Cioffi, moreover, assisted or encouraged McGarrigal and Tannin in committing this fraud, and McGarrigal and Tannin assisted or encouraged Cioffi. Tannin assisted or encouraged both Cioffi and McGarrigal.

145.    In committing these concealments and omissions, Cioffi, Tannin, and McGarrigal were acting pursuant to, and in furtherance of, their agreement with each other and others to deceive the Bank and the Issuer in order to gain liquidity and to preserve their professional reputations and employment.

146.    Defendants Cioffi, Tannin, McGarrigal, acting together, and at times with others, planned and agreed to deceive the Bank and the Issuer in the manner described herein. These defendants knew and understood at the time of their agreements that the Bank would be injured by their wrongful conduct.

147.    Defendants' conscious agreement to act in concert is apparent from the email correspondence among Cioffi, Tannin, and McGarrigal, samples of which are set forth in

this Complaint, and the extensive interaction among Cioffi, Tannin, and McGarrigal, including with respect to the fraud perpetrated on Bank of America and the Issuer. Tannin, Cioffi, and McGarrigal took no actions to stop the fraud because they agreed with that deception.

148.    Cioffi, Tannin, and McGarrigal had a common objective of misleading the Bank and the Issuer and withholding from them the true facts so that the Bank and the Issuer would be induced to proceed with, among other things, the CDO-squared Transaction, which Defendants regarded as critical for propping up the Funds.

149.    As a direct, proximate, and foreseeable result of Defendants' fraud, Bank of America has suffered significant damages.

## THIRD CAUSE OF ACTION
(Breach of fiduciary duty, and aiding and abetting breach of fiduciary duty – by BANA as Successor Trustee[1] against all defendants)

150.    Each of the foregoing allegations is incorporated herein by reference.

151.    The Issuer justifiably reposed its trust and confidence in BSAM with respect to the selection, management, and disposition of the Collateral owned by the Issuer. As Collateral Manager, BSAM owed a fiduciary duty to the Issuer.

152.    As a result of that fiduciary relationship, BSAM and its officers owed the Issuer uncompromising duties of care, good faith, and loyalty, as well as duties of full and candid disclosure.

153.    By causing the Issuer to purchase the initial $2.89 billion of Collateral without disclosing either to the Bank or to the Issuer the true financial condition of the

---

[1] BANA brings these claims in its capacity of Successor Trustee as successor by merger to LaSalle, the Issuer's assignee under the Indenture. See paragraph 5 above.

hedge funds from which those assets derived, BSAM, Cioffi, Tannin, and McGarrigal breached the fiduciary duties they owed to the Issuer.

154. Specifically, BSAM, Cioffi, Tannin, and McGarrigal breached their duties of care, good faith, and loyalty by putting their own interests and those of the Funds (which were advanced by selling the assets that would constitute the initial Collateral) ahead of that of the Issuer. BSAM, Cioffi, Tannin, and McGarrigal also breached their duties of full and candid disclosure by withholding from the Bank and the Issuer the material information that the Funds were facing collapse at the time that Defendants sold the initial Collateral to the Bank for transfer to the Issuer.

155. Cioffi, Tannin, and McGarrigal were the officers of BSAM who made the decisions and acted on behalf of BSAM to accomplish the breaches of fiduciary duty.

156. Cioffi, Tannin, and McGarrigal each knew of the breaches of fiduciary duty and knowingly participated in or induced them. Cioffi, Tannin, and McGarrigal each facilitated, encouraged, and assisted the acts and omissions of his colleagues that constituted the breaches of duty.

157. BSAM's, Cioffi's, Tannin's, and McGarrigal's conduct was willful, malicious, and without regard to the interests of the Issuer.

158. Had BSAM, Cioffi, Tannin, and McGarrigal not breached their fiduciary duties, the Issuer would not have acquired the Collateral for the CDO-squared Transaction on the terms that governed that transaction.

159. As a direct, proximate, and foreseeable result of Defendants' breach of fiduciary duty, the Issuer has suffered significant damages.

## FOURTH CAUSE OF ACTION
(Breach of contract – by BANA as Successor Trustee against BSAM)

160.    Each of the foregoing allegations is incorporated herein by reference.

161.    Pursuant to section 5(c) of the Collateral Management Agreement dated May 24, 2007 between BSAM and High Grade Structured Credit CDO 2007-1 (*i.e.*, the Issuer), BSAM contractually promised that it would not cause the Issuer to acquire any Collateral from BSAM itself or any of BSAM's affiliates or any account or portfolio managed by BSAM unless the Issuer's board of directors had received such information relating to the acquisition as the board of directors may reasonably require, and approved the acquisition and price in advance. BSAM promised as well that any such transaction would comply with the Investment Advisers Act.

