UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

|  |  |  |
|---|---|---|
| BANK OF AMERICA, NATIONAL ASSOCIATION, and BANC OF AMERICA SECURITIES LLC, | : | |
| | : | |
| Plaintiffs, | : | 08 CV 9265 (PAC) |
| | : | |
| -against- | : | |
| | : | |
| BEAR STEARNS ASSET MANAGEMENT INC., RALPH CIOFFI, MATTHEW TANNIN, and RAYMOND McGARRIGAL, | : | |
| | : | |
| Defendants. | : | |

———————————————————————

MEMORANDUM OF BEAR STEARNS ASSET MANAGEMENT INC.
IN SUPPORT OF ITS MOTION TO DISMISS

**TABLE OF CONTENTS**

Page

Table of Authorities .......................................................................................................... iii

Preliminary Statement ....................................................................................................... 1

The Relevant Facts ............................................................................................................ 5

Argument ........................................................................................................................... 11

I.    COUNT I FAILS TO STATE A CLAIM FOR BREACH OF SECTION 4(C) OF
      THE ENGAGEMENT LETTER ................................................................................. 11

      A.    The Funds' Liquidity Problems and Redemptions Did Not Trigger
            BSAM's Disclosure Obligations Under Section 4(c) ........................................... 11

      B.    BSAM Complied With Section 4(c) and Did Not Cause BOA's Claimed
            Damages ............................................................................................................. 13

II.   COUNT II FAILS TO STATE A FRAUD OR FRAUDULENT INDUCEMENT
      CLAIM ....................................................................................................................... 16

      A.    An Alleged Breach of a Contractual Obligation Cannot Give Rise to a
            Fraud or Fraudulent Inducement Claim ............................................................. 16

      B.    The Complaint Does Not Adequately Allege Fraudulent Intent ......................... 19

      C.    Plaintiffs Do Not Adequately Allege "Justifiable Reliance" or "Resulting
            Injury" ................................................................................................................ 21

III.  COUNT III FAILS BECAUSE IT IS PREEMPTED BY THE MARTIN ACT, IS
      BARRED BY SECTION 11 OF THE ENGAGEMENT LETTER, AND DOES
      NOT STATE A BREACH OF FIDUCIARY DUTY CLAIM ...................................... 22

      A.    The Breach of Fiduciary Duty Claim is Preempted by the Martin Act ................ 22

      B.    Section 11 of the Engagement Letter Precludes This Claim ................................ 23

      C.    BANA Cannot Base a Breach of Fiduciary Duty Claim on an Alleged
            Breach of Duties by BSAM to the Issuer ............................................................. 24

IV.   COUNT IV FAILS BECAUSE THE REQUISITE APPROVALS WERE
      SOUGHT AND OBTAINED ...................................................................................... 26

V.    COUNT V FAILS TO STATE A CLAIM AGAINST BSAM FOR FRAUD OR
      AIDING AND ABETTING FRAUD ........................................................................... 26

      A.     Plaintiffs' Fraud Claim Against BSAM Fails.........................................................27

      B.     The Complaint Does Not State an Aiding and Abetting Claim Against
            BSAM .................................................................................................................27

VI.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE PROXIMATE CAUSATION ........31

Conclusion ...................................................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*484 Assocs., L.P. v. Moy,*
   No. 06 Civ. 2290 (PAC), 2007 WL 683999 (S.D.N.Y. Mar. 5, 2007)......................28 n.13

*60223 Trust v. Goldman Sachs & Co.,*
   540 F. Supp. 2d 449 (S.D.N.Y. 2007) .............................................................33 n.17

*Axelrod, Inc. v. Simon & Schuster, Inc.,*
   No. 07 Civ. 891 (DLC), 2007 WL 2412257 (S.D.N.Y. Aug. 27, 2007)............................17

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544, 127 S. Ct. 1955 (2007)........................................................................20

*Brass v. American Film Techs., Inc.,*
   987 F.2d 142 (2d Cir. 1993) ............................................................................5 n.3

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,*
   98 F.3d 13 (2d Cir. 1996) ................................................18, 19 n.10, 21, 29

*CPC Int'l Inc. v. McKesson Corp.,*
   70 N.Y.2d 268 (1987) ............................................................................................23

*CSI Investment Partners II, L.P. v. Cendant Corp.,*
   507 F. Supp. 2d 384 (S.D.N.Y. 2007) ..................................................................32

*Castellano v. Young & Rubicam, Inc.,*
   257 F.3d 171 (2d Cir. 2001) ..................................................................................23

*Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.,*
   70 N.Y.2d 382 (1987) ............................................................................................16

*CompuDyne Corp. v. Shane,*
   453 F. Supp. 2d 807 (S.D.N.Y. 2006) ..................................................................32

*Curto v. Bender,*
   231 Fed. App'x 93 (2d Cir. 2007) ..................................................................5 n.3

*Davidoff v. Farina,*
   No. 04 Civ. 7617 (NRB), 2005 U.S. Dist. LEXIS 17638 (S.D.N.Y. Aug. 19, 2005)...............33 n.17

*Dura Pharmaceuticals, Inc. v. Broudo,*
   544 U.S. 336 (2005) ..........................................................................................32

*Edison Fund v. Cogent Inv. Strategies Fund Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008) ........................................................31 n.16

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003) ...............................................................................32

*Garber v. Legg Mason Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) .......................................................33 n.17

*Hampshire Equity Partners v. Teradyne, Inc.*,
    No. 04 Civ. 3318 (LAP), 2004 WL 736217 (S.D.N.Y. Mar. 30, 2005)......................31 n.16

*Harrison v. Rubenstein*,
    No. 02 Civ. 9356 (DAB), 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007) .....................31 n.16

*Heller v. Goldin Restructuring Fund, L.P.*,
    No. 07 Civ. 3704 (RJS), 2008 WL 5328430 (S.D.N.Y. Dec. 22, 2008) ...........................23

*Henneberry v. Sumitomo Corp. of America*,
    532 F. Supp. 2d 523 (S.D.N.Y. 2007) ...............................................................24

*International CableTel Inc. v. Le Groupe Videotron Ltee*,
    978 F. Supp. 483 (S.D.N.Y. 1997)................................................................ 16, 17, 18

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005) .......................................................... 27, 29, 30

*Joffee v. Lehman Bros.*,
    410 F. Supp. 2d 187 (S.D.N.Y. 2006), *aff'd*, 209 Fed. App'x 80 (2d Cir. 2006) ......................33 n.17

*LNC Invs., Inc. v. First Fidelity Bank*,
    173 F.3d 454 (2d Cir. 1999) ...............................................................................32

*Laub v. Faessel*,
    297 A.D.2d 28 (1st Dep't 2002)........................................................................32

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) ...................................................................... 33 n.17, 34

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .......................................... 32, 33, 33 n.17, 34, 35

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ..........................................................................27, 29

*MCI Worldcom Communications, Inc. v. North American Communications Control, Inc.,*
No. 98 Civ. 6818 (LTS), 2003 WL 21279446 (S.D.N.Y. June 4, 2003) ...................................28 n.13

*Mandarin Trading Ltd. v. Wildenstein,*
No. 602648/06, 2007 WL 3101235 (N.Y. Sup. Ct. Sep. 4, 2007) ...............................................19 n.10

*In re Merrill Lynch & Co. Research Reports Secs. Litig.,*
568 F. Supp. 2d 349 (S.D.N.Y. 2008) ...............................................31, 31 n.16, 33 n.17, 34, 35 n.18

*In re Merrill Lynch & Co. Research Reports Secs. Litig.,*
Nos. 02 MDL 1484, 02 Civ. 9690 (JFK), 2008 U.S. Dist. LEXIS 44344 (S.D.N.Y. June 4,
2008).........................................................................................................................................34

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,*
No. 02 Civ. 0767 (LBS), 2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003) ..................................23

*Nathel v. Siegal,*
No. 07 Civ. 10956 (LBS), 2008 WL 4684171 (S.D.N.Y. Oct. 20, 2008)..................................30

*New York Univ. v. Continental Ins. Co.,*
87 N.Y.2d 308 (1995) ..............................................................................................................16

*In re Omnicom Group, Inc. Secs. Litig.,*
541 F. Supp. 2d 546 (S.D.N.Y. 2008) .....................................................................................34

*Patane v. Clark,*
508 F.3d 106 (2d Cir. 2007) ...............................................................................................26 n.11

*Randolph Equities, LLC v. Carbon Capital, Inc.,*
No. 05 Civ. 10889 (PAC), 2007 WL 914234 (S.D.N.Y. March 26, 2007) ....................................31, 32

*Reddington v. Staten Island Univ. Hosp.,*
511 F.3d 126 (2d Cir. 2007) ....................................................................................................5 n.3

*Rothman v. Gregor,*
220 F.3d 81 (2d Cir. 2000) ......................................................................................................5 n.3

*S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.,*
84 F.3d 629 (2d Cir. 1996) ......................................................................................................19

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
441 F. Supp. 2d 579 (S.D.N.Y. 2006) .....................................................................................33

*Serova v. Teplen,*
No. 05 Civ. 6748 (HB), 2006 WL 349624 (S.D.N.Y. Feb. 16, 2006).........................................31 n.16

*Seven Hanover Associates, LLC v. Jones Lang Lasalle Americas, Inc.*,
   No. 04 Civ. 4143 (PAC), 2008 WL 464337 (S.D.N.Y. Feb. 19, 2008) ...................................... 17, 18

*Shanahan v. Vallat*,
   No. 03 Civ. 3496 (PAC), 2008 WL 4525452 (S.D.N.Y. Oct. 3, 2008) ....................................... 31, 33

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ...................................................................................................... 19

*Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.*,
   322 F. Supp. 2d 482 (S.D.N.Y. 2004) ............................................................................... 19 n.10

*U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*,
   582 F. Supp. 2d 605 (S.D.N.Y. 2008) ..................................................................................... 11

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*,
   530 F. Supp. 2d 486 (S.D.N.Y. 2007) ..................................................................................... 25

## STATUTES

Fed. R. Civ. P. 9(b) .......................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) .............................................................................................................. 1

N.Y. Gen. Bus. Law art. 23-A ................................................................................................. 23

Defendant Bear Stearns Asset Management Inc. ("BSAM") respectfully submits this memorandum of law in support of its motion to dismiss the complaint of plaintiffs Bank of America, National Association ("BANA") and Banc of America Securities LLC ("BAS") (together, "BOA"), in its entirety, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).

