UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————— x

BANK OF AMERICA, NATIONAL ASSOCIATION        :
and U.S. BANK NATIONAL ASSOCIATION,          :
solely in its capacity as Trustee under the Indenture   :
                                             :
                          Plaintiffs, and    :     08-CV-09265 (AJN)
                                             :
BANC OF AMERICA SECURITIES LLC,              :     ECF Case
                                             :
            Plaintiff/Counterclaim-Defendant,   :
                                             :
                  - against -                :
                                             :
BEAR STEARNS ASSET MANAGEMENT INC.,          :
RALPH CIOFFI, MATTHEW TANNIN, and            :
RAYMOND McGARRIGAL,                          :
                                             :
            Defendants/Counterclaim-Plaintiffs.   :
———————————————————————————— x

**DEFENDANTS' BRIEF
IN SUPPORT OF MOTION TO
<u>EXCLUDE THE EXPERT TESTIMONY OF MUKESH BAJAJ</u>**

TABLE OF CONTENTS

Table of Authorities ............................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

DR. BAJAJ'S OPINION ...........................................................................................................3

ARGUMENT ..............................................................................................................................6

     A.    The governing *Daubert* standard for admissibility ................................................6

     B.    Dr. Bajaj's Damages Calculations Are Based On An
           Unprecedented and Untested Use of an Event Study Framework to
           Measure Alleged Overvaluation of Illiquid CDO Assets ........................................8

     C.    Bajaj's Opinions Should be Excluded Because They Are Based On
           Speculative and Unfounded Assumptions ............................................................10

     D.    Dr. Bajaj's "Overvaluation" Calculations Improperly Measure
           Damages based on Forced/Fire Sale Discounts ....................................................16

     E.    The $CDO^2$ Offering Circular and BOA's Own Valuation Approach
           Further Undermine Dr. Bajaj's Reliance on Market Price
           Discounts to Calculate Damages on the $CDO^2$ ....................................................21

     F.    Dr. Bajaj's "But-For" $CDO^2$ Contradicts a Fundamental Feature of
           Structured Securities ............................................................................................23

CONCLUSION..........................................................................................................................25

TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re AIG, Inc. Sec. Litig.,*
  265 F.R.D. 157 (S.D.N.Y. 2010), *vacated on other grounds by*
  689 F.3d 229 (2d Cir. 2012)..................................................................................9

*Amorgianos v. Amtrak,*
  303 F.3d 256 (2d Cir. 2002)..................................................................................7

*Anchor Sav. Bank, FSB v. United States,*
  597 F.3d 1356 (Fed. Cir. 2010)...........................................................................18

*Astra Aktiebolag v. Andrx Pharms., Inc.,*
  222 F. Supp. 2d 423 (S.D.N.Y. 2002)....................................................................7

*Barrett v. Black & Decker (U.S.) Inc.,*
  No. 06 Civ. 1970 (SCR) (MDF), 2008 WL 5170200 (S.D.N.Y. Dec. 9, 2008) ......................16

*Barrows v. Forest Labs., Inc.,*
  742 F.2d 54 (2d Cir. 1984)...................................................................................16

*Boucher v. United States Suzuki Motor Corp.,*
  73 F.3d 18 (2d Cir. 1996).....................................................................................10

*Buckley v. Deloitte & Touche USA LLP,*
  No. 06 Civ. 3291 (SHS), 2012 WL 3538733 (S.D.N.Y. Aug. 16, 2012) ................................15

*Campbell v. Metro. Prop. & Cas. Ins. Co.,*
  239 F.3d 179 (2d Cir. 2001)...................................................................................7

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.,*
  650 F. Supp. 2d 314 (S.D.N.Y. 2009)...................................................................10

*In re Countrywide Fin. Corp. Sec. Litig.,*
  273 F.R.D. 586 (C.D. Cal. 2009).............................................................................9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993)....................................................................................*passim*

*Hotaling v A.B. Leach & Co.,*
  247 N.Y. 84 (1928) ...............................................................................................18

*Int'l Motor Sports Grp., Inc. v. Gordon,*
  No. 98 Civ. 5611 (MBM), 1999 WL 619633 (S.D.N.Y. Aug. 16, 1999).....................17 n.14

*In re Intelligroup Sec. Litig.*,
    468 F. Supp. 2d 670 (D.N.J. 2006) ................................................................8

*In re Iridium Operating LLC*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) ........................................................22

*In re Janes*,
    90 N.Y.2d 41 (1997) .............................................................................17 n.14

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ....................................................................... 6, 7, 8

*Lama Holding Co. v. Smith Barney Inc.*,
    88 N.Y.2d 413 (1996) ...........................................................................17 n.14

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003) ..............................................................10, 16

*Litman v. United States*,
    78 Fed. Cl. 90 (Fed. Cl. 2007) .............................................................19 n.17

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ....................................................................7, 10

*McGuire v. Russell Miller, Inc.*,
    1 F.3d 1306 (2d Cir. 1993) ...................................................................17 n.14

*Mink Mart, Inc. v. Reliance Ins. Co.*,
    65 F. Supp. 2d 176 (S.D.N.Y. 1999) ...........................................................11

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
    No. C. 08-4575 (SI), 2011 WL 1842819 (N.D. Cal. May 16, 2011) ........................9

*Rosewood Apartments Corp. v. Perpignano*,
    200 F. Supp. 2d 269 (S.D.N.Y. 2002) ....................................................17 n.14

*Scalp & Blade, Inc. v. Advest, Inc.*,
    309 A.D.2d 219 (4th Dep't 2003) ..........................................................17 n.14

*Sharma v. Skaarup Ship Mgmt. Corp.*,
    916 F.2d 820 (2d Cir. 1990) .................................................................17 n.14

*Silicon Knights, Inc. v. Epic Games, Inc.*,
    No. 5:07-CV275-D, 2011 WL 6748518 (E.D.N.C. Dec. 22, 2011) ........................15

*Standard Dyeing & Finishing Co. v. Arma Textile Printers Corp.*,
    No. 85 Civ 5399 (BN), 1991 WL 49782 (S.D.N.Y. Mar. 25, 1991) ........................18

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   546 F.3d 196 (2d Cir. 2008)................................................................................9

*United States v. Williams*,
   506 F.3d 151 (2d Cir. 2007)................................................................................7

*Estate of Warhol*,
   No. 824/87, 1994 WL 245246 (N.Y. Surr. Ct. N.Y. County Apr. 14, 1994) .................18 n.16

*In re Xerox Corp. Sec. Litig.*,
   746 F. Supp. 2d 402 (D. Conn. 2010) ...................................................................8

*In re Young Broad. Inc.*,
   430 B.R. 99 (Bankr. S.D.N.Y. 2010) (Gonzalez, C.J.) .........................................9-10

**OTHER AUTHORITIES**

Fed. R. Evid. 401 ...............................................................................................7

Fed. R. Evid. 702 ............................................................................................3, 6

PRELIMINARY STATEMENT

As detailed in our motion for summary judgment, Plaintiffs' core theory of how the collapse of the two BSAM hedge funds in June/July 2007 caused them damages failed to pan out. After *6000* hours and millions of dollars of expert time (Bajaj at 8-9)[1], Plaintiffs were simply unable to prove that revelation of news of the Funds' difficulties caused a marketwide decline in the prices for CDOs and/or somehow impacted the risk of default or non-payment of the $CDO^2$ or its constituent collateral. *See* Memo. in Support of Mtn. for Summ. Judg. at 32-37.