162.    BSAM repeatedly breached the Collateral Management Agreement in that it caused the Issuer to engage in conflicted transactions involving the Bear Stearns Funds or other Bear Stearns entities without providing the contractually and statutorily mandated disclosures and obtaining the contractually and statutorily mandated approvals and consent.

163.    The Issuer has performed all of its obligations under the Collateral Management Agreement, and any conditions precedent to BSAM's contractual liability have occurred or been performed.

164.    As a direct, natural, and proximate result of BSAM's breaches of the Collateral Management Agreement, the Issuer has suffered significant damages.

## FIFTH CAUSE OF ACTION
(Fraud and fraudulent inducement, and aiding and abetting fraud and fraudulent inducement – by the Bank against all defendants)

165.    Each of the foregoing allegations is incorporated herein by reference.

166.    As detailed above, as part of a concerted program to gain liquidity by defrauding the Bank and others, the Funds falsely represented in connection with a series of repo transactions in the spring of 2007 between, on the one hand, BAS and, on the other, one of the Bear Stearns Funds, that the Funds had experienced no material adverse change in their financial condition since the date of the last financial statements either issued or furnished to BAS, and that such financial statements were complete and correct and fairly presented the Fund's financial condition.

167.    Similarly, in connection with the repo transactions, as part of their program to gain liquidity through fraud on the Bank, the Funds and Defendants concealed, withheld, and omitted to disclose to BAS material information concerning the Funds' financial condition that the Funds and Defendants were obligated, for two related reasons, to disclose to BAS. The first reason is that a full disclosure about the Funds' financial condition was necessary to correct the false representations and warranties described above. The second reason is that Defendants had superior knowledge regarding the condition of the Funds and were aware that BAS was acting on the basis of mistaken information in that regard. The correct information about the condition of the Funds was not available to BAS and was peculiarly within the knowledge of Defendants.

168.    The Funds, whose officers are the individual defendants, knew that these representations and warranties were false and knew that they were concealing material information that they were obligated to disclose. The individual defendants made the decisions and acted on behalf of the Funds to accomplish the fraud. Using their positions as the Funds' officers, the individual defendants caused the Funds to commit these

misrepresentations and omissions in order to induce BAS to enter into repo financing transactions.

169.    The individual defendants acted knowingly, willfully, and maliciously, or at the very least recklessly.

170.    Defendants intended and expected that Bank of America would rely and proceed on the basis of these misrepresentations and omissions.

171.    Reasonably relying on the misrepresentations, and reasonably proceeding on the basis of information that Defendants knew, but BAS did not know, was mistaken, BAS acted to its detriment by entering into repo financings with the Funds in the spring of 2007. But for the misrepresentations and omissions, BAS never would have entered into these repo transactions on the terms that governed those transactions.

172.    BSAM participated in this fraud. BSAM knew that the Funds were making false representations, and that the Funds and the individual defendants were omitting to disclose material information to BAS, in order to induce BAS to enter into repo transactions. As manager and investment adviser to the Funds, BSAM knowingly and deliberately furnished substantial assistance to the Funds and the individual defendants to advance the fraudulent inducement in connection with the repo transactions.

173.    In causing these false representations and omissions, Defendants were acting pursuant to, and in furtherance of, the agreement among Cioffi, Tannin, McGarrigal, and others to deceive the Bank in order to gain liquidity and to preserve their professional reputations and employment.

174.    Defendants Cioffi, Tannin, and McGarrigal, acting together, and at times with others, planned and agreed to deceive the Bank in the manner described herein. These

defendants knew and understood at the time of their agreements that the Bank would be injured by their wrongful conduct.

175.   Defendants' conscious agreement to act in concert is apparent from the email correspondence among Cioffi, Tannin, and McGarrigal, samples of which are set forth in this Complaint, and the extensive interaction among Cioffi, Tannin, and McGarrigal, including with respect to the fraud perpetrated on Bank of America. Tannin, Cioffi, and McGarrigal took no actions to stop the fraud because they agreed with that deception.

176.   Cioffi, Tannin, and McGarrigal had a common objective of misleading the Bank and withholding from it the true facts so that the Bank would be induced to proceed with, among other things, repo transactions that Defendants hoped would help to prop up the Funds.

177.   As a direct, proximate, and foreseeable result of Defendants' fraud, BAS has suffered significant additional damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

(a)   On all Causes of Action, compensatory damages in an amount to be proven at trial;

(b)   On the Second, Third, and Fifth Causes of Action, punitive damages in an amount to be determined at trial;

(c)   Attorneys' fees and costs;

(d)   Pre-judgment and post-judgment interest; and

(e)   Such other relief as this Court deems just and proper.

Dated: October 29, 2008
       Washington, D.C.

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP

By: _____
    Lawrence S. Robbins (LR-8917)
    Richard A. Sauber
    Kathryn S. Zecca
    Daniel R. Walfish (DW-5916)

1801 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
lrobbins@robbinsrussell.com

*Attorneys for Plaintiffs*