## Preliminary Statement

This case arises out of a $4 billion arms-length commercial transaction in May 2007 between two of the most sophisticated financial services companies in the world – BOA and BSAM – pursuant to which mortgage-backed assets, including assets owned by two BSAM hedge funds, were pooled and structured into a specialized form of collateralized debt obligation ("CDO") known as a CDO-squared (essentially a CDO of CDOs) (the "CDO-Squared Transaction"). BOA was the underwriter for the CDO-Squared Transaction and, for the vast majority of the notes issued, it also served as guarantor (in the amount of $3.2 billion) and financier (in the amount of $750 million). Two BSAM hedge funds provided the bulk of the collateral and BSAM itself was the collateral manager.

Plaintiffs' complaint alleges five common law causes of action arising out of this transaction, but each is legally flawed and must be dismissed for a range of reasons. The breach of contract claims fail because the contracts were not breached. The two fraud claims fail because at least one is a prohibited attempt to turn an alleged breach of a contractual obligation into a tort claim, and both fail to allege the requisite elements of fraud or aiding and abetting fraud. The breach of fiduciary duty claim is (i) preempted by the Martin Act; (ii) explicitly barred by a contract between BSAM and BAS; and (iii) further barred because there was no fiduciary relationship between BSAM and either BAS or the Issuer.

Above and beyond these claim-by-claim legal deficiencies is the basic fact that BOA's underwriting of and substantial participation in the CDO-Squared Transaction amounted to a deliberate and considered bet on mortgage-backed CDO securities by an active participant in the CDO market. Unfortunately for all involved, shortly after this transaction closed, the market for mortgage-backed

structured assets such as CDOs and CDO-squareds, particularly those backed by sub-prime mortgages, collapsed. As BOA's own public filings acknowledge, there were "extreme dislocations" in the CDO market in the "second half of 2007," including significant credit ratings downgrades in the fourth quarter, all of which resulted in "unprecedented capital losses," including losses at BOA due to its own CDO exposure. These public filings further acknowledge that these "market dislocations" continue to cause "additional losses" and "significantly impact" BOA's "results" – as well as the results of virtually all other major financial institutions – to the present day.[1]  It was this dramatic and unprecedented market collapse, and not any alleged disclosure failures by BSAM, that proximately caused the securities that are at the heart of this case to lose most of their value, just as that same market collapse inflicted *hundreds of billions of dollars* of losses spread across virtually every major financial institution in the United States and many worldwide.

        Reading BOA's complaint, one would hardly know that the losses it suffered in connection with the CDO-Squared Transaction had any connection to the sub-prime meltdown that emerged in full force in the summer of 2007. Its claim that it was the collapse of the BSAM hedge funds, and not the catastrophic collapse of the subprime-backed CDO market, that caused BOA's alleged losses is an implausible assertion, one that ignores market realities. As we argue in detail below and as multiple decisions by this Court confirm, this failure by BOA to adequately plead a plausible theory of proximate causation is fatal to all of plaintiffs' claims.

        BOA, one of the largest and most sophisticated banks in the world, attempts to re-write history in an effort to re-direct blame onto BSAM, claiming that had it been told sooner about redemptions and liquidity concerns at the two BSAM hedge funds that provided the bulk of the collateral for the CDO-Squared Transaction, it never would have gone through with the deal and, therefore, would not have suffered the substantial losses it now claims. But this theory of the case is belied by BOA's own conduct and the realities of the CDO-Squared Transaction itself.

_____

[1] *See* p. 10, *infra.*

As the complaint reveals, BOA was advised on the day before the deal was to close, first orally and then in writing, of just such redemption and liquidity issues, yet it made a decision to go through with and close the deal anyway. As the complaint and the documents cited therein also make clear, following Defendants' disclosure BOA had a choice: walk away from the deal (and in particular refuse to guarantee the $3.2 billion in Super-Senior notes) or go through with it. BOA paused and considered its options, negotiated some additional terms, and then took the latter course, proceeding with closing the deal and issuing the guarantee (known as a "put"). Indeed, BOA went far beyond its closing obligations, agreeing as well to provide $750 million in "repo" financing so that the two BSAM hedge funds could buy back all of the Mezzanine or intermediate risk notes issued out of the new deal. This too was a calculated, but not a contractually required, gamble, taken after BSAM had made the disclosure concerning redemption and liquidity issues at the larger of the two funds.

Going forward with the deal even after BSAM's disclosure was, without question, a choice BOA was perfectly free to make. Indeed, the handsome fees BOA was slated to earn from underwriting this deal gave it strong economic incentive to do so. But having so acted, with knowledge of redemption and liquidity issues and an opportunity to probe further, BOA should not now be permitted to bring a multi-billion dollar lawsuit predicated on the exact opposite premise. Accordingly, as we argue below, several of BOA's claims also must be dismissed because the complaint fails to adequately allege, and indeed refutes, any notion that BOA's losses resulted from BSAM's alleged failures to disclose the Funds' financial condition, as opposed to BOA's own voluntary choices to move forward with the deal (or the overall market collapse).

Obviously aware that BSAM's May 23 pre-closing disclosure undermines its attempt to pin liability on BSAM, BOA also attempts to hang its hat on its decision to purchase $2.89 billion in "initial collateral" the day before, on May 22, two days before the scheduled closing. But that too was a considered

decision not required by the governing contract, and in any event was unwound two days later. It did not

cause – *and is not alleged to have caused* – any resulting damage.

In addition to these overarching fatal flaws, each of BOA's claims must be dismissed for a

number of other reasons:

*Count I*, for breach of a disclosure provision in the Engagement Letter, fails because: (i) BSAM's disclosure obligation was keyed to material adverse "events" impacting BSAM, not developments at two of its many Funds, and therefore was not triggered in the first place; and (ii) BSAM nonetheless disclosed the exact kind of information it is accused of concealing.

*Count II*, for fraud, fails because BSAM's alleged disclosure obligation was purely contractual *and* the governing Engagement Letter disclaims any non-contractual duties; accordingly, BSAM's alleged failure to disclose developments at the Funds cannot give rise to a fraud claim under black letter New York law.

*Count III*, for breach of fiduciary duties allegedly owed by BSAM to BOA and/or the CDO-Squared Issuer prior to closing, should be dismissed because: (i) New York's Martin Act preempts this claim; (ii) it is also barred by Section 11 of the Engagement Letter, which forecloses breach of fiduciary duty claims by BAS against BSAM; and (iii) to the extent the collateral manager (*i.e.*, BSAM) even owed duties to the Issuer prior to closing, the Collateral Management Agreement defines the scope of any such duties and makes clear that there was no fiduciary relationship between BSAM and the Issuer at any point in time.

*Count IV*, for breach of a provision in the Collateral Management Agreement requiring pre-approval for the post-closing sale of assets from the funds to the Issuer, fails because in fact the requisite approvals were sought and received, and the complaint fails to identify any transactions for which they were not.

*Count V*, for fraud and aiding and abetting fraud in connection with the Spring 2007 repo transactions, fails on multiple grounds: (i) there can be no fraud claim against BSAM because the alleged misrepresentations were made by the Funds themselves; and (ii) the aiding and abetting claim against BSAM fails, both because the underlying fraud claim fails (on two grounds), and because plaintiffs in any event do not adequately allege the other requisite elements of an aiding and abetting claim: "actual knowledge" or "substantial assistance."

Accordingly, and for the reasons set forth in further detail below, BSAM respectfully

submits that the complaint should be dismissed in its entirety, and with prejudice.

## The Relevant Facts

BSAM is "an asset-management unit of Bear Stearns." (Compl. ¶ 7).[2]  BSAM ran two hedge funds that "invested principally in highly structured securities, including securities backed by subprime mortgages": Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the "HG Fund") and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (the "EL Fund") (collectively, the "Funds"). (Compl. ¶¶ 7, 14-15).  As the complaint explains, "many of [the Funds'] securities were collateralized debt obligations, or CDOs," which are "a type of security backed, or collateralized, by a pool of securities that themselves are usually backed by other assets, often mortgages." (Compl. ¶ 15).  Both Funds "invested in the same types of assets" and contained the same "underlying portfolio," although the EL Fund used a higher or "enhanced" degree of leverage. (Compl. ¶¶ 26, 113).  Defendants Ralph Cioffi, Matthew Tannin and Raymond McGarrigal were the portfolio managers for the Funds. (Compl. ¶¶ 8, 9, 11, 14).[3]

### The CDO-Squared Transaction and the Terms of the Engagement Letter

According to the complaint, BSAM and BOA "had a longstanding and extensive business relationship," BOA "was interested in working with BSAM on structured products transactions," and BOA and BSAM "were in regular communication about potential business opportunities." (Compl. ¶ 16).

---

[2] In May 2008, BSAM became a wholly-owned subsidiary of JPMorgan Chase & Co.

[3] This factual summary is based on the non-conclusory allegations in the complaint (Ex. A). *See e.g.*, *Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 131 (2d Cir. 2007) (in ruling on a motion to dismiss, the Court need not accept as true "bald assertions and conclusions of law"); *Curto v. Bender*, 231 Fed. App'x 93, 94 (2d Cir. 2007) ("conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss").  The facts are also drawn from documents that are annexed to the complaint and/or integral to plaintiffs' claims. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (court ruling on motion to dismiss may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit"); *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (on motion to dismiss, court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference").  The relevant documents are annexed as exhibits to the Declaration of Marjorie E. Sheldon, dated January 16, 2009, submitted in support of BSAM's motion, and are referenced herein as Ex. __.

Commencing "[i]n or about late 2006," BSAM and BOA "began to discuss . . . a CDO-squared transaction in which a special-purpose entity (the Issuer) would acquire a diversified portfolio of mortgage-related securities (the 'Collateral'), including CDOs purchased from the Bear Stearns Funds, and then issue multiple classes, or 'tranches,' of securities backed by the Collateral." (Compl. ¶ 17).