Instead, through their expert Mukesh Bajaj, PhD, Plaintiffs put forth their damages "Plan B." This damages analysis is based on a critical assumption provided to Dr. Bajaj by counsel: that if the Defendants had made earlier disclosure to BOA about developments at the Funds, the parties would have renegotiated a different "but-for" $CDO^2$ where Plaintiffs would have paid less for the Initial Collateral and therefore would have lost less when that collateral and the $CDO^2$ itself later failed to perform.

A first fatal problem with Dr. Bajaj's analysis is that its very foundation – the "but-for" $CDO^2$ assumption – is pure speculation and there is no evidence that such a renegotiation has ever happened in any CDO deal or would have happened here. Dr. Bajaj's analysis therefore must be excluded because it is speculative and based on unsupported and faulty assumptions.

Dr. Bajaj's analysis suffers from other major shortcomings and errors. While Dr. Bajaj has been a paid expert for many years and has testified in over 50 matters, this is the first time he

---

[1] The deposition testimony and expert report excerpts referenced herein are annexed as exhibits to the Declaration of Marjorie E. Sheldon in Support of Defendants' Motion to Exclude the Expert Testimony of Mukesh Bajaj, dated November 30, 2012, and are cited by the witness or expert's last name, followed by a page or paragraph number. All other referenced materials are annexed as exhibits to the Declaration of Jason Moff in Support of Defendants' Motion to Exclude the Expert Testimony of Mukesh Bajaj, dated November 30, 2012, and are cited by their declaration exhibit number.

– or any other expert to his knowledge – has presented in a litigation a purported "event study" to try to measure the impact of the disclosure of information on the prices of illiquid and thinly traded CDOs.  This lack of judicial or peer review, scrutiny, testing, or endorsement weighs heavily against the required finding that his methodology is reliable, and it demands the strictest of scrutiny as the Court discharges its gate-keeping function.

Beyond relying on a speculative and unsupported assumption and employing an untested methodology, Dr. Bajaj improperly calculates damages by comparing the agreed-upon prices of the Initial Collateral with the prices at which the Funds sold different assets weeks later under very different forced sale circumstances.  That "apples and oranges" comparison renders his method unreliable and irrelevant because such forced or fire sale discounts are not a proper measure of an asset's value for determining legal damages.

Dr. Bajaj also ignores the structural realities of the $CDO^2$.  In calculating damages to the $CDO^2$, he allocates the purported amount that BOA allegedly overpaid for the underlying collateral to each $CDO^2$ tranche in proportion to the size of each tranche, including the most highly rated Super-Senior notes. This assumption, that the $CDO^2$ tranches were damaged in proportion to their size, contradicts the fundamental feature of structured securities, whereby losses are experienced first and in higher proportion by the lower rated tranches.  Application of that assumption here results in unreliable and irrelevant damages calculations disproportionately allocated to the Super-Senior tranche of the $CDO^2$.

Stripped of fancy economic jargon, Dr. Bajaj's so-called "event study" amounts to no more than a calculation of a legally irrelevant going-out-of-business sale discount experienced by the Funds when they were forced to sell assets in June/July 2007 after repo counterparties made margin calls and began seizing assets; a flawed attempt to circumvent BOA's contemporaneous

valuations that show the Funds' difficulties did not impair the value of the CDO[2]; and an analysis that fails reliably or properly to arrive at legally cognizable damages figures.  For these reasons, Dr. Bajaj's testimony should be excluded pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

DR. BAJAJ'S OPINION[2]

To calculate damages to the various tranches of the CDO[2], Dr. Bajaj purports to have conducted an "event study." (Bajaj Report ¶ 21). An event study, in Dr. Bajaj's words, is meant "to examine 'how the release of information affects prices at a particular time.'" (*Id.* ¶ 52). Event studies typically involve a regression model designed to compare: (a) the rate of change in the prices of assets allegedly impacted by the disclosure of previously omitted information, against (b) the rate of change in the prices of other similar assets traded in the same market.  A regression model is meant to assess whether there exists any statistically significant difference between (a) and (b) following the disclosure of allegedly value-relevant information. (*See* Bajaj Report ¶¶ 21, 54 n.81).

While an event study is a common methodology employed in stock-drop cases involving publicly and frequently traded securities such as common stock, Dr. Bajaj admits that of the "hundreds" of event studies he has been involved with, this is the first and only case where he has issued a report in which he conducted what he calls a "formal event study" on the effect of "disclosures on [the] valuation of a CDO portfolio." (Bajaj at 38-41).  Dr. Bajaj also concedes that he is unaware of a single other CDO event study that has been proffered in court or appeared

---

[2] For the relevant background facts of the case, we respectfully refer the Court to the Defendants' Rule 56.1 statement of background and undisputed facts, submitted in support of Defendants' Motion for Summary Judgment. Terms not defined in this brief have been defined in the Memorandum in Support of Defendants' Motion for Summary Judgment.

in any academic journal.  (*Id.* at 41).  In fact, as we discuss below, a number of courts have rejected event studies in the context of thinly traded assets, including asset-backed securities and bonds.

Dr. Bajaj's so-called event study focused on three alleged omissions by Defendants:  (1) that Defendants allegedly intended to liquidate the Funds or allegedly believed that such liquidation was highly likely; (2) that Defendants allegedly intended to suspend redemptions at both Funds or allegedly believed that such suspension was highly likely; and (3) that substantial redemption requests, exceeding $300 million for the end of June 2007, allegedly had occurred at the Enhanced Fund. (Bajaj Report ¶ 20). For Dr. Bajaj's analysis to be relevant, each of these alleged omissions had to be known or knowable to BSAM prior to May 22, 2007. (Bajaj at 87-88, 164).[3]

Dr. Bajaj claims to have conducted what he calls a "review of the economic evidence" and concluded that "investors learned of the Funds' liquidation" on July 17, 2007; "investors learned that both the Funds would suspend redemptions" on June 27, 2007; and "investors learned that the [Enhanced] Fund had experienced hundreds of millions of dollars of redemption requests" on June 6, 2007.  (Bajaj Report ¶¶ 21-23). Next, Dr. Bajaj selected "event windows" corresponding to these three disclosure dates.  An "event window" is the period following a disclosure for which transaction price movements are measured.  Dr. Bajaj's event windows spanned from one to two weeks long.  (Bajaj Report Appx. 5 at 14-15).