      The parties ultimately agreed to enter into the multi-billion dollar CDO-Squared Transaction, which was memorialized in an engagement letter dated March 9, 2007 (the "Engagement Letter," Ex. B). The Engagement Letter explained that BSAM had engaged BAS to structure and market "a single transaction involving the offering of several classes of debt and/or equity securities . . . to be issued by one or more special purpose entities," and it provided that BSAM would serve as "Collateral Manager" for the Issuer of the securities. (Compl. ¶ 18; Ex. B at 1). The Engagement Letter set forth the "terms and conditions" of the transaction prior to the closing. (Ex. B at 1-2).

      Section 11 of the Engagement Letter, titled "No Advisory or Fiduciary Responsibility," makes clear that the parties' relationship was purely contractual: "neither party has assumed nor will assume an advisory, agency or fiduciary responsibility in favor of the other party with respect to any of the transactions contemplated hereby or the process leading thereto" and "neither party has any obligation to the other party with respect to the Offering except the obligations expressly set forth in this Letter Agreement." (Ex. C at 9). That Section further states that "[e]ach party hereby waives and releases . . . any claims . . . with respect to any breach or alleged breach of agency or fiduciary duty hereunder." (*Id.*).

      The Engagement Letter also provides that the offering would consist of multiple tranches of securities: (i) the "Super-Senior Notes," which were the most senior (and thus least risky) tranche and comprised about $3.2 billion of the deal's total value; (ii) the "Mezzanine Notes," which were the intermediate tranches; and (iii) the equity, which was the most junior (and therefore most risky) tranche. (Compl. ¶¶ 17, 19). To facilitate the sale of the Super-Senior Notes to third-party investors, BOA "committed to write a put option," thereby guaranteeing that it would buy these notes back if the

noteholders were unable to sell them. (Compl. ¶ 19). Plaintiffs also allege that it was "understood that

BSAM or its hedge funds would initially purchase the Equity and the Mezzanine Notes." (Compl. ¶ 20).

The Disclosure Obligations Pursuant to Section 4(c) of the Engagement Letter

Because BOA "would be committing itself to buy approximately $3.2 billion worth of

Super-Senior Notes if there were no purchasers," BOA alleges that it "insisted on a commitment" from

BSAM that it would notify BOA of the "occurrence" of "events" – defined in the agreement as "Collateral

Manager Event[s]" – that would result in a "material adverse change" in the financial condition or prospects

of the Collateral Manager – *i.e.* BSAM itself, as opposed to the specific funds or assets that BSAM

managed. (Compl. ¶ 22). Section 4(c) or the "Material Adverse Change Clause" of the Engagement Letter

specifically provides in pertinent part:

> The Collateral Manager shall notify BAS of the occurrence of any of the
> following events (each, a "Collateral Manager Event") promptly after the
> Collateral Manager becomes aware of such occurrence: (i) a material
> adverse change, or development that would reasonably be expected to
> result in a material adverse change, in the business, properties, financial
> condition or prospects *of the Collateral Manager*, . . . or (iii) any other
> adverse financial, organizational or other event or change *at the Collateral
> Manager* which would reasonably be expected to impair the ability of BAS
> in its capacity as Placement Agent to market the Securities issued in
> connection with the Transaction.

(Ex. B at 4) (emphasis added). BOA's obligation to issue the put with respect to the Super-Senior Notes

(and thus its commitment to purchase the $3.2 billion in such Notes) was made expressly contingent on "the

absence of any Collateral Manager Event." (*Id.*, § 5).

Plaintiffs allege that in April and May of 2007, "events occurred" that triggered BSAM's

disclosure obligations under Section 4(c). (Compl. ¶ 23). They allege that the Funds, which provided

much, but not all, of the collateral for the CDO-Squared Transaction, were experiencing liquidity problems

that "were compounded by a series of significant redemption requests" by investors, and that the Funds

"suffered dramatic losses in April." (Compl. ¶¶ 43, 49).

The complaint goes on to allege that "[a]t a certain point" – without specifying a date – the transaction was "priced," meaning that "the economic terms were agreed to," and it was "thereafter scheduled to close on May 24, 2007." (Compl. ¶ 61). BOA alleges that it then "agreed, in order to facilitate the closing . . . to purchase and hold for two days before closing approximately $2.89 billion of assets that would be sold to the Issuer as the initial Collateral at closing," and "[o]n May 22, 2007, BAS purchased the $2.89 billion of assets earmarked to become the Collateral from the Funds." (Compl. ¶ 62).

On May 23, 2007, the day *before* the closing date, BSAM twice advised BOA – first orally by phone (in the afternoon) and then in writing (at 6:30 p.m.) – that the EL Fund, which was the source of the majority of the collateral for the transaction, was facing significant liquidity problems and was in danger of having to be wound down. (Compl. ¶¶ 65, 70). In its written disclosure, BSAM expressly told BOA that the EL Fund "has recently received a large number of requests for redemption from its investors," that it expected "redemptions in the months of June and July of approximately $324 million, representing approximately 49.92% of the total equity capital of the fund," and that it was "considering all available options," including "asset sales" *and/or "an orderly wind down of the fund."* (Compl. ¶ 70; Ex. C, emphasis added).

Despite these disclosures, BOA elected to continue with the transaction, allegedly even orally negotiating some limited additional terms (but without securing an executed writing confirming those alleged terms). (Compl. ¶¶ 76-78). BOA closed the deal as scheduled on May 24, including issuing the put option (and thereby obligating itself to potentially purchase the $3.2 billion in Super-Senior Notes). Upon closing, BSAM "entered into a Collateral Management Agreement with the Issuer" (the "CMA") (Compl. ¶ 85; Ex. D).

The Repurchase Agreements

In addition to closing the deal and issuing the put, on May 24, BOA put itself at further risk by agreeing – without any obligation to do so – to provide $750 million in "repo" financing to the Funds to

allow them to buy back all of the Mezzanine Notes issued as part of the deal. (Compl. ¶ 101). As the complaint explains, "the provider of the repo" – in this case, BOA – "takes title to the asset serving as collateral" (here, the Mezzanine Notes) and the "party receiving financing" – here, the Funds – "sells the asset to the provider of the financing and commits to repurchase the asset at some later time for a price higher than the sale price." (Compl. ¶ 29).[4]

The repo transactions were "governed by . . . master repurchase agreements between the Funds and BAS" (the "Master Repo Agreements"), and there was a separate Master Repo Agreement for each fund. (Compl. ¶ 98, Exs. E & F). Both agreements contain a material adverse change clause in which each party to the transaction – i.e., the Funds and BAS (but not BSAM) – represents and warrants that "no material adverse change in such party's financial condition has occurred since the date of the most recent financial statements furnished by [the Funds]." (Compl. ¶¶ 99-100; Exs. E & F at 11). According to the complaint, the Funds failed to comply with the obligation in the repo agreements when they purportedly falsely warranted "that their financial condition had not recently suffered a material adverse change." (Compl. ¶ 131).

The Collapse of the Funds

Following the closing of the CDO-Squared Transaction, the EL and HG Funds faced continuing and mounting losses as the CDO market suffered significant declines. Ultimately, the two Funds were unable to meet redemption requests and the EL Fund suspended redemptions in early June. Margin calls then forced the Funds to sell off substantial holdings in mid-June at severely deflated prices. (Compl. ¶¶ 110, 114, 115, 118). Both Funds entered liquidation proceedings at the end of July. (Compl. ¶ 118). Notwithstanding the liquidation of the Funds and the subsequent sale of BSAM (as part of Bear

---

[4] While the Complaint speaks vaguely of repo transactions between BOA and the Funds in "late May 2007," the only specifically identified repo transaction in this time period is the $750 million May 24, 2007 repo in connection with the closing of the CDO transaction. (Compl. ¶ 101).

Stearns & Co.) to JPMC, BSAM continued to discharge its obligations as collateral manager for the CDO-Squared Transaction. (Ex. G).

Pursuant to a Termination and Purchase Agreement signed by BSAM, the Funds, and BOA, all of the outstanding repo transactions with BOA were unwound in mid-June 2007. (Ex. H). Pursuant to this same agreement, when these transactions were unwound, any claims arising under the Master Repo Agreements were extinguished.[5]

The Collapse of the CDO Market Generally

The Funds were not alone in suffering severe losses on their mortgage-backed CDO holdings during this time period. As BOA's own public filings make clear, "beginning in the summer" of 2007, "[a] sharp rise in defaults on subprime mortgages and worries about the potential fallout from the faltering housing and subprime mortgage markets triggered financial market turbulence," including "[a] dramatic repricing of credit risk and unprecedented capital losses stemming from sharp declines in the value of structured credit products based on subprime debt" (such as CDOs). (Ex. O at 11.) "Furthermore, in the fourth quarter of 2007, the credit ratings of certain structured securities (e.g., CDOs) were downgraded which among other things triggered further widening of the credit spreads for these types of securities." (*Id.* at 10.) Like virtually every other major financial institution in America, BOA had been "an active participant in the CDO market and maintain[ed] ongoing exposure to these securities and," as a result of the "extreme dislocations" in these markets, "incurred losses associated with these exposures" (*id.*), including losses stemming from commercial paper it was forced to purchase as a result of its obligations under "written put options" (*id.* at 37-38, 121).

---

[5] Plaintiffs neglect to mention the unwind transaction, the Termination and Purchase Agreement, or this provision. Because the agreement is clearly integral to Plaintiffs' repo-related claim, it may be considered by the Court on this motion. (*See* note 2, *supra*).

Claims Against BSAM

Based on these alleged facts – but ignoring these market realities – plaintiffs assert five claims against BSAM, each of which fails to adequately state any claim for relief against BSAM.  In Points I through V, we explain the grounds for dismissing each individual claim.  We then explain, in Point VI, why BOA's failure to plead proximate or loss causation – which is a necessary element of all of its claims – independently merits dismissal of the entire complaint.