---

[3] Defendants dispute that all of the three alleged omissions were known or knowable prior to May 22; in fact, the record shows a dynamic series of developments and efforts to address growing redemption requests and head off the uncertain possibility of suspending redemptions and/or liquidating one or both Funds.  But this dispute is not germane to this motion.

These event windows cover the period in June/July 2007 during which the two BSAM Funds announced suspensions of redemptions, the Funds' repo counterparties made margin calls and seized collateral, and the Funds were forced to sell off substantial amounts of their holdings (primarily CDOs).  Dr. Bajaj's purported event study compared, or "regressed," (a) the price discounts on these CDO asset sales by the Funds after each of the three allegedly curative announcements against (b) the price discounts in two designated series of the ABX index during the same time frame.  The ABX index is a "frequently-used gauge of valuations of subprime-based RMBS." (Barro Report at 10).   By regressing these two price discounts against one another, Dr. Bajaj claims he attempted to filter out influences from aggregate conditions in housing and financial markets by holding constant the behavior of the ABX indexes.  According to Dr. Bajaj, any statistically significant residual discount in the prices of the CDO assets sold by the Funds during his designated event windows and not already reflected in contemporaneous fluctuations of the ABX index can be attributed to the revelation of each of the three alleged omissions.  (Bajaj Report ¶¶ 52-59).

Dr. Bajaj then applied these alleged residual price discounts to sixty of the eighty-three assets that comprised the Initial Collateral sold to BOA on May 22, 2007 (and then to the Issuer on May 24).  Using these assumptions, he calculated that if full curative disclosure concerning the Funds was not made until July 17, 2007, those sixty "Analyzed Assets" were overvalued on May 22, 2007 by $420.3M to $466.5M; if full disclosure was made by June 27, by $262.6M to $445.9M; and if June 6 is the curative disclosure date, by $126.5M to $166.2M. (*See* Bajaj Report ¶¶ 21-23, Appx. 7-A; *see also* Bajaj Supp. Rebuttal Report at 2-3).

To allow Dr. Bajaj to transform his "overvaluation" of the underlying Initial Collateral into damages on the Super-Senior and Mezzanine tranches of the $CDO^2$, Plaintiffs' counsel

instructed him to assume that, had BSAM disclosed the allegedly concealed information about the Funds prior to May 22, BOA and BSAM would have done the "same" deal except that, because of the Funds' difficulties, BOA would have renegotiated lower prices for the Initial Collateral. *See* Bajaj at 212 ("as I understand the economic argument, it is that with those disclosures Bank of America would have been able to negotiate a lower price that is equal to the change in value that is observed upon the disclosure"); *id.* at 215-16 ("The question is whether, with the knowledge that was withheld from the bank, the bank could have negotiated a lower initial price which would have correspondingly reduced its losses"); *id.* at 217-18.  Dr. Bajaj calls this speculative and hypothetical renegotiated deal the "but-for" CDO² transaction: where everything about the transaction would have been the same, except it would be proportionally smaller and BOA (and the Issuer) would have paid lower prices.  (Bajaj Report ¶ 64).

ARGUMENT

A.    The governing *Daubert* standard for admissibility

Rule 702 of the Federal Rules of Evidence permits "a witness who is qualified as an expert" to testify if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; if "the testimony is based on sufficient facts or data"; if "the testimony is the product of reliable principles and methods"; and if "the expert has reliably applied the principles and methods to the facts of the case."  This rule entrusts the district court with the critical gatekeeping task of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

The gatekeeping responsibility "applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal quotations omitted), and whether the

expert testimony is "proffered at trial or in connection with a motion for summary judgment." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). The proponent of expert testimony must carry the "burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*).

To be reliable, an expert's testimony must be grounded in the methods and procedures of scientific, technical, or other specialized knowledge, and it must be based on more than a subjective belief or speculation. *Daubert*, 509 U.S. at 589-90. The expert must "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. "[I]t is critical that an expert's analysis be reliable at every step . . . . *[A]ny* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002) (internal quotations and citations omitted) (emphasis in original).

The expert's testimony also must "fit" the issues in the case by having a "valid scientific [or other technical] connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591-92. Courts have also looked to the definition of relevance under Fed. R. Evid. 401 for guidance, examining whether the testimony "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (analyzing *Daubert* and quoting Fed. R. Evid. 401). "If the expert has failed to consider the necessary factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded for lack of probative value." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002).

B.     Dr. Bajaj's Damages Calculations Are Based On
       An Unprecedented and Untested Use of an Event
       Study Framework to Measure Alleged Overvaluation
       of Illiquid CDO Assets

In evaluating the reliability of expert testimony, important considerations include whether

the expert's methodology can be and has been tested, whether it has been accepted by the

relevant professional community, whether there are standards controlling the method's operation,

and whether it has been subjected to peer review or publication.  *Daubert*, 509 U.S. at 593-94;

*Kumho Tire,* 526 U.S. at 151.  Here, these considerations weigh strongly against a finding of

reliability when combined with the significant additional flaws discussed below.

Dr. Bajaj calls event studies "a well-accepted statistical methodology commonly used by

financial economists," (Bajaj Report at ¶ 21), but the event study methodology has enjoyed no

such acceptance in the context in which he seeks to employ it here.  As noted above, despite

having worked on "hundreds" of event studies, this case is the very first time Dr. Bajaj has

issued a report involving what he calls a "formal event study" on the effect of "disclosures on

[the] valuation of a CDO portfolio."  (Bajaj at 39-41).  Nor is Dr. Bajaj aware (and neither are

we) of a single other CDO event study that has been offered in a court or an academic journal.

(*Id.* at 41).

Event studies are commonly used to measure price impacts upon disclosures relating to

publicly and widely traded stocks.  These studies are generally applied to securities that trade in

efficient markets, where "the efficient market hypothesis," *In re Xerox Corp. Sec. Litig.*, 746 F.

Supp. 2d 402, 408 n.1 (D. Conn. 2010), assumes "the market's immediate reaction to any

financially-important news," *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 696 (D.N.J.

2006).  The leap from that well-accepted application of event study methodology to the very

different context of a privately and thinly traded illiquid asset class like CDOs presents numerous

difficulties and challenges, and courts have rejected event studies in the context of similar structured products and other infrequently traded assets. *See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* 546 F.3d 196, 207-11 & n.17 (2d Cir. 2008) (affirming rejection of event study in context of infrequently traded asset-backed securities, where, among other things, the disclosures were insufficiently related to the underlying financial health of the certificates). *See also In re Nuveen Funds/City of Alameda Sec. Litig.,* No. C. 08-4575 (SI), 2011 WL 1842819, at *7 (N.D. Cal. May 16, 2011) (finding that an "event study" could not properly be performed because the debt securities at issue were executed infrequently, and contrasting that market against "efficient markets with many thousands of stock trades every day"); *In re AIG, Inc. Sec. Litig.,* 265 F.R.D. 157 (S.D.N.Y. 2010) (rejecting event study meant to measure changes in bond prices), *vacated on other grounds by* 689 F.3d 229 (2d Cir. 2012); *In re Countrywide Fin. Corp. Sec. Litig.,* 273 F.R.D. 586, 620-21 (C.D. Cal. 2009) (denying class certification based on event study used to argue fraud-on-the-market, where bonds traded on only 20% of the available trading days and "too few observations were available").