Argument

I.    COUNT I FAILS TO STATE A CLAIM FOR BREACH
      OF SECTION 4(C) OF THE ENGAGEMENT LETTER

BSAM did not breach the disclosure obligations pursuant to Section 4(c) because (i) that obligation was never triggered; and (ii) even if it was, it was met.  For these reasons, the claim for breach of the Engagement Letter fails.  *See, e.g., U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 582 F. Supp. 2d 605, 609-10 (S.D.N.Y. 2008) (breach of contract claim requires an actual breach by defendants).[6]

A.    The Funds' Liquidity Problems and Redemptions Did Not
      Trigger BSAM's Disclosure Obligations Under Section 4(c)

Under Section 4(c) of the Engagement Letter, BSAM was obligated to disclose only those events that constituted or "that would reasonably be expected to result in a material adverse change, in the business, properties, financial condition or prospects of the *Collateral Manager*" – *i.e.*, of BSAM itself. (Ex. B § 4(c)(i)).  Section 4(c)(iii) likewise applies only to an "event or change *at the Collateral Manager*," as opposed to at the fund level. (*Id.* § 4(c)(iii)).[7]

---

[6] Under § 14(a) of the Engagement Letter, the parties agreed to the application of New York law.

[7] Had BOA wanted disclosures of events affecting the Funds, rather than the overall health of BSAM, it could have demanded this requirement.  Indeed, in the material adverse change clause in the Master Repo Agreements with BOA it did just that – requiring the Funds, rather than BSAM, to disclose a material adverse change in their financial condition. (Point V *infra*; Exs. E & F at 11).

Presumably faced with the difficulty of pleading that BSAM knew on or before May 22 that its overall financial situation had materially changed, BOA instead argues that the disclosure obligations in Section 4(c) were triggered by events affecting the Funds – two of many hedge funds managed by BSAM. Plaintiffs theorize, with the benefit of hindsight, that in May 2007, defendants should have known that the "events" at the Funds would have reasonably been expected to materially impact BSAM as a whole. Not surprisingly, their complaint is devoid of any explanation of how the financial conditions of the Funds triggered the disclosure obligations in Section 4(c). Nor are there any allegations in the complaint that show that the liquidity and other problems experienced by the Funds meant that BSAM was similarly concerned about its overall financial condition.

To the contrary, the complaint makes clear that the Funds were only a limited part of BSAM's business. For example, plaintiffs admit that BSAM was the "asset-management unit of Bear Stearns," (Compl. ¶ 7), and that it was "a preeminent asset manager" (Compl. ¶ 14). Plaintiffs further concede that the Funds were only "two of" the funds that BSAM managed. (Compl. ¶ 14). As the offering materials for the CDO-Squared Transaction further reflect, BSAM's various businesses went far beyond these two Funds:

> BSAM provides investment management services to individuals, banks, investment companies, pension and profit sharing plans, trusts, estates, charitable organizations, corporations and other business entities. The Company also develops and manages private investment funds and structured investment products which principally include equity and fixed income hedge funds, private equity funds, venture capital funds, separate accounts and structured products. The Company and its affiliates are general partners in hedge funds, private equity funds, and venture capital funds.

(Ex. I at 3). Critically, these same offering materials make clear that the Funds accounted for only a small percentage of the approximately "$54.1 billion in third-party funds under discretionary management" by

BSAM as of March 15, 2007. (Ex. J at 27-28). [8]

Against this background, and even assuming the truth of the allegations about the difficulties of the Funds for purposes of this motion, plaintiffs allege no facts that support the notion that, prior to the closing of the CDO-Squared Transaction, BSAM knew or reasonably should have expected that the events or developments facing these Funds would translate into a material adverse change for BSAM as a whole. Indeed, BSAM continued to serve as collateral manager of the CDO-squared for its duration, (Ex. G), and plaintiffs do not allege that BSAM's ability to function as such was in any way impaired by the liquidation of the Funds. Absent any such facts, plaintiffs have failed to explain why BSAM's disclosure obligation was triggered in the first place.

B.   BSAM Complied With Section 4(c) and
      Did Not Cause BOA's Claimed Damages

Even assuming the alleged redemptions by Fund investors triggered Section 4(c), the claim still fails because BSAM complied with its alleged obligations under that provision. Regardless of what BSAM thought or said about the possible impact of liquidity and redemption issues, it did disclose the very "events" that plaintiffs now claim were concealed – namely, the escalating volume of redemption requests and the possibility that the EL Fund would not be able to survive. And it did so "before the CDO-squared Transaction was scheduled to close" (Compl. ¶ 65), when BOA – by its own admission – retained the right *not* to close the transaction (Compl. ¶ 76).

---

[8] According to the allegations in the Complaint, the EL Fund had less than $1 billion in investor equity under management. (*See* Ex. C (May 23 letter, explaining that the $300 million in redemption requests represented approximately half of the EL Fund's investor equity)).

Plaintiffs allege that BSAM's fees from managing the HG Fund "*reportedly* accounted for 75% of BSAM's total revenues in 2004 and 2005." (Compl. ¶ 25) (emphasis added). But plaintiffs offer no factual basis for this assertion, which is implausible on its face, and in any event pre-dates this transaction by several years. Notably, there is no such assertion concerning HG-related revenues in Spring 2007 and – even more telling – no allegation concerning EL-related revenues at any point in time.

As explained above, BSAM told BOA of the redemption and liquidity issues concerning the larger of the two Funds the day before the closing. In its May 23, 2007 letter, BSAM explicitly told BOA that the EL Fund – "the source of approximately 65% of the initial collateral portfolio" for the transaction – had "recently received a large number of requests for redemption"; that BSAM expected redemptions of more than $300 million in the next two months, which would comprise half of the total equity of the Fund; and that as a result, the Fund may have to be wound down. (Compl. ¶ 70; Ex. C).

Well aware that the May 23 letter put BOA on notice of the very "events" at the EL Fund that form the basis for its breach of contract claim, plaintiffs contend that the letter was "false and misleading" because (i) it went on to state that these developments "will not materially affect our [i.e., BSAM's] ability to perform our obligations as collateral manager" and "will not have a material adverse effect on our [i.e., BSAM's] business" when BSAM allegedly knew otherwise; and (ii) BSAM did not disclose that these developments would "reasonably be expected to impair" BOA's ability to market the securities. (Compl. ¶¶ 70, 71, 73). But BSAM's subjective beliefs, and BOA's after-the-fact speculation about BSAM's state of mind, are beside the point for purposes of BOA's breach of contract claim. As the complaint states, BSAM was required to disclose "the occurrence of certain events." BSAM did that, and it did so prior to closing. Its opinions of the significance of those events – and its decision not to offer an opinion about the likely impact on BOA's ability to market the securities – are simply beside the point (although it bears noting that the Fund's later collapse did not affect BSAM's ability to continue to act as collateral manager and plaintiffs have not alleged otherwise).

Contrary to what plaintiffs contend (Compl. ¶ 72), it also is of no relevance that the May 23 letter did not reference the HG Fund. First, plaintiffs' assertion that "Defendants were receiving redemption requests for the High-Grade Fund that they could not satisfy" is pled only "on information and belief," and is not supported by specific dates, amounts, or any other such details. (Compl. ¶ 114). Second, the HG Fund represented only a minority portion of the collateral for the CDO-Squared Transaction. The majority

-14-

of the collateral for the CDO-squared securitization transaction – 65 percent, as stated in the May 23 letter –

was being acquired from the EL Fund. (Ex. C). Finally, even if plaintiffs could somehow plead that

redemptions in the HG Fund had material significance to the overall health of BSAM as of May 2007, the

May 23 disclosure was sufficient to put BOA on notice that there may be an issue with redemptions in the

HG Fund as well. As plaintiffs acknowledge, the two Funds "invested in the same types of assets" and the

"underlying portfolio" of the EL Fund "mirrored" that of the HG Fund (Compl. ¶¶ 26, 113). Yet, when

BOA was discussing the disclosure letter with BSAM on the morning of May 24, there is no allegation that

anyone from BOA asked even a single question about the state of the HG fund. (Compl. ¶ 74.)

       Lastly, whatever losses BOA incurred were caused by its own decisions and the

unprecedented dramatic market meltdown that ensued, and not by any wrongdoing on BSAM's part. As

explained above, BOA alleges that the Material Adverse Change Clause was added at its insistence, in

exchange for its commitment to issue a put option for (and thus effectively guarantee) the $3.2 billion worth

of Super-Senior Notes. (Compl. ¶ 22). BOA was not obligated to and did not issue the put until the

closing, on May 24th. If it truly believed that the substantial redemption requests and possible closure of

the EL Fund were as critical to its decision to go forward as it now contends, it could have exercised its

contractual right *not* to issue the put, which would have had the practical effect of derailing the entire

transaction. Not only did BOA go forward with closing and issuing the put, but it also voluntarily agreed,

following and despite BSAM's May 23 disclosure, to finance the Funds in their purchase back of $750

million of the riskier Mezzanine securities being issued. To the extent BOA seeks damages from the

decline in value of the commercial paper it later came to own (Compl. ¶ 125), or from the decline in value

of the securities that it *chose to* finance via repo on the closing date (Compl. ¶ 126), all of those damages

could have been avoided.[9]

---

[9]  BOA alleges that, "consistent with its obligations under the put option," it "bought all the Super-Senior
Notes" issued by the CDO-Squared. (Compl. ¶ 125). In point of fact, the put was never exercised and
BOA ended up owning the commercial paper because it chose to buy it, not because BSAM exercised the

Given these alleged facts, plaintiffs do not – and cannot – state a claim for breach of section 4(c) of the Engagement Letter and Count I should be dismissed with prejudice.

II.     COUNT II FAILS TO STATE A FRAUD
        OR FRAUDULENT INDUCEMENT CLAIM

Recognizing that BSAM's May 23 letter undermines a claim of fraud based on BOA's decision to close the transaction on May 24, plaintiffs try to construct a fraud claim based on alleged omissions prior to May 23. The claim fails on multiple grounds.

        A.     An Alleged Breach of a Contractual Obligation Cannot
               Give Rise to a Fraud or Fraudulent Inducement Claim

Plaintiffs allege that "for a period of time leading up to May 22, 2007," defendants "concealed, withheld, and omitted to disclose material information concerning the Funds' financial condition" (Compl. ¶ 139), and that "[w]ithout the[se] material concealments and omissions," BOA "would not have written the put option or purchased the $2.89 billion worth of securities to facilitate the closing." But as the Complaint makes clear, this disclosure obligation was a contractual one, arising out of section 4(c) of the Engagement Letter. This forecloses plaintiffs from asserting a fraud claim under settled New York law.