Here too, while Dr. Bajaj acknowledges that infrequently traded assets like CDOs require "the use of different methods compared to standard stock event studies" (Bajaj Rebuttal Report ¶ 48), his approach raises numerous questions as to its methodological soundness. We discuss several significant and fatal flaws below,[4] but the important starting point is that Dr. Bajaj's unprecedented, untested, never published or peer-reviewed application of event study methodology to measure the effect of disclosures on the value of CDOs, when combined with the multiple significant flaws described below, compels exclusion of his testimony. *See In re Young*

---

[4] Numerous other major flaws and critiques that further demonstrate the unreliability of Dr. Bajaj's analysis are set forth in Harvard University Professor Robert Barro's report and another defense expert report, but are not directly relevant to this motion.

*Broad. Inc.*, 430 B.R. 99, 127 (Bankr. S.D.N.Y. 2010) (Gonzalez, C.J.) (rejecting proposed

valuation expert who purported to have modified an otherwise peer-tested and accepted

discounted cash flow valuation technique because, *inter alia*, expert's modified version "is not a

method that has been tested or relied upon by other experts, it had never been subjected to peer

review or discussed in any publication, the potential rate of error is unknown, and there is no

evidence that this method was ever employed, discussed, and certainly not generally accepted in

any academic or professional community," and because expert's explanation for making his

modifications "does not give him free rein to employ a brand new valuation method that he

conceded has never been used by any valuation expert in court").

C.     Bajaj's Opinions Should be Excluded Because They
       Are Based On Speculative and Unfounded Assumptions

       "[E]xpert testimony should be excluded if it is speculative or conjectural," and the

"[a]dmission of expert testimony based on speculative assumptions is an abuse of discretion."

*Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21, 22 (2d Cir. 1996). *Accord Major*

*League Baseball*, 542 F.3d at 304, 311 (rejecting defendant's expert's opinions of a "but-for"

world which would have existed only had certain factual assumptions contrary to the testimonial

evidence been true). Expert testimony also is inadmissible if it is based on "assumptions that are

'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and

oranges comparison.'" *Boucher*, 73 F.3d at 21 (citation omitted). *See, e.g., Compania*

*Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.,* 650 F. Supp. 2d 314, 319-20 (S.D.N.Y.

2009) (rejecting expert analysis based in part on what would have happened in "but-for" world,

where expert based analysis on "a series of assumptions that have no basis in fact or reality");

*Lippe v. Bairnco Corp.,* 288 B.R. 678, 690 (S.D.N.Y. 2003) (rejecting valuation expert who

could not, *inter alia,* verify truth of his assumption that sale of corporation would have warranted

payment of control premium by prospective purchasers); *Mink Mart, Inc. v. Reliance Ins. Co.*, 65 F. Supp. 2d 176, 180-81 (S.D.N.Y. 1999) (excluding expert testimony based on "speculation" and not "grounded on verifiable propositions of facts'").

As noted above, there are two key pillars of Dr. Bajaj's damages analysis. The first is the assumption that had BSAM disclosed the allegedly concealed information about the Funds earlier (prior to May 22), BOA and the Issuer still would have purchased the same collateral, except that BOA would have renegotiated discounted prices for that collateral because of the Funds' difficulties. The second is the assumption that had BOA (and then the Issuer) purchased the same collateral at discounted prices, the $CDO^2$ would have been identical to the actual $CDO^2$, but proportionally smaller in size across all tranches.

Dr. Bajaj's analysis fails because there is no evidence in the record to support the assumptions of this "but-for" $CDO^2$, which is based on nothing more than speculation about what might have been. Dr. Bajaj cites no evidence to support the "but-for" price renegotiation; he simply accepted it as an assumption from BOA's counsel. Dr. Bajaj also confirmed he did not know whether BOA would have been able to renegotiate the prices had the disclosure been made earlier. (Bajaj at 217-18). No other witness of the dozens deposed has supported the assumption that such a price renegotiation would have taken place in that scenario. These failures of proof alone are a sufficient basis to exclude Dr. Bajaj's analysis.

The discovery record in fact points in the opposite direction, to the improbability if not implausibility of a renegotiated $CDO^2$ deal. First, the "but-for" price renegotiation would require the fact-finder to speculate that had the disclosure about the Funds been made earlier, BOA would have asked to lower the prices of the Initial Collateral by up to $485MM (or more). Yet both sides had agreed to the prices for that collateral on April 30 and had agreed (as later

disclosed to investors in the offering materials) that the April 30 prices would be the prices at which the Initial Collateral would be sold to the new $CDO^2$ at closing, irrespective of whether the market value of those assets had gone up or down between April 30 and closing,[5] making a price renegotiation based on subsequent developments at the Funds highly unlikely.  In addition, prior to agreeing to the prices on April 30, BOA's CDO trading desk had reviewed BSAM's Initial Collateral selections and prices and determined that BSAM's prices were about $50-$60MM higher than where BOA would mark them, and yet BOA did not ask BSAM to lower the prices.[6] And, even after receiving BSAM's May 23 letter, BOA made no effort or inquiry whatsoever to see if BSAM would agree either to take the assets back or to reduce the prices,[7] further undermining the likelihood of the price-renegotiated "but-for" $CDO^2$.

Second, the "but-for" price negotiation would require speculation that BSAM would have agreed to BOA's hypothetical proposal to lower prices and would have chosen to accept up to $485MM less in sale proceeds for its Funds, as opposed to walking away from the deal and having the Funds keep the assets.  Given BSAM's obligations to the Funds and their investors,[8] the view of the BSAM portfolio managers (the defendants in this case) that they did not need to disclose the developments at the Funds to BOA,[9] and BSAM's view that those developments would not impact its ability to function as collateral manager,[10] it is pure speculation to conclude

---

[5] *See* Defs.' Memo. of Law in Support of Mtn. for Summ. Judg. at 23-25; Ex. 1 at 3, 46-47; Foley at 769-71; Ex. 2.

[6] Exs. 2, 3; Foley at 766-71; McLaughlin at 333-35.

[7] McLaughlin at 211-14, 347-49; Foley at 571-72, 795-96; Dash at 419; Tannin at 324.

[8] *See* Kesselman at 331-36.

[9] *See, e.g.,* McGarrigal at 15-21, 162-65; Cioffi at 55-57, 280-82; 285-90.