As the New York Court of Appeals has explained, "[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated," and "[t]his legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract." *Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 389 (1987). In other words, "where a party is merely seeking to enforce its bargain, a tort claim will not lie." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995). *See also International CableTel Inc. v. Le Groupe Videotron Ltee*, 978 F. Supp. 483, 489 (S.D.N.Y. 1997) (explaining that a "false promise,

---

put. Although this has no bearing on BSAM's motion, it may well affect whether and to what extent BOA can recover the damages it seeks in this action.

whenever made, cannot give rise to a fraud claim where that promise is directly incorporated into a written contract between the parties").

There are innumerable cases illustrating this rule, including a recent decision by this Court. In *Seven Hanover Associates, LLC v. Jones Lang Lasalle Americas, Inc.*, No. 04 Civ. 4143 (PAC), 2008 WL 464337 (S.D.N.Y. Feb. 19, 2008), the parties had entered into multiple written agreements in connection with a property leasing transaction, including management agreements and a leasing agreement. The property owner alleged that the manager breached various provisions in these agreements. It also "attempt[ed] to cast the allegations in a light which might also give rise to claims of tort." *Id.* at *3. Citing the above rule, this Court dismissed all of the tort claims, including the fraud claim, because "Defendant's obligations to Plaintiffs with respect to its management and leasing functions are specifically delineated in the contract." *Id.* at *4. As this Court explained: "[s]ince Plaintiffs' tort claims are based on the same factual allegations and same alleged duties as the breach of contract claim, and because there are no duties independent of the contract, the non-contractual claims must be dismissed." *Id.*  Similarly, in *Axelrod, Inc. v. Simon & Schuster, Inc.*, No. 07 Civ. 891 (DLC), 2007 WL 2412257, at *6 (S.D.N.Y. Aug. 27, 2007), the Court dismissed a fraud claim that, like BOA's claim here, was "premised on [defendants'] failure to adhere to contractual duties to disclose" that were memorialized in the governing written agreements. *See also International CableTel*, 978 F. Supp. at 488 (dismissing plaintiff's claims because "[d]efendant's promise to negotiate exclusively with plaintiff plainly was not collateral to the [agreement], it was memorialized in that agreement as defendant's principle [sic] obligation").

In negotiating the Engagement Letter, BOA claims it "insisted on a commitment" from BSAM that it would notify BOA of certain events, and "these *contractual* obligations" were memorialized in section 4(c). (Compl. ¶¶ 22-23) (emphasis added). According to the Complaint, "[t]hese *contractual* obligations were triggered when the Bear Stearns Funds were facing serious liquidity problems by at least the spring of 2007," (Compl. ¶ 128) (emphasis added), and "BSAM violated these *contractual* obligations"

by failing to disclose the difficulties allegedly facing the Funds in April and May of 2007 (Compl. ¶ 23) (emphasis added). Given these allegations – the same ones that underlie the contract claim in Count I – plaintiffs do not (and cannot) state a separate claim for fraud or fraudulent inducement under New York law based on these same alleged failures to disclose.

Obviously aware of this impediment to its fraud claim, BOA contends that BSAM owed the Bank disclosure obligations that were independent of, or collateral to, the duties set forth in the Engagement Letter. (Compl. ¶¶ 63-64, 139). But Section 11 of the Engagement Letter – titled "No Advisory of Fiduciary Responsibility" – expressly disclaims any extra-contractual duties, stating: "neither party has assumed nor will assume an advisory, agency or fiduciary responsibility in favor of the other party with respect to any of the transactions contemplated hereby or the process leading thereto" and "*neither party has any obligation to the other party with respect to the Offering except the obligations expressly set forth in this Letter Agreement*." (Ex. B at 9) (emphasis added).

In its seminal decision on this subject, the Court of Appeals for the Second Circuit dismissed a fraud claim precisely because of the absence of both a fiduciary relationship and any other relationship of reliance between the contracting parties. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (dismissing fraud claim because, contrary to what plaintiff alleged, defendants did not owe plaintiff "a fiduciary duty distinct from their obligation to perform under the [contract]," "[n]or was [defendant] relied upon for advice or the exercise of judgment based on superior information or professional expertise"). The result should be no different in this case.

Here, as in *Hanover*, the governing contract "unequivocally defines the parties' relationship," and BSAM "had no duties other than those specified in the contract." 2008 WL 464337, at *4. And as in *International CableTel*, the obligation that BSAM allegedly breached "was not collateral to"

the parties' written agreement, "it was memorialized in that agreement." 978 F. Supp. at 488. Under these circumstances, Count II should be dismissed, with prejudice, for failure to state a claim.[10]

> B.     The Complaint Does Not Adequately Allege Fraudulent Intent

Count II also should be dismissed for failure to allege fraudulent intent, or scienter. To satisfy Rule 9(b), a plaintiff asserting common law fraud must allege "facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). *Accord, e.g., S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996). Conclusory allegations, by definition, do not suffice to state a claim. *E.g., Shields*, 25 F.3d at 1129 (plaintiff's "frequent conclusory allegations – that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things – do not satisfy the requirements of Rule 9(b)"). The complaint here does not allege *any* facts that would support an inference – let alone a "strong inference" – that BSAM intended to deceive BOA.

Plaintiffs allege that BSAM concealed and withheld information from BOA in Spring 2007 "as part of a concerted program to gain liquidity by defrauding the Bank and others." (Compl. ¶ 139). Indeed, they go so far as to allege that there was an agreement among the defendants "to use deceptive means" against the Bank and the Issuer "to try to rescue the Funds," (Compl. ¶ 60), and that by concealing

---

[10] Plaintiffs attempt to circumvent the *Bridgestone/Firestone* bar by alleging that defendants' disclosure obligation arose not from the Engagement Letter, but from their "superior knowledge regarding the condition of the Funds and their awareness that Bank of America was acting on the basis of mistaken and inaccurate information about the condition of the Funds." (Compl. ¶ 139). They cannot proceed on this theory, for several reasons. First, section 11 of the Engagement Letter precludes it, stating that "[n]either party has *any* obligation to the other party with respect to the Offering *except the obligations expressly set forth in this Letter Agreement.*" (Ex. B at 9) (emphasis added). Second, the allegation that BSAM knew that the plaintiffs were acting on "mistaken knowledge" is conclusory and does not satisfy Rule 9(b). *See e.g., Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.,* 322 F. Supp. 2d 482, 500-01 (S.D.N.Y. 2004); *Mandarin Trading Ltd. v. Wildenstein*, No. 602648/06, 2007 WL 3101235, at * 5 (N.Y. Sup. Ct. Sep. 4, 2007). Indeed, the only basis from which to infer that BSAM "knew" BOA had and was acting on "mistaken" or "inaccurate" information about the funds – even assuming it actually did – is that BSAM allegedly had an obligation to disclose events or occurrences at the funds, and had not yet done so as of May 22. But that, of course, only confirms why this is nothing more than a breach of contract claim, based on BSAM's alleged failure to comply with section 4(c) of the Engagement Letter.

information from BOA, they "were acting pursuant to, and in furtherance of, their agreement with each other and others to deceive the Bank and the Issuer to gain liquidity." (Compl. ¶ 145). Plaintiffs also allege – in conclusory fashion – that defendants' "concealments and omissions" were "knowing, reckless, willful and/or malicious." (Compl. ¶ 141).

But there is not a single factual allegation in the complaint to support these conclusory claims of an "agreement" or "program" to deceive BOA or the Issuer. Although the complaint references internal e-mails and communications, none of them mentions BOA, the Issuer, or this transaction. Nor is there a single specific factual allegation to show or even suggest an agreement of any sort between or among any of the defendants concerning BOA, the Issuer, or this transaction.

In contrast to these conclusory statements, the complaint's non-conclusory allegations not only fail to support, but affirmatively undermine, any inference of scienter. Despite conclusory allegations of a vast conspiracy to dupe BOA into rescuing BSAM and the fund managers from the Funds' liquidity crisis, in fact BSAM *did* disclose that the EL Fund had received redemption requests representing half of that fund's total investor equity and that the fund might have to be wound down. (Ex. C). While the complaint emphasizes that this disclosure came the day after BOA had purchased into a warehouse $2.89 billion of the Funds' assets and only one day before the deal was scheduled to close, the material point is that BSAM made the disclosure prior to closing (Compl. ¶ 65; Ex. C), and at a time when BOA could (according to its own pleading and the deal documents) have refused to issue the put and therefore could have avoided placing itself at risk for the $3.2 billion in Super-Senior notes, and more generally could have elected not to proceed with the transaction at all.

These allegations negate any inference – and certainly any "strong" inference – of fraudulent intent and therefore fail to satisfy Rule 9(b). The allegations also fail to satisfy the basic "plausibility" test that now governs all motions to dismiss, whether or not the heightened pleading requirements of Rule 9(b) come into play. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct.

1955, 1974 (2007) (to survive dismissal, a complaint must allege "enough facts to state a claim for relief that is plausible on its face").  Count II should thus be dismissed.

        C.      <u>Plaintiffs Do Not Adequately Allege "Justifiable Reliance" or "Resulting Injury"</u>

        Plaintiffs further contend that, but for the alleged "material concealments and omissions," they "would not have written the put option [on May 24] or purchased $2.89 billion worth of securities" in advance of the closing on May 22. (Compl. ¶ 143).  A close analysis of the complaint, however, shows that Plaintiffs' own allegations undermine any claim of "actual and justifiable reliance" or "resulting injury" – two necessary prerequisites of a common law fraud claim. *See, e.g., Bridgestone/Firestone*, 98 F.3d at 19 (to state a fraud claim, plaintiff must allege that defendant "made a material false representation," that "plaintiff reasonably relied upon the representation," and that "plaintiff suffered damage as a result of such reliance") (citation omitted).