[10] *See* Ex. 19.

that selling the Funds' assets for hundreds of millions of dollars less than had been agreed on April 30 is something BSAM would or even could have consented to. Nor is there any evidentiary basis to conclude that even if BSAM had entertained the "but-for" $CDO^2$ price renegotiation prior to May 22, it would have come up with price discounts identical or comparable to what the Funds experienced weeks later when forced to sell assets under a very different set of circumstances (which later discounts are the basis for Dr. Bajaj's analysis).

Critically, there is no evidence – none – that such a price renegotiation has ever taken place in a BSAM or BOA CDO deal or any other CDO deal. In fact, there is substantial evidence that any such hypothetical price renegotiation would have been inconsistent with industry practice, which was that the collateral for a new CDO was transferred to that new CDO at prices set on a pre-determined earlier date (here, April 30)[11] and that those prices were not revisited, or reset to market value as of the time of closing.[12] BOA's own documents show that in other CDO deals closing within weeks of the $CDO^2$ transaction, where BOA concluded that the market value of the underlying collateral had declined, and was lower than the prices the new

---

[11] Kesselman Supp. Report at ¶¶ 5-9.

[12] Kesselman at 334-36 (repricing as of May 15 would have been inconsistent with industry practice and he "can't imagine . . . that happening"). *See also* Kesselman Supp. Report ¶ 9 (defendants' CDO industry expert, explaining that in his over 15 years of experience, he had never seen a deal reprice to market value as of the time of closing); Foley at 783-84 (BOA's execution day-to-day banker on the $CDO^2$ deal, testifying that he could not recall having ever been involved in a CDO where the prices of the initial collateral were re-negotiated to market value as of the time of closing); Castro at 398-401, 405-406 (plaintiffs' industry expert, confirming that it was *not* industry practice to revisit initial collateral prices at the time of closing to see if the market value had changed).

CDO agreed to pay for that collateral, the response was not to renegotiate the prices to changed market values but instead to disclose in the Offering Circular the change in market value.[13]

Third, on top of the speculative price renegotiation, the "but-for" CDO² also would require speculation that, assuming BOA had asked BSAM to lower the prices, and assuming BSAM had agreed to lower the prices, the parties also would have agreed to proportionately shrink the size of the deal across all the tranches, instead of, for example, keeping the tranche sizes the same (and the overall deal at the $4B size) and using the saved money to buy additional collateral. For BOA, the fees it would earn were a main driver of its interest in the transaction (Ex 6; Kesselman at 299-300); those fees depended primarily on the size of the deal; and BOA had already taken $15.4 million in fees into its P&L when the deal was "priced" on April 30 based on the $4 billion deal size (Ex. 7; McLaughlin at 322-25). In addition, BOA did not even consider trying to cap the deal size after it received the May 23 letter, even though there is evidence that that could have been done (Kesselman Report ¶ 52(a)); to the contrary, as late as August 2007, BOA was still considering exercising its "option to add up to $300 million of additional ABS securities to the CDO to improve the cash flows and overall profitability." (Ex. 8). In other words, there is every reason, or at least many reasons, to think that BOA's reaction to lower prices for the collateral would have been to keep the deal at the $4 billion size and work with BSAM to use the savings to purchase additional collateral, not shrink the deal to a smaller size, and cut its fees, as Dr. Bajaj assumes.

---

[13] Specifically, BOA produced offering circulars for two CDOs from June and August, 2007. In one, the market value of the initial collateral at the time of closing was disclosed to investors to be "significantly less than . . . original acquisition cost" and in the other it was disclosed to investors that a "material decline in the market value" of the initial collateral had occurred since the original date of purchase. (*See* Exs. 4 & 5). In neither case was there a renegotiation to the lower market value prices at the time of closing.

It is important to emphasize that the "but-for" $CDO^2$ assumption is a crucial link in plaintiffs' damages theory.  It provides the only mechanism for Dr. Bajaj to get from what he claims to be the amount of "overvaluation" of the Initial Collateral (the 60 underlying assets he analyzed) to what he claims are the damages to the securities that BOA ended up holding: the Super-Senior and Mezzanine tranches of the $CDO^2$ itself.  BOA was not damaged and did not suffer any losses from the May 22 purchase of the Initial Collateral, because whether the prices paid for that collateral were inflated or not, it is undisputed that BOA turned around and sold those assets to the Issuer at closing for the exact same prices.  The question is instead whether and how plaintiffs were damaged at the $CDO^2$ level, i.e., in the value of the Super-Senior and Mezzanine tranches of the $CDO^2$ that BOA came to own, and the "but-for" $CDO^2$ construct is a crucial and necessary link in Dr. Bajaj's attempt to answer that question.

This crucial and essential link, however, fails.  The "but for" $CDO^2$ is an improbable and implausible construct of plaintiffs' counsel's invention; and the multiple steps of unsupported speculation necessary for a fact-finder to adopt Dr. Bajaj's analysis require its preclusion. *See, e.g., Buckley v. Deloitte & Touche USA LLP*, No. 06 Civ. 3291 (SHS), 2012 WL 3538733, at *7-8 (S.D.N.Y. Aug. 16, 2012) (excluding expert analysis of what a company's board of directors and lenders "would have done if certain hypothetical" disclosures had been made earlier as improper conjecture and lacking "sufficient factual foundation," where there was no evidence of Board's or lender's past behavior or reactions to such disclosures); *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV275-D, 2011 WL 6748518, at *17 (E.D.N.C. Dec. 22, 2011) (finding expert damages rebuttal analysis based on a hypothetical renegotiation if allegedly omitted information had been disclosed earlier "not relevant and inadmissible" because expert "relied on hypothetical facts . . . not supported by" any meaningful record of prior such renegotiations); and

cases cited at 10-11, supra. *See also Barrows v. Forest Labs., Inc.*, 742 F.2d 54, 60 (2d Cir.
1984) ("A claim for benefit-of-the-bargain damages must be based on a bargain that was actually
struck, not on a bargain whose terms must be supplied by hypotheses about what the parties
would have done if the circumstances surrounding their transaction had been different.").

D.    Dr. Bajaj's "Overvaluation" Calculations Improperly
      <u>Measure Damages based on Forced/Fire Sale Discounts</u>

      Dr. Bajaj has improperly calculated damages by comparing prices for one set of assets
determined as a result of arm's length negotiations at an earlier point in time (the April 30 prices
for the Initial Collateral) with prices for a different set of assets sold by the Funds under
markedly different forced or fire sale circumstances at later dates (the "analyzed assets," sold
between June 7 and July 23, 2007).  Because "forced sale" or "fire sale" prices are not a proper
measure of an asset's value for determining legal damages, Dr. Bajaj's approach is based on a
faulty premise that leads him to an irrelevant and unreliable result.  This is exactly the sort of
"apples and oranges" comparison that courts have rejected in various contexts. *See, e.g., Barrett
v. Black & Decker (U.S.) Inc.*, No. 06 Civ. 1970 (SCR) (MDF), 2008 WL 5170200, at *8
(S.D.N.Y. Dec. 9, 2008) (rejecting causation expert's "apples to oranges" comparison); *Lippe*,
288 B.R. at 689 (excluding valuation expert's testimony derived from "apples and oranges"
comparison).