        Taking the May 22 warehousing transaction first, the complaint does not allege, nor could it, that any injury "resulted from" this very brief purchase from the Funds and "warehousing" of the $2.89 billion in securities.  BOA alleges that as of May 22 it "bore the risk of any deterioration in value of [the $2.89 billion in] assets, as well as the risk that the transaction would not close." (Compl. ¶ 62.)  Even accepting this as true, on May 24, two days later, the transaction did close, and the entire $2.89 billion in securities purchased on a temporary basis by BOA on May 22 was sold to the Issuer at that time. (Compl. ¶¶ 62, 78, 154).  There is no claim that BOA suffered any loss – or that the prices of the $2.89 billion in securities had "deteriorated" – when the May 22 purchase was unwound two days later.  And nowhere does BOA allege or even suggest it was not told or did not fully understand the precise securities it was purchasing on May 22 and the risks of the mortgage-based collateral underlying those securities.

        BOA also does not allege that it had any contractual obligation to purchase the initial $2.89 billion of securities into a warehouse facility in anticipation of and prior to closing.  If BOA was concerned about possible exposure in the event it chose to buy these securities pre-closing, it could have contracted for

specific protection in the Engagement Letter, just as it contracted for protection against writing the put, or it could have entered into a separate agreement setting forth terms and conditions specifically in connection with the May 22 warehousing transaction. It did not do so, and its decision to purchase the $2.89 billion in securities without any new agreement as to terms and conditions was a decision it made at its own risk and one that, in any event, did not itself "result in" any damages.

That brings us to May 24, when BOA *elected* to move forward and close the deal, including issuing the put option, all *after being put on notice* on May 23 that the EL Fund had received a large amount of redemptions and was in danger of being imminently wound down. As explained above in Point I, by moving forward despite this notification, BOA voluntarily exposed itself to the alleged risk, and any losses suffered resulted from its own elective decisions to go forward with closing and guarantee the Super-Senior notes by issuing the put, not from any "material concealments or omissions" by BSAM.

For all of these reasons, Count II should be dismissed.

III.  COUNT III FAILS BECAUSE IT IS PREEMPTED BY THE MARTIN
      ACT, IS BARRED BY SECTION 11 OF THE ENGAGEMENT LETTER,
      AND DOES NOT STATE A BREACH OF FIDUCIARY DUTY CLAIM

Count III – brought by BANA as the alleged "successor" to LaSalle under the Indenture – purports to assert a claim for breach of fiduciary duties allegedly owed by BSAM *to the Issuer* based on the fact that BSAM "sold the initial Collateral *to the Bank for transfer to the Issuer*" prior to the closing (*i.e.*, on May 22). (Compl. ¶ 154) (emphasis added). The claim should be dismissed for three separate and independent reasons.

A.  The Breach of Fiduciary Duty Claim is Preempted by the Martin Act

Even assuming, *arguendo,* that BSAM did owe fiduciary duties to the Issuer, BANA's claim must be dismissed because – under controlling precedent from the Second Circuit – it is preempted by the Martin Act, New York's "blue sky" law. That act prohibits fraudulent and deceitful practices in connection with the distribution, exchange, purchase and sale of securities and empowers the New York

-22-

Attorney General to bring suit against those who violate it. N.Y. Gen. Bus. Law art. 23-A. The New York Court of Appeals has held that there is no implied private right of action under the Martin Act. *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 275 (1987).

The Court of Appeals for the Second Circuit has held that the Martin Act preempts common law breach of fiduciary duty claims if the subject matter of the claim is "covered by" the Act, because allowing such claims to proceed would effectively provide investors with a private right of action to enforce the very conduct prohibited by the statute. *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) (affirming dismissal of breach of fiduciary duty claim because "[t]his claim is barred by the Martin Act"). Both before and since *Castellano*, courts in this district have routinely dismissed breach of fiduciary duty claims where the breach involves conduct covered by the Martin Act. *See, e.g., Heller v. Goldin Restructuring Fund, L.P.*, No. 07 Civ. 3704 (RJS), 2008 WL 5328430, at *5-7 (S.D.N.Y. Dec. 22, 2008) (holding that "[p]laintiff's [breach of] fiduciary duty claim is preempted by the Martin Act"); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2003 WL 22052894, at *3 (S.D.N.Y. Sept. 2, 2003) (same, noting that "[t]he federal district courts that have examined the question have reached the same result with near unanimity").

BANA's breach of fiduciary duty claim is predicated on allegations of nondisclosure and material omissions in connection with the purchase and sale of securities. The subject matter of the claim is thus directly covered by the Martin Act. Under *Castellano* and its progeny, this claim is therefore preempted and Count III should be dismissed, with prejudice.

B.    Section 11 of the Engagement Letter Precludes This Claim

Well aware that in Section 11 of the Engagement Letter, BAS expressly "waive[d] and release[d] . . . any claims" against BSAM for "any breach or alleged breach of agency or fiduciary duty" (Ex. B at 9), BANA – as the alleged successor in interest to the Trustee – purports to assert a breach of fiduciary duty claim on behalf of the Issuer. But Count III is nothing more than an attempt by BAS to plead

a prohibited breach of fiduciary duty claim based on the alleged failure to disclose information *to BAS* prior

to closing, as evidenced by the repeated references to BAS in the relevant allegations.

        For example, BANA alleges that defendants breached their fiduciary duties prior to closing

by "causing the Issuer to purchase the initial $2.89 billion of Collateral without disclosing either *to the Bank*

*or to the Issuer* the true financial condition of the hedge funds from which those assets derived." (Compl. ¶

153) (emphasis added). Paragraph 154 states that BSAM breached fiduciary duties to the Issuer on May

22, when it "sold the initial Collateral *to the Bank for transfer to the Issuer*." (Compl. ¶ 154, emphasis

added). Similarly in paragraph 83, plaintiffs allege: "As part of its fiduciary duty to the Issuer, BSAM was

required to disclose, *to the Issuer or to the Bank*, before *the Bank* purchased the $2.89 billion of Collateral"

that the Funds "were on the brink of collapse." (Compl. ¶ 83) (emphasis added).

        The obfuscation is not accidental. On May 22, the date of the alleged breach of fiduciary

duty, the Issuer was nothing more than a shell, and the CMA had not yet taken effect. (*See* Compl. ¶ 85).

The only agreement in place was the Engagement Letter; the only entity to which BSAM owed any duties

was BAS; and, as explained above the only duties BSAM owed to BAS were contractual ones. (*See* Point

IIA). Accordingly, this claim is a not-so-well disguised attempt by Plaintiffs to recover on a breach of

fiduciary duty theory based on its allegations that BSAM concealed information from BAS prior to May

22. Such a claim is plainly barred by Section 11 of the Engagement Letter, and Count III should therefore

be dismissed.

      C.      BANA Cannot Base a Breach of Fiduciary Duty Claim
               on an Alleged Breach of Duties by BSAM to the Issuer

        Separate and apart from the Section 11 impediment, BANA cannot state a breach of

fiduciary duty claim against BSAM on the Issuer's behalf because there is no fiduciary relationship

between BSAM and the Issuer. *Henneberry v. Sumitomo Corp. of America*, 532 F. Supp. 2d 523, 550

(S.D.N.Y. 2007) (breach of fiduciary duty claim requires "the existence of a fiduciary relationship between

the parties"). While BANA conclusorily asserts that "[a]s Collateral Manager, BSAM owed a fiduciary

duty to the Issuer," and that the duties that BSAM allegedly breached were the "result of that fiduciary relationship," (Compl. ¶¶ 151-52), such allegation is belied by BOA's other allegations and referenced documents.

Prior to the execution of the CMA on May 24, 2007, there was no relationship between BSAM as collateral manager and the Issuer, contractual or otherwise. Thus there could be no breach of a fiduciary relationship on May 22. Moreover, even when the CMA was executed on May 24, the relationship was purely contractual. (Compl. ¶ 85; Ex. D). Nothing in the CMA gives rise to a fiduciary relationship. For example, the CMA sets forth the "duties and obligations of the Collateral Manager." (Ex. D at 2). It states that the Collateral Manager "shall perform its obligations under this Agreement" with "reasonable care, in good faith and exercising a degree of skill and attention no less than that generally exercised by institutional managers . . . in substantially similar transactions." (*Id.* at 3). That provision, by its plain terms, applies to the specific contractual duties enumerated in the contract and does not give rise to additional duties not set forth therein. This is made crystal clear in the "Limits of Collateral Manager Responsibility" section, which states that "the Collateral Manager assumes no responsibility under this Agreement other than to render the services called for hereunder" consistent with this standard of care. (*Id.* at 12). Further confirming that the parties did not contemplate tort liability, the contract also limits the type of damages recoverable under the agreement, stating: "The Collateral Manager shall not be liable for any consequential, punitive, exemplary or treble damages or lost profits hereunder." (*Id.* at 13).

The law is well settled that where, as here, "a contract governs the relationship between two commercial parties, the assumption is that there is no fiduciary relationship unless the contract provides otherwise." *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.,* 530 F. Supp. 2d 486, 503-04 (S.D.N.Y. 2007). Thus, even if the breach occurred after the execution of the CMA (which is not what plaintiffs allege), there can be no breach of fiduciary duty claim.

For these reasons, BANA does not (and cannot) state a breach of fiduciary duty claim against BSAM and Count III should be dismissed with prejudice.

IV.    COUNT IV FAILS BECAUSE THE REQUISITE
       APPROVALS WERE SOUGHT AND OBTAINED

Plaintiffs' claim that, after closing on May 24, BSAM "engaged in conflicted transactions falling within the purview of section 5(c) . . . without providing the necessary disclosure and obtaining the necessary consent" (Compl. ¶ 92), is meritless.

The documents that plaintiffs themselves signed, had access to and presumably were aware of prior to filing the complaint show that BSAM notified the Issuer's board of directors and obtained written approval from the board of directors in connection with the handful of so-called "conflicted transactions" (*i.e.*, purchases of assets by the Issuer from the Funds) that BSAM, as collateral manager, caused the Issuer to make following the May 24 closing.  (*See* Exs. K & L).  For this reason alone, the claim fails.[11]

The claim also fails because the complaint does not identify a single transaction that was not approved, nor does it allege what information – if any – was actually requested by the Issuer's board or withheld by BSAM.  To the extent there *were* any transactions other than the ones for which approval was sought and obtained, plaintiffs presumably have this information at their disposal since BANA claims, after all, to stand in the shoes of the Trustee.  Without these most basic details, the complaint does not put BSAM on notice of what it allegedly did wrong and the claim thus fails under Rule 8(a).