      As a general matter, the measure of damages on breach of contract, fraud, and breach of
fiduciary duty claims in connection with the purchase of securities turns on whether the price
paid was more than the value of what the plaintiff agreed and was supposed to receive in

exchange.[14]  In this case, that damages measure must account for the agreement (disclosed to

prospective investors) that the new $CDO^2$ would purchase the Initial Collateral at prices that had

been set as of April 30, regardless of whether the market value of those assets had changed

between April 30 and the date of closing.  In other words, plaintiffs assumed the risk of a decline

in market value between April 30 and closing.  But regardless of the precise measure of damages

in this case, using "forced" or "fire sale" prices to determine a change in "value" is error.

A "fire sale" is "essentially a forced sale of an asset at a dislocated price"; assets "sold in

fire sales can trade at prices far below value in best use;" and such sales can result in "prices

diverging from values," or "deviations of prices from" or prices "below" "fundamental values."

(Ex. 9 at 30, 37-38, 42, *cited in* Bajaj Report ¶ 35 n. 46).  Plaintiffs' own CDO industry expert,

Daniel Castro, more colloquially described a "fire sale" as a situation where "you've got to sell

at whatever price and you just dump it and you get whatever you get."  (Castro at 158-59).  Dr.

Bajaj recognizes this as well.  *See* Bajaj Report ¶ 35 ("As academic studies have noted, sudden

---

[14] *See, e.g., Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) ("[t]he
damage award resulting from a breach of an agreement to purchase securities is the difference
between the contract price and the fair market value of the asset at the time of breach").  *See also
McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1310 (2d Cir. 1993) (fraud damages measured as
the difference between what plaintiffs paid for the securities they purchased and what those
securities were "actually worth" at that time); *Lama Holding Co. v. Smith Barney Inc.*, 88
N.Y.2d 413, 421 (1996)  ("the loss is computed by ascertaining the 'difference between the value
of the bargain which a plaintiff was induced by fraud to make and the amount or value of the
consideration exacted as the price of the bargain'") (citation omitted); *Int'l Motor Sports Grp.,
Inc. v. Gordon*, No. 98 Civ. 5611 (MBM), 1999 WL 619633, at *9 (S.D.N.Y. Aug. 16, 1999)
(damages for common law fraud are "measured as 'the difference between the purchase price
and the true value of the stock'") (citation omitted).  *See also Scalp & Blade, Inc. v. Advest, Inc.,*
309 A.D.2d 219, 225 (4th Dep't 2003) (object of compensatory damages for breach of fiduciary
duty is to "make the plaintiff 'whole'"); *Rosewood Apartments Corp. v. Perpignano*, 200 F.
Supp. 2d 269, 276 (S.D.N.Y. 2002) (damages for breach of fiduciary duty claim should "start[ ]
with the price that would have been generated by the sale for fair market value"); *In re Janes,* 90
N.Y.2d 41, 55 (1997) (where fiduciary breach involved a failure to diversify, "the court should
determine the value of the stock on the date it should have been sold").

sales of a large quantity of assets are likely to occur at dislocated prices and cause severe losses to sellers.").[15]

Courts in various contexts have recognized that a "forced" or "fire sale" price for an asset is inconsistent with, and not a proper gauge of calculating, the value of that asset for damages purposes. *See, e.g., Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1370 (Fed. Cir. 2010) (noting that "fair market value presumes conditions that, by definition, simply do not obtain in the context of a forced sale," and thus holding that contractual breach resulting in fire sale of subsidiary company should not lead to damages based on fire sale prices); *Standard Dyeing & Finishing Co. v. Arma Textile Printers Corp.*, No. 85 Civ. 5399 (BN), 1991 WL 49782, at *11-12 (S.D.N.Y. Mar. 25, 1991) (noting that proper measure of conversion damages is "fair market value of the converted property," and therefore rejecting damages expert who presumed that "market value of [plaintiff's] collateral . . . is represented by merely its liquidation value at a forced sale"); *Hotaling v A.B. Leach & Co.*, 247 N.Y. 84, 90 (1928) (explaining, in assessing fraud damages, that "[i]t may be doubted whether the price paid at [a forced] sale is any evidence of the value of the property sold even at the time of the sale").[16]

Critically, BOA recognized that a "distressed" "market price" was not indicative of "true value" when valuing the CDO$^2$ and its constituent collateral beginning in the summer of 2007. *See, e.g.*, Ex. 8 at BOA-BSAM 00792184-86; *see also, e.g.*, Ex. 1 at 33 (noting that "forced sale"

---

[15] A "forced sale" or "fire sale" price stands in contrast to the "fair market value" of an asset. "The definition of 'fair market value' is a value that is negotiated between a willing buyer and a willing seller with full information and no compulsion." (Bajaj at 209-10).

[16] *See also Estate of Warhol*, No. 824/87, 1994 WL 245246, at *5 (N.Y. Surr. Ct. N.Y. County Apr. 14, 1994) (in discussing estate tax on artwork, court explained that "the value obtained at a forced or immediate sale [,] by definition, would mean that the buyer would be under a compulsion to sell and would not be free to engage in the normal market negotiations that produce fair market value").

is "likely to be made at a loss"). This simple point also has been recognized by Dr. Bajaj himself – who testified in a prior case that a "fire sale" price is not a proper measure of an asset's fair market value for purposes of determining damages.[17]

The problem with Dr. Bajaj's damages calculations is that the record overwhelmingly points to the conclusion that the Funds' asset sales in June/July 2007 were "forced" or "fire sales." Plaintiffs have conceded the point by repeatedly so alleging: the Second Amended Complaint ("SAC") alleges that "in the middle of June," "[o]ver the course of one or two weeks, BSAM was *forced to liquidate* about $5 billion worth of the Funds' holdings," (Ex. 10 ¶ 104 (emphasis added); *see also id.* ¶¶ 105, 112 (referring to "rushed" nature of Funds' sales)); in their motion to dismiss papers, plaintiffs repeated that "BSAM was *forced* to liquidate much of both Funds' holdings" and argued the Funds were "forcibly liquidated" (Ex. 11 at 6, 25 (emphasis added)); plaintiffs told Judge Crotty the Funds sold $3B of assets "at fire sale prices" (Ex. 12 at 22); and, well after expert discovery was closed, plaintiffs repeated to this Court their claim that "because of the redemption requests, BSAM had to make fire sales of its remaining assets" (Ex. 13 at 14). Plaintiffs' industry practice expert concurred that the Funds' sales at this time were "less orderly and more like a fire sale." (Castro at 160-61) *See also id.* at 290-91 (agreeing that