V.     COUNT V FAILS TO STATE A CLAIM AGAINST
       BSAM FOR FRAUD OR AIDING AND ABETTING FRAUD

Plaintiffs' claim against BSAM for fraud and aiding and abetting fraud in connection with repo transactions between BAS and the Funds is meritless.  Presumably recognizing that they would have

---

[11] *See e.g., Patane v. Clark*, 508 F.3d 106, 111 n.2 (2d Cir. 2007) ("documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit" may be considered on motion to dismiss).

to file any claims of fraud by *the Funds* with the liquidators appointed to oversee the winding down of the

Funds, plaintiffs attempt to circumvent that process and instead purport to assert their fraud claims against

BSAM.  But their fraud claim against BSAM fails because plaintiffs have failed to allege any fraudulent

conduct by BSAM, as opposed to by the Funds.  Plaintiffs' claim for aiding and abetting fraud similarly

fails because (i) there is no valid underlying claim for fraud against the Funds; and (ii) plaintiffs have failed

to allege with the requisite particularity that BSAM had knowledge of the alleged fraud or that BSAM

provided substantial assistance to advance the allegedly fraudulent conduct.

A.    Plaintiffs' Fraud Claim Against BSAM Fails

Plaintiffs have not stated a valid fraud claim against BSAM because they have not alleged

any fraudulent conduct by BSAM in connection with the repo transactions.  In support of their fraud claim

against BSAM, all plaintiffs can muster is that "the Funds" made false representations about their financial

condition "in connection with a series of repo transactions in the spring of 2007" and that "the Funds and

Defendants" concealed material information about the Funds' financial condition that they were "obligated"

to disclose to BAS.  (Compl. ¶¶ 166, 167, 172).  Because the alleged misrepresentations were made by *the*

*Funds*, as plaintiffs allege in paragraphs 166, 168 and 172 of their complaint, rather than by BSAM, there

can be no fraud claim against BSAM.[12]

B.    The Complaint Does Not State an
       Aiding and Abetting Claim Against BSAM

Plaintiffs' claim that BSAM aided and abetted the Funds' alleged fraud also fails.  To state

a claim for aiding and abetting fraud, plaintiffs must allege with sufficient particularity to satisfy Rule 9(b)

"(1) the existence of a fraud; (2) a defendant's knowledge of the fraud; and (3) that the defendant provided

substantial assistance to advance the fraud's commission." *JP Morgan Chase Bank v. Winnick*, 406 F.

Supp. 2d 247, 252 (S.D.N.Y. 2005) (citation omitted). *E.g., Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292-

---

[12] To the extent plaintiffs attempt to assert any fraudulent conduct by BSAM, they have not done so with
the requisite particularity required by Rule 9(b).

93 (2d Cir. 2006) (requiring particularity under Rule 9(b)). Plaintiffs have missed the mark on each element.

       1.     Plaintiffs Have Not Stated a
              Valid Fraud Claim Against the Funds

The aiding and abetting claim against BSAM should be dismissed because the underlying claim of fraud by the Funds fails on two independent grounds.[13] *First*, any claim against the Funds for fraud is barred by the June 2007 Termination and Purchase Agreement among BSAM, the Funds, and BOA, pursuant to which all outstanding repo transactions with BOA were unwound in mid-June 2007. (Ex. H). Based on Section 13(b) of this same agreement, when these transactions were unwound, any claims arising under the Master Repo Agreements were extinguished: "The performance of each party's obligations under this Agreement constitutes a final settlement of all obligations, rights and remedies that each Party may have under the Repurchase Agreements." (Ex. H at 12). This claim clearly arises under the Master Repo Agreements, as plaintiffs allege that the Funds breached one of the representations and warranties in that agreement. (Compl. ¶¶ 98-104).[14] Because BSAM was also a party to the Termination and Purchase agreement, any claims asserted against it in connection with the repo transactions similarly fail.

*Second*, plaintiffs cannot state a viable fraud claim against the Funds because plaintiffs have not alleged with particularity that BAS justifiably relied on any alleged misrepresentation or that damages

---

[13] *See, e.g., 484 Assocs., L.P. v. Moy*, No. 06 Civ. 2290 (PAC), 2007 WL 683999, at*4 (S.D.N.Y. Mar. 5, 2007) (dismissing aiding and abetting claim because complaint failed to state a fraud claim); *MCI Worldcom Communications, Inc. v. North American Communications Control, Inc.*, No. 98 Civ. 6818 (LTS), 2003 WL 21279446, at *11 (S.D.N.Y. June 4, 2003) (dismissing aiding and abetting claim because complaint failed to state a fraudulent inducement claim).

[14] Annex 1 to the Master Repurchase Agreement states that each party "represents and warrants to the other party that no material adverse change in such party's financial condition has occurred since the date of the most recent financial statements furnished by such party to the other party, and such financial statements are complete and correct and fairly present such party's financial condition and results of operations as at and for the period ended on the date thereof." (Exs. E & F at 11; Compl. ¶¶ 99-100).

were incurred "as a result of such reliance." *See Bridgestone/Firestone*, 98 F.3d at 19.  Not surprisingly, in violation of Rule 9(b), plaintiffs are conspicuously vague about the specifics of the repo transactions at issue – how many there were, when they occurred, in what amounts, and with which Fund(s) – and instead merely allege in conclusory fashion that the repos took place "in the spring of 2007" (Compl. ¶ 171), or "in late May 2007" (Compl. ¶ 101).  The reason for the lack of requisite detail is self-evident.  To the extent the repo transactions post-dated BSAM's May 23 disclosure, plaintiffs' fraud claim fails for the reasons set forth in Points IB and IIC above.

Thus, the only transaction even arguably identified with sufficient particularity to satisfy Rule 9(b) is "a $750 million repo financing on or about May 24 for the Mezzanine Notes issued in the CDO-squared Transaction." (Compl. ¶ 101).  But as to that transaction, BSAM's May 23 disclosure about the EL Fund redemptions negates any conceivable inference of fraudulent intent on the part of BSAM, and BAS's decision to proceed in the face of that disclosure negates any claim of justifiable reliance or losses incurred "as a result of such reliance."[15]

For these reasons, plaintiffs have not pled a viable underlying fraud claim against the Funds and the claim for aiding and abetting against BSAM therefore fails as well.

> 2.    Plaintiffs Have Not Adequately Alleged
>        "Actual Knowledge" or "Substantial Assistance"

Plaintiffs' aiding and abetting fraud claim also fails because they have not pled with particularity (i) BSAM's knowledge of the fraud or (ii) that BSAM provided substantial assistance to advance the fraud's commission. *See Winnick*, 406 F. Supp. 2d at 252.

"Knowledge," for purposes of an aiding and abetting fraud claim, means "actual knowledge of the underlying fraud." *Id. See also Lerner*, 459 F.3d at 292-93 (affirming dismissal of aiding and

---

[15] In addition, the fraud claim in Count V is premised on the same alleged "agreement," "program" or "scheme" to defraud that form the basis for Count II. (Compl. ¶¶ 97, 104, 166) But these accusations fare no better than those in Count II because they are equally devoid of supporting facts. (*See supra* at 19).

abetting fraud claim because plaintiffs "have failed to allege actual knowledge of the fraud with the particularity necessary" to satisfy Rule 9(b)); *Nathel v. Siegal*, No. 07 Civ. 10956 (LBS), 2008 WL 4684171, at *11 (S.D.N.Y. Oct. 20, 2008) (to satisfy the "knowledge" element of this claim, "a plaintiff must allege actual knowledge – allegations of constructive knowledge or recklessness are insufficient"). To satisfy this element of their claim, plaintiffs would have to allege that someone at the management level at BSAM, and not just the fund managers – who are the alleged primary wrongdoers – had actual knowledge of what the Funds did or did not tell BAS about the Funds' financial condition. But plaintiffs do not allege that anyone at BSAM knew what representations the Funds made about their financial condition prior to May 24 or at any point in the spring of 2007, let alone knew that any such representations were false and were made with the intent to defraud BOA.

      The complaint also does not – and cannot – allege that BSAM provided "substantial assistance" to the alleged wrongdoers, which is a separate and independent element of this claim. "Substantial assistance," for purposes of this claim, means that a defendant "affirmatively assists, or helps conceal, or fails to act when required to do so, thereby enabling the fraud . . . to occur." *Nathel*, 2008 WL 4684171, at *12 (citation omitted). *Accord, e.g.*, *Winnick*, 406 F. Supp. 2d at 256. In addition – and fatal to plaintiffs' claim here – it also means that "[t]he aider/abettor's actions must also 'proximately cause[] the harm on which the primary liability is predicated.'" *Nathel*, 2008 WL 4684171, at *12 (citation omitted). As the *Winnick* Court explained:

> Whether the assistance is substantial or not is measured, in turn, by whether "the action of the aider and abettor proximately caused the harm on which the primary liability is predicated." *Essentially, "[t]he substantial assistance element has been construed as a causation concept, requiring that the plaintiff allege that the acts of the aider and abettor proximately caused the harm upon which the primarily liability is predicated."*

406 F. Supp. 2d at 256 (citations omitted) (emphasis added).

      Even crediting the complaint's allegations that the Funds knowingly misled BOA as to their financial condition (which they did not), plaintiffs do not identify any separate person at the management

level at BSAM who allegedly assisted the fund managers or the Funds in doing so, let alone how, when and where such assistance was allegedly provided. And even if they had done that, they do not – and in light of the May 23 disclosure, cannot – allege that anything that BSAM did or failed to do "proximately caused the harm" for which they now seek to recover.

On any or all of these grounds, the aiding and abetting claim against BSAM should be dismissed as a matter of law.

## VI.   PLAINTIFFS FAIL TO ADEQUATELY ALLEGE PROXIMATE CAUSATION

Plaintiffs' claims suffer from an additional fatal flaw – failure to adequately plead proximate causation. Because proximate causation is a requisite element of fraud, breach of fiduciary and breach of contract claims, this defect compels dismissal of the entire complaint.