---

[17] Specifically, in *Litman v. United States*, 78 Fed. Cl. 90, 129 (Fed. Cl. 2007), Dr. Bajaj testified that "[t]he definition of fair market value as economists understand it requires you to determine what would the security trade [at] if the market were open and orderly and people were transacting voluntarily . . . ." *Id.* (quoting Bajaj Deposition in that case). Dr. Bajaj further testified that an underwriter's set IPO price for a newly public company was "more similar to, [in Bajaj's words], 'a distressed seller being willing to sell at a fire-sale price[;]' therefore the transaction should not be the basis for determining the fair market value . . . ." *Id.* Dr. Bajaj's position in *Litman* was correct, and consistent with New York damages law.

one aspect of what happened to BSAM funds was they were "forced to liquidate significant assets"). And press coverage at the time reported the same thing.[18]

Dr. Bajaj, on the other hand, simply does not know, one way or the other, whether the asset sales by the Funds following the alleged curative disclosures – which sales form the basis for his "overvaluation" damages analysis – reflected "forced" or "fire sale" prices. Dr. Bajaj was clear in his deposition that he wasn't "tasked to do th[e] work" of going into the record to figure out if the BSAM asset sales he analyzed were "forced" or "fire sales" and so, as he explained, "I can't have an opinion on that." (Bajaj at 223-25). *See also id.* at 225 ("I have no basis to have an opinion one way or the other" and "I can't tell you whether each of the transactions were in fact at fair market value or depressed value."). *See also id.* at 211-13 (asked if he had measured "fair market value" in this case, Dr. Bajaj responded: "I don't know that I can give you a clear answer to that question because one could argue that BSAM funds' trades represented in part their liquidity problems and, therefore, they were distressed trades").

---

[18] *See, e.g.*, Ex. 14 (Wall Street Journal article noting that in June, "the two funds were forced to sell about $4 billion of assets to meet margin calls"); Ex. 15 (other Wall Street Journal article describing the "series of forced assets sales").

The only contrary evidence Dr. Bajaj cited was a single statement attributed to BSAM's then-CEO, Richard Marin, in an 8K filing on June 26, 2007, in which Mr. Marin stated that as of that date the Funds' sales "have been orderly." *See* Bajaj at 223 ("I would infer from that statement that he was telling the world these were not forced sales"); Bajaj Report ¶ 46. Whatever the meaning of Mr. Marin's statement, which presumably was intended to reflect the fact that many of the Funds' sales in this time period were negotiated unwind agreements with repo counterparties, that lone document – in the face of overwhelming evidence to the contrary – hardly provides an adequate basis for an expert to reliably opine that his analysis is not based on impermissible "forced sale" or "fire sale" prices. Moreover, it has no evidentiary value for asset sales after June 26, and yet Dr. Bajaj's biggest damages numbers purport to calculate "overvaluation" of the Initial Collateral based on asset sales post-dating Mr. Marin's statement, where there is no evidence to support a finding that those sales were not at "forced" or "fire sale" prices.

Under *Daubert*, and consistent with this Court's critical gate-keeping function, the fact-finder should not be permitted to consider or rely on a damages analysis when the proponent of that analysis cannot say one way or the other if his analysis is based on a "forced" or "fire sale" discount, and where the record overwhelmingly suggests that it is – i.e., where the Plaintiffs cannot meet their burden of showing the analysis is reliable and relevant.[19]

E.    The CDO² Offering Circular and BOA's Own
      Valuation Approach Further Undermine Dr. Bajaj's Reliance
      on Market Price Discounts to Calculate Damages on the CDO²

Additional evidence reinforces the error of Dr. Bajaj's assumption that using changes in market price discounts when the Funds were forced to sell assets is a proper lens through which to calculate plaintiffs' CDO² damages. The Offering Circular made clear that the Issuer was investing in "illiquid" collateral that "may restrict its ability to dispose of investments in a timely fashion and for a fair price" and that the Issuer was "generally prohibited . . . from selling Collateral Debt Securities except under certain limited circumstances." (Ex. 1 at 31). The Offering Circular also explained that: (1) because of the nature of the underlying collateral, the

---

[19] Not unmindful of this issue, Dr. Bajaj testified at his deposition that, in his opinion, it would not "impact the validity of [his] analysis" whether or to what degree the sale of Fund assets in June/July 2007 that he uses to calculate his "overvaluation" of the Initial Collateral reflect "forced" or "fire sale" circumstances. (Bajaj at 226-27). This is because, he testified, what he was "measuring is the change in value" post the three corrective disclosure dates. (*Id.* at 227). We respectfully submit that he is wrong. If the prices paid on May 22 by BOA and on May 24 by the Issuer were – as Dr. Bajaj himself concedes – "fair market value" in the sense that they were negotiated at arm's length, and without any compulsion (Bajaj at 215-17), and the prices he uses to measure the "change in value" were derived from asset sales following the Funds' disclosures in June and July that were "forced" or "fire sale" prices, then the "change in value" that Dr. Bajaj's analysis has measured (and then uses for his damages calculations) reflects the "forced" or "fire sale" discount as opposed to a change in fair market value. Dr. Bajaj appears to have acknowledged that this is so, albeit begrudgingly. *See* Bajaj at 244-45 ("if it were the case that all transactions . . . during [the] June 6 disclosure window reflected distress," then "[i]t is possible that you would be measuring distressed-based overvaluation"). It is that uncertainty, and indeed the extraordinarily high likelihood that what he is measuring is a "forced" or "fire sale" discount, that renders Dr. Bajaj's analysis inadmissible.

"market value" of those securities was "expected to fluctuate" for a range of reasons including developments in the markets; and (2) no party – not BOA, not BSAM, and not the Issuer – would have "any obligation or liability to the holders of the" Super-Senior and Mezzanine Notes for any "decrease in the value of[] the [underlying collateral] from time to time." (Ex. 1 at 32). Taken together, these disclosures told investors that market price movements on the underlying collateral (which the $CDO^2$ was not expected to sell) were not to be looked to as a measure of a change in value of the $CDO^2$.

Also, as noted above, when valuing the $CDO^2$ for financial reporting purposes, BOA similarly expressly rejected the proposition – central to Dr. Bajaj's damages calculations here – that "distressed" "market prices" reflected the "true value" of the $CDO^2$ collateral, and instead calculated the fair value of the tranches of the $CDO^2$ by using "internal models which incorporate expected cash flows of the underlying collateral." (Ex. 8). *See also* Ex. 16, BOA's January 7, 2008 letter to the SEC (explaining that "valuation of CDO investments was generally based on the projection of the underlying cash flow in a CDO deal structure and market level spreads").