The "pleading requirements for common law fraud are essentially the same as those for claims under Section 10(b) and Rule 10b-5." *In re Merrill Lynch & Co. Research Reports Secs. Litig.*, 568 F. Supp. 2d 349, 366 (S.D.N.Y. 2008) (citation omitted). As this Court has repeatedly held, common law tort claims such as fraud cannot survive unless "loss causation" – which is analogous to the common law concept of "proximate cause" – has been adequately pled. *See, e.g., Shanahan v. Vallat*, No. 03 Civ. 3496 (PAC), 2008 WL 4525452, at *4, 7 (S.D.N.Y. Oct. 3, 2008) (noting that "[t]he concept of loss causation is similar to the doctrine of proximate cause" and holding that common law fraud and securities fraud claims both fail because plaintiffs could not establish loss causation); *Randolph Equities, LLC v. Carbon Capital, Inc.*, No. 05 Civ. 10889 (PAC), 2007 WL 914234, at *8 (S.D.N.Y. March 26, 2007) (dismissing common law fraud claim against one defendant for failure to allege loss causation).[16]

---

[16] *See also In re Merrill Lynch*, 568 F. Supp. 2d at 359-60; *Edison Fund v. Cogent Inv. Strategies Fund Ltd.*, 551 F. Supp. 2d 210, 229-33 (S.D.N.Y. 2008); *Harrison v. Rubenstein*, No. 02 Civ. 9356 (DAB), 2007 WL 582955, at *20 (S.D.N.Y. Feb. 26, 2007); *Serova v. Teplen*, No. 05 Civ. 6748 (HB), 2006 WL 349624, at *8 (S.D.N.Y. Feb. 16, 2006); *Hampshire Equity Partners v. Teradyne, Inc.*, No. 04 Civ. 3318 (LAP), 2004 WL 736217 at *4-5; (S.D.N.Y. Mar. 30, 2005).

Similarly, "where damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability." *LNC Invs., Inc. v. First Fidelity Bank*, 173 F.3d 454, 466 (2d Cir. 1999). In fact, "[l]oss causation is the fundamental core of the common-law concept of proximate cause" and, as such, is "[a]n essential element" of "any tort" claim. *Randolph*, 2007 WL 914234, at *8 (citing and quoting *Laub v. Faessel*, 297 A.D.2d 28, 31 (1st Dep't 2002)). Likewise on a breach of contract claim, a plaintiff must plead and prove both a breach of the contract by the defendant *and* "resulting damages to the plaintiff." *E.g., CSI Investment Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 413 (S.D.N.Y. 2007). And "[t]he standard for pleading damages from a breach of contract is virtually the same as that for pleading loss causation. Both are satisfied where the damage is alleged to have been proximately caused by the wrongful conduct." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 832 (S.D.N.Y. 2006).

"Similar to loss causation, the proximate cause element of common law fraud requires that plaintiff adequately allege a causal connection between defendants' non-disclosures and the subsequent decline in . . . value . . . ." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). Thus, to establish proximate cause or loss causation, "a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, . . . i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of security." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 173 (2d Cir. 2005) (citation omitted). *See also Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (loss causation requires plaintiffs to distinguish the alleged fraud from the "tangle of [other] factors" that affect a stock's price). The purpose of the loss causation rule, "as with the foreseeability limit in tort," is "to fix a legal limit on a person's responsibility, even for wrongful acts." *Lentell*, 396 F.3d at 174 (citation omitted). Fraud claims arising in the context of the purchase and sale of securities are routinely dismissed for failure to adequately allege

proximate cause or loss causation.[17]

It is not enough to allege that, "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Id.* at 172 (citation omitted). As this Court has explained, that constitutes transaction as opposed to loss causation, which is "akin to" common law "reliance," *id.* (and also has not been and cannot be alleged). *See, e.g., In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 589 (S.D.N.Y. 2006) (explaining that transaction causation and loss causation are distinct pleading requirements). Moreover, where, as here, the alleged losses "'coincide[] with a marketwide phenomenon causing comparable losses to other investors,' . . . a plaintiff's claim fails when 'it has not adequately [pled] facts which, if proven, would show that its loss was caused by the alleged misstatement [or omissions] as opposed to intervening events.'" *Lentell*, 396 F.3d at 174 (citation omitted). *See also Shanahan*, 2008 WL 4525452, at *5-7 (plaintiffs' losses were not due to defendants' alleged omissions, but to the "industry-wide phenomena that destroyed all or most" companies in a "collapsing market") (citation omitted).

Plaintiffs' allegations do not and cannot satisfy these exacting pleading prerequisites. Plaintiffs acknowledge the "market-wide decline in CDO prices" and allege that "rushed" sales of several billion dollars in CDOs into this marketplace as the Funds were collapsing in June 2007, and reduced demand for such CDOs following the Funds' collapse, "contributed" to this decline. (Compl. ¶ 123; *see also* Compl. ¶ 116.) But no facts are set forth to establish that the alleged omissions by the defendants, as opposed to the market-wide decline that started before the Funds collapsed and continues to this day, were the *proximate cause* of their claimed losses, nor have plaintiffs even attempted to "ascribe some rough

---

[17] *See e.g. Lentell*, 396 F.3d at 164, 175-78; *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 151 (2d Cir. 2007); *Joffee v. Lehman Bros.*, 410 F. Supp. 2d 187, 190 (S.D.N.Y. 2006), *aff'd*, 209 Fed. App'x 80 (2d Cir. 2006); *In re Merrill Lynch*, 568 F. Supp. 2d at 360, 363-64; *Garber v. Legg Mason Inc.*, 537 F. Supp. 2d. 597, 616-17 (S.D.N.Y. 2008); *60223 Trust v. Goldman Sachs & Co.*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007); *Davidoff v. Farina*, No. 04 Civ. 7617 (NRB), 2005 U.S. Dist. LEXIS 17638, at *50-53 (S.D.N.Y. Aug. 19, 2005).

proportionality of the whole loss" to the alleged omissions. *In re Merrill Lynch & Co. Research Reports Secs. Litig.*, Nos. 02 MDL 1484, 02 Civ. 9690 (JFK), 2008 U.S. Dist. Lexis 44344, at *22-24 (S.D.N.Y. June 4, 2008) (dismissing securities fraud claims for failure to adequately plead loss causation) (*citing Lattanzio*, 476 F.3d at 158 (affirming order dismissing securities fraud claim for failure to plead loss causation) and *In re Omnicom Group, Inc. Secs. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008) (dismissing claims for same reason)). *See also In re Merrill*, 568 F. Supp. 2d at 364 ("the Complaint does not assert facts that distinguish between the alleged fraud and the market-wide collapse of Internet stocks as the cause of [plaintiff's] losses").

The failure to make this distinction is particularly egregious in the context of plaintiffs' claims for damages from the $3.2 billion in so-called Super-Senior notes they came to hold as a result of agreeing to issue the put option. According to the complaint, plaintiffs did not even "step[] in" and purchase these notes until later in June, when the market for such Super-Senior securities "dried up." (Compl. ¶ 125.) Yet there is no allegation that the Funds' collapse, as opposed to the overall decimation of the CDO market, caused this particular sector of the market to dry up; nor does the complaint explain how, once BOA stepped in and purchased the notes, the further decline in their value can be attributed to the Funds' collapse weeks earlier. Instead, plaintiffs, in conclusory fashion, simply assert that "[t]he Super-Senior Notes have lost substantial value since the Bear Stearns Funds collapsed." (Compl. ¶ 125.)

Significantly, although every one of BOA's public filings since the summer of 2007, including most recently its quarterly report for the period ending September 30, 2008, concedes that general "market dislocations *continued* to significantly impact" BOA's results and that BOA *continued* to "incur[] additional losses on CDOs and related subprime exposure" (Ex. R at 60 (emphasis added); *see also* Exs. M at 41, N at 48, O at 10, P at 43, Q at 49), the complaint in no way acknowledges – much less attempts to assign some "rough proportionality" of causation to – this admitted, dramatic, and continuing market-wide deterioration that is now far removed from the Funds' collapse in early June 2007. *See Lentell*, 396 F.3d at

-34-

174 ("when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to

other investors, the prospect that the plaintiff's loss was caused by the fraud decreases") (citation omitted).

Nor does the complaint acknowledge or grapple with another significant intervening cause of the decline in

the value of the securities at issue here, as also described and admitted in BOA's own public filings – the

fourth quarter 2007 downgrading of the credit ratings of CDOs, "which among other things triggered

further widening of credit spreads [i.e., reductions in value] for these types of securities." (Ex. O at 10). *See*

*Lentell*, 396 F.3d at 174 (when the connection between the investment loss and the information concealed

"is attenuated, or if the plaintiff fails to 'demonstrate a causal connection between the content of the alleged

. . . omissions and the harm actually suffered,'" "a fraud claim will not lie") (citations omitted).[18]

These substantial pleading inadequacies are fatal to all of plaintiffs' claims, because they all

require a showing that plaintiffs' damages were proximately caused by defendants' alleged misconduct.

### Conclusion

For the reasons set forth above, BSAM respectfully requests that this Court dismiss BOA's

complaint in its entirety.

Dated:   New York, New York
         January 16, 2009

Kramer Levin Naftalis & Frankel LLP

By:      /s/ Barry H. Berke
         Barry H. Berke
         Eric Tirschwell
         Kerri Ann Law
         Marjorie E. Sheldon

---

[18] Further underscoring the lack of proximate causation are the allegations in the Complaint showing that the Funds' own securities began to decline in value, as part of a market-wide decline, well before the Funds' collapse. Thus, the complaint alleges that BOA itself was told in May that the EL Fund was down 6.5% in April (Compl. ¶ 106), that the final EL Fund return for April was down 18.97% (Compl. ¶ 107), and that this fund also was down 38% in May (*id.* ¶ 112). In other words, by plaintiffs' own pleading, the EL Fund assets had lost close to half their value before either Fund collapsed in early June. Plaintiffs' complaint is therefore inadequate for the additional reason that it fails to explain how the decline in the value of the securities following the collapse of the Funds "was attributable to the alleged fraud, rather than simply a continuation of the loss in value that afflicted [these assets] during the [CDO market's] collapse" beginning months earlier. *In re Merrill Lynch*, 568 F. Supp. 2d at 364.

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Attorneys for Defendant Bear Stearns Asset
Management Inc.

KL3 2697117.2