In the face of these statements about how the value of the illiquid $CDO^2$ tranches and the $CDO^2$'s illiquid constituent collateral was in fact viewed at the time, Dr. Bajaj's very different damages calculations – based on changes in market price discounts alone when the Funds were forced to sell assets, changes he does not connect to any increased risk of default or non-payment or actual impairment of the assets – become even more irrelevant and unreliable. *See, e.g.*, *In re Iridium Operating LLC*, 373 B.R. 283, 351-52 (Bankr. S.D.N.Y. 2007) (excluding expert valuation and solvency analysis that "ignored or wrongly discarded" plaintiff's own contemporaneous projections, and noting that expert analysis "lacks credibility when an expert uses projections that fly in the face of what everyone believed at th[e] time").

F.      Dr. Bajaj's "But-For" CDO² Contradicts
        a Fundamental Feature of Structured Securities

The "but-for" CDO² assumption renders Dr. Bajaj's analysis unreliable and irrelevant in another important respect. It leads him unjustifiably to allocate damages in proportion to the size of each tranche relative to the total deal size of the CDO².

Perhaps the most fundamental and basic principle of structured finance is that lower-rated tranches of a structured security (here, the Mezzanine tranches and the Equity) absorb losses before and in a proportionally greater percentage compared to the higher-rated tranches (here, the Super-Senior Notes). *See* Castro Report ¶ 28(a)(i) ("[e]very tranche below (i.e., junior to) the Super Senior provides credit enhancement to the Super Senior by absorbing credit losses prior to such losses being experienced by the Super Senior"); Ex. 17 at BOA-BSAM 00602942 ("Losses will hit higher risk (subordinate/equity) tranches before the CP tranche."); Bajaj Report at ¶ 8 n.4 ("the equity [junior] tranche absorbs initial losses, followed by the CDO's mezzanine tranches, and finally the last tranche to absorb losses is the super-senior tranche").

The CDO² was structured so that 81% of the face value of the notes to be issued was Super-Senior notes and the remaining 19% Mezzanine notes and Equity. As noted above, Dr. Bajaj's allocation of damages across the tranches of his "but-for" CDO² mirrors that division exactly – he allocates 81% of his overall damages calculations to the "but-for" Super-Senior Notes and 19% to the "but-for" Mezzanine notes and Equity. (Barro Report at 32; *see also* Bajaj Report ¶¶ 63-65). In other words, Dr. Bajaj assumes that the benefits (or losses avoided) from paying a lower price for the underlying collateral would have accrued equally across the most senior and the junior tranches.

However, this hypothetical "but-for" CDO² is not a proper basis for measuring damages. If Dr. Bajaj is correct, and if the Initial Collateral was worth between $127 million and $467

million less than what BOA (and the Issuer) paid for it, then the relevant question according to this analysis is whether the tranches of the $CDO^2$ were therefore worth less than what they were issued for, and by how much (i.e., what were the damages to the $CDO^2$ and to BOA, which ended up owning those tranches). But Dr. Bajaj did not attempt to calculate directly the fair market value of the tranches of the $CDO^2$ after any of the alleged curative disclosures (Bajaj at 221-22), and therefore offers no relevant evidence as to whether the Funds' disclosures directly affected the tranches' value.

But even assuming *arguendo* that the value of the $CDO^2$ deal was affected by the Funds' disclosures by between $127 and $467 million, the tranches of the $CDO^2$ would not be affected proportionally. If the only losses from the $CDO^2$ deal were from the alleged Fund-related disclosures cited by Dr. Bajaj (and no other market losses occurred), then the revelation of those problems would have affected the lowest tranches first. BOA's own schedule of write-downs of the $CDO^2$ confirms the point, showing the Mezzanine tranches written down sooner and in higher proportion compared to the Super-Senior tranche. (Ex. 18).

Dr. Bajaj's "uniform proportionate division," on the other hand, violates "the basic principles of tranched financial structures, whereby losses or gains at the margin accrue proportionately much more to the lower-rated tranches." (Barro Report at 32). As defendants' expert, Professor Robert Barro, explains (at pp. 32-37 of his report), Dr. Bajaj's method of allocating the damages across the $CDO^2$ tranches is not merely an academic point. For example, using the June 6 disclosure as an example, Dr. Bajaj's analysis is that the value of the underlying collateral of the $CDO^2$ would have declined by between $126.5 and $142MM or between 4.5-5.0 percent because of the news about the level of redemption requests and suspension of redemptions at the EL Fund. (Barro Report at 35-36; Bajaj Report Appendix 7-b). As Professor

Barro shows, in a real-life tranched structured security like the CDO², those losses "would have accrued almost entirely to the equity and mezzanine tranches of the CDO² deal" and "[v]irtually none of the losses avoided would have benefited the Super-Senior tranche." (Barro Report at 35). Moreover, it was the BSAM Funds – not BOA – that owned both the equity and the Mezzanine tranches as of June 6. "Therefore, the estimated savings – amounting to losses avoided – from moving up the June 6 announcement would have been accrued virtually 100 percent to the Funds," and the "benefits (or losses avoided) for BofA would have been close to zero." (*Id.* at 35-36). Professor Barro lays out a similar analysis for the June 27 and July 17 announcements about the Funds, showing that if Dr. Bajaj's estimated savings are applied according to the tranched structure of the CDO², instead of in equal proportion across all tranches, the results would be dramatically different than what Dr. Bajaj presents, with the impact on value being absorbed almost entirely or largely by the equity and lower rated Mezzanine tranches and to a much lesser degree by the Super-Senior noteholders. (*Id.* at 36-37).

In sum, Dr. Bajaj's reliance on the assumptions of the "but-for" CDO² leads to results that, on their face, contradict one of the most basic principles of tranched securities, which is an additional compelling reason to find his analysis unreliable and irrelevant.

## CONCLUSION

For the reasons set out above, taken individually and even more so if considered as a whole, Dr. Bajaj's damages analysis should be excluded in its entirety as speculative, unreliable, unhelpful to the finder of fact, and irrelevant to the actual damages issues in the case.

Dated: New York, New York
      November 30, 2012

Kramer Levin Naftalis & Frankel LLP
By:____/s/ Barry H. Berke_____
Barry H. Berke
Eric A. Tirschwell
Marjorie E. Sheldon
Jason Moff

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
*Attorneys for Defendant Bear Stearns Asset Management Inc.*

Hughes Hubbard & Reed LLP
By:____/s/ Marc Weinstein_____
Marc Weinstein

One Battery Park Plaza
New York, New York 10004
(212) 837-6000
*Attorneys for Defendant Ralph Cioffi*

Brune & Richard LLP
By:____/s/ Nina M. Beattie_____
Nina M. Beattie

One Battery Park Plaza
New York, New York 10004
(212) 668-1900
*Attorneys for Defendant Matthew M. Tannin*

Driscoll & Redlich
By:____/s/ Catherine L. Redlich_____
Catherine L. Redlich

521 Fifth Avenue
New York, New York 10175
(212) 986-4030
*Attorneys for Defendant Raymond McGarrigal*

KL3 2904998.1