UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

BANK OF AMERICA, NATIONAL ASSOCIATION  :
and U.S. BANK NATIONAL ASSOCIATION,   :
solely in its capacity as Trustee under the Indenture  :
                                        :
                          Plaintiffs, and  :     08-CV-09265 (AJN)
                                        :
BANC OF AMERICA SECURITIES LLC,         :
                                        :     ECF Case
          Plaintiff/Counterclaim-Defendant,  :
                                        :
                - against -             :
                                        :
BEAR STEARNS ASSET MANAGEMENT INC.,     :
RALPH CIOFFI, MATTHEW TANNIN, and       :
RAYMOND McGARRIGAL,                     :
                                        :
          Defendants/Counterclaim-Plaintiffs.  :

————————————————————— x


DEFENDANTS' AMENDED MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## Table of Contents

Table of Authorities ............................................................................................................ ii

Preliminary Statement.......................................................................................................... 1

Background and Material Undisputed Facts ...................................................................... 4

Argument ............................................................................................................................ 14

    I.    THE MAY 22 FRAUD CLAIM SHOULD BE DISMISSED  BECAUSE
          DEFENDANTS HAD NO DUTY TO DISCLOSE  FUND
          PERFORMANCE OR REDEMPTION REQUESTS TO BOA........................... 14

    II.   THE REPO FRAUD CLAIM FAILS BECAUSE BOA CANNOT
          PROVE, NOR CAN IT RECOVER DAMAGES FOR, ALLEGED
          FRAUD IN CONNECTION WITH THE REPO FINANCING ......................... 19

          A.    The Repo Fraud Claim Fails Because BSAM Disclosed the EL
                  Fund Redemption Requests Before BOA Extended Financing to
                  the Funds ........................................................................................... 19

          B.    BOA Already Compensated Itself for any Decline in Value of the
                  Mezzanine Notes................................................................................ 20

    III.  BSAM DID NOT OWE THE ISSUER A FIDUCIARY DUTY  OR
          BREACH ANY SUCH DUTY IN CONNECTION WITH THE
          PURCHASE OF THE INITIAL COLLATERAL ................................................. 22

          A.    The Arm's-Length Stipulation Defeats the Claim of Fiduciary
                  Duty vis-à-vis the Purchase of the Initial Collateral .................................. 22

          B.    The April 30 Pricing Agreement Reinforces the Absence  of any
                  Alleged Fiduciary Duty or Breach in Connection with the Purchase
                  of the Initial Collateral ...................................................................... 23

          C.    No Written Agreement or Course of Dealing Between the Parties
                  Gives Rise to a Fiduciary Duty ........................................................ 24

    IV.  ALL OF PLAINTIFFS' CLAIMS FAIL FOR LACK OF  PROOF OF
          DIRECT AND PROXIMATE CAUSATION .................................................... 28

          A.    Plaintiffs Must Show that Each Alleged Legal Wrong  Was a
                  Direct and Proximate Cause of their Damages ......................................... 29

          B.    Plaintiffs Are Unable to Show that the Revelation of Information
                  About the Funds Caused a Market-Wide Decline in CDO Prices;

BOA's Own Documents Show Its Damages Are Attributable to the Market-Wide Collapse, Not Disclosures of Difficulties at the Funds...............................................................................................................32

C.      Plaintiffs' Damages Expert Cannot Cure the Failure of Proof on Direct and Proximate Cause..................................................................37

Conclusion .........................................................................................................................40

<u>**Table of Authorities**</u>

**Page(s)**

CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
   No. 08 Civ. 7508 (SAS), 2012 WL 3584278 (S.D.N.Y. Aug. 17, 2012) .......................39 n.17

*AG Capital Funding Partners, LP v. State St. Bank & Trust Co.*,
   11 N.Y.3d 146, 866 N.Y.S.2d 578 (2008) ...........................................................................24

*Amusement Indus., Inc. v. Stern*,
   693 F. Supp. 2d 327 (S.D.N.Y. 2010)........................................................................30 n.12

*Banque Arabe et Int'l D'Investissement v. Maryland Nat'l Bank*,
   57 F.3d 146 (2d Cir. 1995)....................................................................................15, 16, 19

*Barrett v. Freifeld*,
   64 A.D.3d 736, 883 N.Y.S.2d 305 (2d Dep't 2009)............................................................22

*Brass v. Am. Film Techs., Inc.*,
   987 F.2d 142 (2d Cir. 1993)...............................................................................................15

*Bullmore v. Ernst & Young Cayman Islands*,
   45 A.D.3d 461, 846 N.Y.S.2d 145 (1st Dep't 2007) ..........................................................28

*Carco Group, Inc. v. Maconachy*,
   383 F. App'x 73 (2d Cir. 2010) .........................................................................................31

*Century Pac., Inc. v. Hilton Hotels Corp.*,
   528 F. Supp. 2d 206 (S.D.N.Y. 2007)................................................................................16

*Citibank N.A. v. K-H Corp.*,
   968 F.2d 1489 (2d Cir. 1992)....................................................................................30 n.13

*Colavito v. New York Organ Donor Network, Inc.*,
   438 F.3d 214 (2d Cir. 2006).......................................................................................29 n.11

*Dexia Holdings, Inc. v. Countrywide Fin. Corp.*,
   No. 2:11-CV-07165-MRP, 2012 WL 1798997 (C.D. Cal. Feb. 17, 2012)........32 n.14, 39 n.18

*DFP Mfg. Corp v. Northrop Grumman Corp.*,
   No. 97-CV-4494, 1999 WL 33458384 (E.D.N.Y. Mar. 23, 1999)........................................25

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
   631 F.3d 42 (2d Cir. 2011)........................................................................................29 n.11

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).........................................................................................................32

*EBC I, Inc. v. Goldman Sachs & Co.*,
    5 N.Y.3d 11, 799 N.Y.S.2d 170 (2005) ......................................................25

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003)..................................................30 n.13, 31, 39

*ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC*,
    50 A.D. 3d 397, 858 N.Y.S.2d 94 (1st Dep't 2008) ...............................39

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994)..............................................................31, 37

*Fragin v. Mezei*,
    No. 09 Civ. 10287, 2012 WL 3613813 (S.D.N.Y. Aug. 22, 2012) .........14

*Friedman v. Anderson*,
    23 A.D.3d 163, 803 N.Y.S.2d 514 (1st Dep't 2005) .......................29 n.11

*Green v. Beer*,
    No. 06 Civ. 4156, 2007 WL 576089 (S.D.N.Y. Feb. 22, 2007) ..............26

*Greenberg v. Joffee*,
    34 A.D.3d 426, 824 N.Y.S.2d 355 (2d Dep't 2006) .......................29 n.11

*In re Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield*,
    276 F.3d 123 (2d Cir. 2002).....................................................................22

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).....................................................................40

*In re Refco Inc. Sec. Litig.*,
    826 F. Supp. 2d 478 (S.D.N.Y. 2011)..............................................40 n.19

*Intellivision v. Microsoft Corp.*,
    784 F. Supp. 2d 356 (S.D.N.Y. 2011),
    *aff'd*, No. 11-1657-CV, 2012 WL 2086297 (2d Cir. June 11, 2012) .......25, 28 n.10

*Jana L. v. W. 129th St. Realty Corp.*,
    22 A.D.3d 272, 802 N.Y.S.2d 132 (1st Dep't 2005) ...............................16

*King County, Wash. v. IKB Deutsche Industriebank AG*,
    708 F. Supp. 2d 334 (S.D.N.Y. 2010).........................................35, 39 n.17

*Laub v. Faessel*,
    297 A.D.2d 28, 745 N.Y.S.2d 534 (1st Dep't 2002) ................. 29 n.11, 30 n.12, 39

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..............................................................30, 31, 37

*LNC Invs., Inc. v. First Fid. Bank, N.A.,*
  173 F.3d 454 (2d Cir. 1999) ............................................................................29 n.11

*Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.,*
  No. 95 Civ. 8450 (AGS) (THK), 1998 WL 422482 (S.D.N.Y. July 22, 1998) .....................22

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,*
  87 A.D.3d 287, 928 N.Y.S.2d 229 (1st Dep't 2011) ......................................................39 n.18

*Merrill Lynch & Co. v. Allegheny Energy, Inc.,*
  500 F.3d 171 (2d Cir. 2007) .............................................................................32 n.14

*National Mkt. Share, Inc. v. Sterling Nat'l Bank,*
  392 F.3d 520 (2d Cir. 2004) ........................................................................29 n.11, 31, 37

*Oddo Asset Mgmt. v. Barclays Bank PLC,*
  19 N.Y.3d 584, 950 N.Y.S.2d 325 (2012) ............................................................ 26 & n.6

*Oddo Asset Mgmt. v. Barclays Bank PLC,*
  No. 109547/08, 2010 WL 8748135 (Sup. Ct. N.Y. County Apr. 21, 2010),
  *aff'd,* 19 N.Y.3d 584, 950 N.Y.S.2d 325 (2012) ................................................23 n.4

*Osan Ltd. v. Accenture LLP,*
  454 F. Supp. 2d 46 (E.D.N.Y. 2006) ...........................................................................23

*Palmetto Partners L.P. v. AJW Qualified Partners, LLC,*
  83 A.D.3d 804, 921 N.Y.S.2d 260 (2d Dep't 2011) ..............................................................28

*People ex rel. Cuomo v. Coventry First, LLC,*
  13 N.Y.3d 108, 886 N.Y.S.2d 671 (2009) ........................................................................24

*Pesa v. Yoma Dev. Group, Inc.,*
  18 N.Y.3d 527, 942 N.Y.S.2d 1 (2012) ........................................................................37

*Scallio v. Tyco Int'l,*
  No. 03 Civ. 7770, 2012 WL 2861340 (S.D.N.Y. July 9, 2012) ...........................................38

*Tradewinds Fin. Corp. v. Refco Sec., Inc.,*
  5 A.D.3d 229, 773 N.Y.S.2d 395 (1st Dep't 2004) ...........................................................23

*United States v. Bilzerian,*
  926 F.2d 1285 (2d Cir. 1991) ...........................................................................27 n.7

*United States v. Wolfson,*
  642 F.3d 293 (2d Cir. 2011) ........................................................................24

**OTHER AUTHORITIES**

*Restatement (Second) of Torts* § 551(2)(e) ........................................................................15, 16

## Preliminary Statement

In the spring of 2007, Bank of America made a calculated bet to continue to expose itself to billions of dollars of largely subprime mortgage-backed securities.  When that bet did not pay off, BOA sought to shift the blame to BSAM and three individuals and recoup its losses by filing this meritless lawsuit predicated on a revisionist view of events.

 (Ex. 1 at 46-53; Price at 194-216).

This case arises out of a $4 billion arm's length commercial transaction in May 2007 between BOA and BSAM, pursuant to which primarily mortgage-backed securities from two Bear Stearns Asset Management ("BSAM") hedge funds were pooled and structured into a specialized form of collateralized debt obligation ("CDO") known as a CDO-squared (essentially a CDO of tranches of other CDOs) (the "CDO²").  The CDO² issued $3.24 billion in highly-rated super-senior or commercial paper notes (the "Super-Senior Notes" or "CP"), and $747.9 million in so-called mezzanine notes that carried more risk (the "Mezzanine Notes").

1

BOA's core accusation is that the defendants concealed material information about the health of the two BSAM Funds, including the level of redemption requests, until May 23 – before the CDO[2] was set to close on May 24, but after BOA purchased the initial collateral on May 22.  BOA further alleges that the May 23 disclosure was incomplete.  Plaintiffs assert four legal claims:[1]

> Claim I:  a claim by BOA against BSAM for breach of § 4(c) of the governing Engagement Letter, the so-called material adverse change or "MAC Clause" that required BSAM to notify BOA of certain changes at BSAM;

> Claim II:  a claim by BOA against all defendants for fraud and fraudulent inducement in connection with BOA's May 22 purchase of the Initial Collateral from the Funds (the "May 22 Fraud Claim");

> Claim III:  a claim by U.S. Bank, as Trustee for the Issuer, against all defendants, for breach of a fiduciary duty allegedly owed to the Issuer in connection with the purchase of the Initial Collateral; and

> Claim IV:  a claim by BOA against all defendants for fraud and fraudulent inducement in connection with BOA's May 24 repo financing of the Mezzanine Notes (the "Repo Fraud Claim").

None of these claims is viable.  The May 22 Fraud Claim rests on an alleged duty to disclose based on "superior knowledge."  To prevail under that theory, BOA would have to show, by clear and convincing evidence, that the health of the Funds was "basic" or "essential" to this transaction.  But the evidence is irreconcilable with such a notion, including most importantly the fact that BOA – which had its own admitted legal obligation to make sure investors were aware of all material information – sold hundreds of millions of dollars of the Super-Senior notes without ever disclosing the information that BSAM had shared with BOA on

---

[1] Two Bank of America entities are named as plaintiffs in this case – Banc of America Securities LLC ("BAS") and Bank of America, National Association ("BANA").  They are referred to collectively as "BOA."

May 23. That fact, among others, defeats BOA's litigation position that this information was so "critical" to the transaction that BSAM was duty-bound to disclose it at an earlier date.

The Repo Fraud Claim suffers from two major flaws. First, there was no omission or concealment. BOA did not extend the repo financing to the Funds until May 24, which was *after* BSAM had made disclosure on May 23 relating to redemption requests at the EL fund. Second, in mid-June, with substantial information about the Funds' difficulties having entered the marketplace, the parties unwound all outstanding repo transactions between BOA and the Funds. As part of that unwind, BOA bought the mezzanine notes at a discount that, according to its own documents and assessment, reflected their value at the time. Any subsequent decline in the value of those notes thus cannot be blamed on, or recovered from, BSAM.

The breach of fiduciary duty claim fails because the parties – including the Issuer – all agreed that the purchase of the Initial Collateral would be deemed to be on an "arm's-length" basis. It is black-letter law that fiduciary duties cannot be superimposed on arm's-length transactions. In addition, while BSAM was tasked with selecting the Initial Collateral, the parties agreed and disclosed to investors that the prices for the Initial Collateral were set as of April 30 and may have changed by the time of closing. That agreement and disclosure belies any claim that the Issuer justifiably relied on BSAM to obtain the "lowest possible prices" or breached any alleged duty by not resetting prices based on developments after April 30. Nor do any written agreements or a "course of dealing" give rise to the claimed fiduciary duty.

Finally, BOA has no evidence that the level of redemption requests or eventual collapse of the BSAM Funds had anything to do with the ultimate failure of the $CDO^2$ or the declining value of its underlying collateral. This fundamental failure of proof is fatal to all four claims because plaintiffs cannot prove that the subject of the defendants' alleged nondisclosure was the

3

direct and proximate cause of their losses.  The truth is far simpler: unfortunately for all

involved, shortly after this transaction closed, the market for mortgage-backed securities,

particularly those backed by subprime mortgages, collapsed.  BOA's own contemporaneous

valuations and public filings attribute its write-downs and losses on the CDO² to these market-

wide developments, including ratings downgrades, defaults, and the poor performance of the

mortgages underlying the structured securities that collateralized the CDO².  Because plaintiffs

cannot prove that the information that the defendants allegedly concealed, once revealed,

proximately and directly impaired the performance or caused the ultimate failure of the CDO² or

its constituent assets, all of their claims fail.

## Background and Material Undisputed Facts[2]

### The Parties and the CDO-Squared Transaction

At the time of this transaction, BOA was one of the largest financial institutions in the

United States, and the company as a whole had more than a trillion dollars in aggregate assets.

(Price at 32-33).  BSAM was an asset management company with over $40 billion in assets

under management.  (Ex. 2 at 1066757).  BSAM's business included, but was not limited to,

managing hedge funds.  In 2007, BSAM managed seventeen hedge funds, two of which are

relevant to this dispute: Bear Stearns High-Grade Structured Credit Strategies (the "HG Fund")

and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (the "EL Fund")

(together, the "Funds").  (Ex. 3).  The Funds accounted for less than seven percent of BSAM's

---

[2]  The background and material facts on which this motion is based are summarized in BSAM's
Statement of Material Facts, pursuant to Local Civil Rule 56.1 ("56.1 Stmt.").  The deposition
testimony and expert report excerpts referenced herein are annexed as exhibits to the Declaration
of Marjorie E. Sheldon, dated November 30, 2012, and are cited by the witness or expert's last
name followed by a page or paragraph number.  All other referenced materials are annexed as
exhibits to the Declaration of Jason Moff, dated November 30, 2012, and are cited by their
declaration exhibit number.

net revenues between January 1 and April 30, 2007. (Ex. 2 at 1066733 and 748). Defendants Cioffi, Tannin and McGarrigal were the portfolio managers for the Funds. (Ex. 4 ¶ 15). Both Funds invested in structured asset-backed securities ("ABS"), including CDOs backed by mortgage-backed securities ("MBS"), a portion of which were backed in turn by subprime mortgage loans. (Ex. 4 ¶ 16).

The CDO[2] was structured to issue securities in the "aggregate principal amount" of at least $4 billion, making it the largest CDO deal that BOA had ever done. (Ex. 5; Foley at 73; Dash at 188-89). The Funds were the source of the assets (mostly CDO tranches) that made up the initial collateral (the "Initial Collateral"). (Kesselman Report ¶ 37). BSAM was responsible for selecting the Initial Collateral, with BOA's input and approval, and for managing the collateral on an ongoing basis once the deal closed. (Kesselman Supp. Report ¶ 4; Ex. 6 at § 2). BOA served as structuring agent, underwriter and placement agent, and it marketed the CP to investors. (Ex. 5 §§ 1-2). A central component of this transaction was that BOA agreed to "purchase or provide protection in the form of a 2a-7 put," thereby committing to buy back up to $3.24 billion worth of Super-Senior Notes if they could not be sold to investors. (Raman at 69-70; Ex. 5 § 5(a)).

Before the transaction closed, it was agreed that the Funds would buy back the Mezzanine Notes and the equity (also referred to as the "preference shares"). (Ex. 4 ¶ 21; Ex. 7; Ex. 5 § 5(b)). As discussed below, BOA financed that buy-back of the Mezzanine Notes through a repo financing on the day of closing. A repo financing is basically a secured loan. The financing party (here, BOA) takes ownership of the assets (the Mezzanine Notes), and the party receiving the financing (the Funds) agrees to repurchase those assets at a later date for a higher price. The difference between the loan amount and the repurchase price is known as a "haircut,"

and that differential is meant to protect the repo lender against a decline in the value of the assets. The repo lender can make a margin call and demand additional security at any time it determines the asset's value has decreased. (Frisina at 7-8, 27-28, 33-35).

BOA stood to earn tens of millions of dollars in fees from the CDO² transaction, including a "structuring fee" of $15.4 million payable upon closing. (Ex. 5 § 7; Ex. 8 at 3; Ex. 9).

**BOA Pursued and Approved this Deal Despite**
**Growing Volatility in the CDO and Subprime Markets**

The Structured Securities Group at BOA ("SSG"), which fell within Global Structured Products ("GSP"), originated this deal for BOA. (Ex. 10; Ex. 8 at 1). The key players at BOA were Michael McLaughlin (head of SSG), Chris Hentemann (head of GSP), Justin Dash (the deal manager), Brian Foley (the "execution day-to-day banker"), and Sai Raman (head of the Structured Derivatives Group, which was responsible for the 2a-7 put). (Ex. 10; McLaughlin at 7-8; Hentemann at 7-8; Dash at 8, 72; Foley at 14-15; Raman at 16-18, 23, 51-52).

From 2005 through at least the second quarter of 2007, BOA was "trying to increase [its] role in the CDO business," which "was becoming a very lucrative business for" BOA. (Foley at 13-14, 153). Going into 2007, SSG had been given a specific "mandate" to "improve the bank's standing in ABS CDO issuance in the lead tables and generate revenue." (Foley at 149-51; *see also* Dash at 13-14; Raman at 56; McLaughlin at 75-76; Hentemann at 97-98).

It was no surprise to BOA that 2007 turned out to be a tumultuous time in the CDO and subprime markets. Market volatility began to surface in early February. (Ex. 11). Because of this volatility, SSG had to "reassess the deals that [they] were considering closing on" (McLaughlin at 91-92), and "BOA had to be more careful in order to avoid suffering losses." (Hentemann at 100-02). By mid-February, BOA had "an 'elevated review process' in place with

Subprime exposure." (Ex. 12; Skardon at 43-48). BOA's head of Risk Management for Capital Markets acknowledged that by late February, his department was "beginning to have concerns about the riskiness of the subprime market." (Ex. 13; Nozari at 114-21).

Notwithstanding BOA's view of the market, BOA continued to pursue its mandate. Discussions between SSG and Cioffi's team began in or before February 2007. At the time, BOA was pursuing three structured securities transactions with BSAM, of which this CDO² was one. (Ex. 14). On February 15, SSG sought and obtained "greenlight" approval to move forward with this transaction. (Ex. 15; McLaughlin at 132-33). It was "a large transaction in a highly competitive space that [BOA] had not been doing as well in" and as such, it was "a big win" for BOA. (McDowell at 57).

On March 9, 2007, BSAM and BOA entered into an Engagement Letter that outlined the principal terms of the transaction. (Ex. 5). BOA's breach of contract claim is based on the Material Adverse Change Clause in the Engagement Letter, which required BSAM to notify BOA of the occurrence of certain "Collateral Manager Events." (Ex. 5, §§ 4(c)(i) and (iii)).

To proceed with the transaction, SSG had to submit a "transaction approval package" ("TAP") and obtain sign-off from multiple departments throughout BOA. (Dash at 50-51; Foley at 173-75). The purpose of the TAP was to explain the details of the transaction and, more importantly, to identify all potential risks. (McLaughlin at 141-43; Raman at 184; Skardon at 91-92; Foley at 172-75; Gilhooley at 10). The Funds' performance was not identified as one of the primary risks, and indeed was not mentioned anywhere in the TAP. (*See* Ex. 8).

BOA knew that the Initial Collateral going from the Funds into the CDO² included CDOs backed by subprime mortgages. (Ex. 4 ¶16; Ex. 16 at 47; Hentemann at 109-10). And throughout the winter and spring of 2007, BOA continued to express concerns about the market

7

for subprime-backed assets. (*See* 56.1 Statement ¶ 27). Despite these concerns, there is no evidence that anyone from BOA *ever* inquired about the Funds' performance or financial condition at any time before it bought the Initial Collateral on May 22. (Briggs at 70; Dash at 369-70; Gilhooley at 17-21; McDowell at 161; McLaughlin at 109; Moynihan at 187; Raman at 109-16; Skardon at 90-91; *see also* Ex. 22, No. 10). On May 22, "in order to facilitate the closing," BOA bought the Initial Collateral from the Funds for transfer to the Issuer at closing, which was scheduled for May 24. (Ex. 4 ¶ 63).

### BSAM's May 23 Disclosure Did not Deter BOA from Closing the Deal or Marketing the CP to Investors

Throughout May, following the Funds reporting negative returns (Ex. 23), an increasing number of investors in the Funds submitted redemption requests for future redemption dates. (Exs. 24, 25, 26). By May 18, the Friday before the scheduled closing of the $CDO^2$ transaction, requests for future Funds redemptions, which would be payable over the next few months, had risen to $304.5 million in the EL fund (about 50% of investor equity capital) and $75.7 million in the HG fund (about 8% of investor equity capital). (Exs. 27, 3).

That same Friday, May 18, Matthew Tannin, one of the three portfolio managers, and others at BSAM received an email from BOA attaching the agenda for a May 21 due diligence call with CP dealers. (Ex. 28). The agenda included a general catch-all question about "impending material" developments at BSAM, which prompted Tannin to consider whether the redemption requests posed any offering memo disclosure issues. He reached out to counsel. (Tannin at 142-48, 296-97).

Two of the BSAM portfolio managers involved did not believe they were required to tell BOA about the developments at the Funds. (The view of the third manager (Tannin) was not elicited because of attorney-client privilege.) BSAM nonetheless decided to share information

concerning the EL Fund with BOA.  (Tannin at 75-78; Cioffi at 55-57, 64-65, 281, 285-88;
McGarrigal at 15-18, 163-65).

At around 6:00 PM on May 23, Cioffi called Foley to tell him that a letter would be on its
way shortly concerning redemption requests by EL Fund investors.  (Cioffi at 304-09; Foley at
407-08).  It was a short phone call, and as Cioffi's contemporaneous email confirms, Foley said
in response that BOA's "only concern would be a material impact on BSAM's ability to perform
as the CDO manager *not what happens to a hedge fund that bsam manages*."  (Ex. 30).
(emphasis added).  The BSAM deal manager, Patrick Fleming, then emailed Cioffi's letter to
BOA's Brian Foley.  The letter disclosed (among other things) that the EL Fund had "recently
received a large number of requests for redemption from its investors," that the portfolio
managers "expect redemptions in the months of June and July of approximately $324 million,
representing approximately 49.2% of the total equity capital of the fund," and that BSAM was
considering "meeting redemption requests through asset sales; implementing a gate on
redemptions consistent with the terms of the fund's operative documents; and/or an orderly wind
down of the fund."  It went on to state, among other things, that "[w]e believe that the foregoing
developments will not materially affect our ability to perform our obligations as collateral
manager of High Grade Structured Credit CDO 2007-1."  The letter was addressed to both SSG
and BOA's Legal Department.  (Ex. 31).

When BOA received BSAM's letter on May 23, it was "not under a legal obligation to
close" and one option – among others – "would have been simply not to close."  (Foley at 564-
65, 589).  But BOA did not exercise that option.  The head of SSG was in London, but he
received the BSAM letter from Raman by email.  (McLaughlin at 208-12).  As Raman explained
when he forwarded the letter: "Just spoke with Justin [Dash] and Brian [Foley] – we will try and

make this deal a bit tighter for us. We also need to let [Risk] know what we're doing," and the head of SSG (McLaughlin) replied: "Agreed." (Ex. 32). McLaughlin did not consider calling off the deal or even postponing it until he returned to the office, and does not recall discussing the letter with anyone, including his boss. (McLaughlin at 213-14). As for Raman, he sought and obtained approval from Risk to do the trade (*i.e.*, close the deal). (Raman at 255-56).

While BOA's witnesses testified to having had a range of reactions to BSAM's disclosure – including the reaction of the Risk representative with whom it was shared, who thought the information was "not dire" and "didn't strike [him] as important" (Gilhooley at 28, 47) – BOA's actions and inactions at the time are far more telling. BOA did not ask if BSAM would buy back the assets, did not pursue *any* alternatives to closing the deal, and did not even postpone the scheduled closing. (Foley at 564-74; Dash at 374-76, 419-21, 427, 460; McLaughlin at 211-14, 221; Moynihan at 200; Gilhooley at 38-41). Making the deal "tighter" merely meant BOA negotiating for the right to pre-approve certain types of assets that would be bought by the CDO² "during the reinvestment period" – *i.e.*, post-closing and going forward. (Ex. 33; Raman at 269).

The transaction closed as scheduled on May 24. On that day, and for multiple days thereafter, BOA sold hundreds of millions of dollars of CP from the CDO² without ever disclosing to any investors the information from BSAM's May 23 letter. (Austen at 105-07, 119, 149; Ex. 34; Ex. 35; Moynihan at 216; Ex. 22, No. 9).

**After it Received BSAM's Letter, BOA Extended Repo Financing
to the Funds, Thereby Taking On Exposure to the Mezzanine Notes**

On May 24, at closing and *after* BSAM had disclosed the EL Fund redemptions to BOA, BOA's repo desk lent almost $700 million to the Funds to finance the Funds' buy-back of the Mezzanine Notes, thereby taking on an additional $700 million in exposure to this transaction.

(Exs. 36, 37).  Extending repo financing to the Funds was not required by, or even addressed in, the Engagement Letter (Ex. 5) and, as a result of that decision, BOA became exposed to almost the entire capital structure of the deal.

The BOA deal team did not tell BOA's repo desk about the May 23 letter or the information in it.  (Frisina at 205-06; Malo at 133-34).  Nor did Risk Management, which had oversight over repo lending.  (Nozari at 73, 198).  The sole person in Risk who was told about the letter did not elevate it to his superiors (Gilhooley at 28-30), and the people in Risk who reviewed and approved repo transactions were never informed, which the Head of Risk Management conceded was "mishandled" and was "a mistake."  (Nozari at 198-200; McLaughlin at 45-48; *see also* Hentemann at 49-54).

**BOA Was Thrilled to Have Closed this Deal and**
**Eager to Do More Business with Cioffi's Team**

After the deal closed, BOA's Foley and Dash thanked and congratulated the BSAM portfolio managers, and Foley told McGarrigal:  "BSAM as an institution and you personally, are excellent partners.  I thoroughly enjoyed working with you and look forward to the next deal." (Ex. 38; Ex. 39; Foley at 636-38).  SSG was given no directive to stop doing deals with BSAM, the portfolio managers, or the Funds (Gilhooley at 50-51; McDowell at 169) and SSG continued to court BSAM and Cioffi's team by inviting them on exclusive trips and to golfing events and dinners to discuss new business.  (Ex. 40; Hentemann at 181; Ex. 41; Ex. 42; Ex. 43; McDowell at 149-53).

**Post-Closing Developments**

As redemption requests by investors in the Funds continued to mount, on June 7, consistent with the Funds' offering documents and the May 23 letter, BSAM suspended redemptions at the EL Fund.  (Ex. 44; Cioffi at 402).  BOA then issued a margin call, demanding

that the Funds post additional collateral of $94 million. (Ex. 45). On June 14, BSAM held a meeting with all of the Funds' repo counterparties, including BOA, at which it discussed performance issues at both Funds, anticipated significant redemptions at the HG Fund, the heavy volume of margin calls received by both Funds, and a plan to sell assets from both Funds. (Ex. 46 at 2; Ex. 98; Ex. 97). On June 15, BOA proposed to "buy the entire repo portfolio" it had with the Funds – including the Mezzanine Notes from the CDO$^2$. (Ex. 47). Negotiations continued over the weekend and on Monday, June 18, BOA and BSAM executed a Termination and Purchase Agreement ("TPA"). (Ex. 48).

Under the TPA, BOA agreed to purchase the Mezzanine Notes at a $105 million discount off the par purchase price ($747.9 million) that the Funds had paid when the deal closed, for a total of $642.7 million. (*See, e.g.,* Ex. 49; Ex. 48 at Sch. 2-1). That $105 million discount reflected what the TPA itself and other BOA documents describe as the "fair value" or "fair market value" of those securities as of that date. (*E.g.,* Ex. 50 at 2; Ex. 51).

In late June, BSAM informed HG Fund investors that it was suspending redemptions in that fund as well, effective June 30. (Ex. 52). On July 17, investors were told that there was "effectively no value left" in the EL Fund and "very little value left" in the HG Fund, and that BSAM would "seek an orderly wind-down of the Funds over time." (Ex. 53).

Beginning in mid-August 2007 and continuing through October 2007, as the market for all subprime-backed CP dried up, BOA, pursuant to its commitment as 2a-7 put provider, bought all of the CP that had been issued by the CDO$^2$. (Ex. 54; Ex. 55; Carp at 302-06; Ex. 56). As a result, by the end of October 2007, BOA owned all of the notes (but not the equity) issued by the CDO$^2$.



(See Exs. 1 (script) and 60 (accompanying slides)).

(Ex. 1 at 46-51; Price at 194-216).

By the end of 2007, BOA had recognized over $2 billion in write-downs on the CDO² notes, with the Mezzanine Notes having been written down to zero. (Ex. 57; Barro Rep. Ex. 17a). BOA's significantly reduced valuations on its CDO holdings in this time period were attributed to delinquency rates on subprime loans increasing "faster than projections" and leading to increasing estimates of cumulative losses, and "massive ratings downgrades" on subprime ABS and CDOs that were "unprecedented and beyond the market's expectation." (Ex. 1 at 23; Ex. 58; Ex. 59 at 6). Other BOA documents emphasize that during Q3 2007, subprime lenders were failing and home prices declining. (Ex. 60 at 9). As BOA's Board of Directors was told in December 2007, "[t]hese actions resulted in unexpected risks that neither the market or the rating agencies had modeled in determining CDO values." (Ex. 1 at 24). As discussed in further detail

below, none of BOA's documents or analyses attributed any of the write-downs on the CDO$^2$ to the collapse of the Funds or to any alleged mismanagement by BSAM as collateral manager.

In February 2008, the Trustee declared an event of default on the CDO$^2$. (Ex. 61). Although BOA had the right to terminate BSAM as collateral manager upon an event of default (Ex. 6, § 13(d)), it retained BSAM as collateral manager until the CDO$^2$ was liquidated at the end of the year. In December 2008, the Trustee auctioned off the collateral. (Ex. 61). At the auction, BOA bought back more than half of the collateral – 48 of the 84 bonds. (Exs. 62, 63, 64).

As explained in detail in our *Daubert* motion, plaintiffs seek total damages on all claims in the range of $125 million to $540 million, which they claim represents the portion of their roughly $3 billion in losses that is attributable specifically to the collapse of the Funds and not to other market-wide developments, depending on the cause of action and their assessment of when the allegedly concealed information about the Funds was fully disclosed.

## Argument

As we demonstrate below, all four claims fail and summary judgment should therefore be granted in favor of the defendants. *See e.g., Fragin v. Mezei*, No. 09 Civ. 10287, 2012 WL 3613813, at *1 (S.D.N.Y. Aug. 22, 2012) (Nathan, J.) (reciting the summary judgment standard).

I.   **THE MAY 22 FRAUD CLAIM SHOULD BE DISMISSED BECAUSE DEFENDANTS HAD NO DUTY TO DISCLOSE FUND PERFORMANCE OR REDEMPTION REQUESTS TO BOA**

To prevail on a common law fraud claim, a plaintiff must show (i) a material misstatement or omission; (ii) fraudulent intent; (iii) reasonable reliance; and (iv) resulting damages. *E.g., Banque Arabe et Int'l D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995). Where, as here, the claim is based on the alleged failure to disclose, the plaintiff "must also prove that the defendant had a duty to disclose." *Id.* That duty "cannot arise

simply because two parties may have been on opposite sides of a bargaining table" in a transaction. *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Here, BOA relies on the doctrine in New York law that a party has a "duty to speak" where "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass*, 987 F.2d at 150 (citations omitted).

The "superior knowledge" doctrine provides that a "party to a business transaction is under a duty to exercise reasonable care to disclose . . . (e) *facts basic to the transaction*, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." *Restatement (Second) of Torts* (the "Restatement"), § 551(2)(e); *see Brass*, 987 F.2d at 151 (adopting the Restatement test). "Basic to the transaction" is an exacting standard, and means something more than just "material":

> A basic fact is a fact that is assumed by the parties as a basis for the transaction itself. It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts may serve as important and persuasive inducements to enter into the transaction, but not go to its essence. These facts may be material, but they are not basic.

*Id.*, cmt. j; *see also Banque Arabe*, 57 F.3d at 156 (the information must have been "*critical* to" the party claiming fraud); *Brass*, 987 F.2d at 151 (one party has a duty to speak when the other party "is mistaken about [the] *basic factual assumptions*" of the transaction) (emphasis added); *Jana L. v. W. 129th St. Realty Corp.*, 22 A.D.3d 274, 277, 802 N.Y.S.2d 132, 135 (1st Dep't 2005) (the doctrine applies when one party has "superior knowledge of *essential facts*") (emphasis added).

15

This rule has been applied when "the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling," Restatement at cmt. l, or "where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair." *Jana L.*, 22 A.D.3d at 277, 802 N.Y.S.2d at 134.

Under New York law, "each element of a fraud claim must be shown by clear and convincing evidence." *Banque Arabe*, 57 F.3d at 153. This higher standard of proof "forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007) (citing *Abrahami v. UPC Constr. Co.*, 638 N.Y.S.2d 11, 13 (1st Dep't 1996)). On summary judgment, once the movant demonstrates "an absence of clear and convincing evidence" of fraud, the burden shifts, and "the evidence presented by the non-moving party in opposition to summary judgment must be enough to make any inference of fraud unequivocal." *Century Pac.*, 528 F. Supp. 2d at 219 (citations and quotations omitted).

Here, far from being clearly and convincingly "basic" or "essential" to this transaction, it is undisputed that the Funds' performance was not (i) discussed or even referred to in BOA's internal due diligence and approval documents; (ii) mentioned in the term sheet for the offering; (iii) the subject of any inquiry by BOA's deal team; or (iv) the subject of any post-closing disclosure by BOA to CP investors.

*Before* BSAM sent the May 23 letter, BOA/SSG never expressed interest in the health of the Funds. The February 15 "Greenlight Request," in which SSG sought (and obtained) formal approval to proceed with the deal, did not mention the Funds (Ex. 15), nor does the Engagement Letter itself. (Ex. 5). The TAP, BOA's internal approval document, contained no background

about the EL Fund and limited background information about the HG Fund. (Ex. 8).  In

addition, the Funds' performance, current condition, or future prospects were not mentioned,

either in the risk section or anywhere else. (*See id.*)  Even the Term Sheet for the offering does

not mention the Funds. (Ex. 65).  As noted above (at p. 4), the Funds themselves were only two

of seventeen funds that BSAM managed and they accounted, at the time, for only about seven

percent of BSAM's revenues.  The offering circular for the CDO$^2$ attached audited financials for

BSAM, but not the Funds.  (Ex. 16 at BOA-BSAM 00027391-401).  Not surprisingly, no

BOA/SSG witness could recall ever asking, or instructing anyone else at BOA to ask, any

questions about the Funds prior to May 23.  (Briggs at 70; Dash at 369-70; McLaughlin at 109;

Moynihan at 187; Raman at 109, 115-16; Skardon at 90-91).

   Similarly, BOA's conduct upon receiving the May 23 letter and thereafter is wholly at

odds with its claim that the health of the Funds was "basic" or "critical" to this transaction.  As

discussed above, BOA did not pursue any alternatives to closing the deal, and in fact closed on

May 24 as it was scheduled to do.  And after closing, BOA not only thanked and congratulated

the Funds' portfolio managers, but also wined and dined them and their team in pursuit of future

business. (*See supra* at 10-12).

   Above all, the fact that BOA sold hundreds of millions of dollars of CP from the CDO$^2$

without disclosing to those investors the developments at the EL Fund outlined in the May 23

letter (Ex. 22, No. 9; Austen at 149) is irreconcilable with a claim premised on the proposition

that this same information was "critical" to the transaction and BSAM was required to disclose it

to BOA even earlier than it did.  BOA's witnesses conceded that as underwriter and placement

agent, BOA had a duty to ensure that investors were made aware of "all material facts and

circumstances about" the securities it was marketing. (Maddox at 51-55; *see also* Austen at 66-

68; McLaughlin at 338-339).  BOA's internal written policy so required (Maddox at 51-52, Ex. 66), and both sides' industry experts so confirmed.  (Castro at 132-33; Kesselman Report ¶ 52(c)).  During oral argument on defendants' motion to dismiss, Judge Crotty specifically noted that BOA "might have disclosure obligations" of its own if it marketed the notes after receiving BSAM's May 23 letter.  He asked BOA's counsel:  "Based on the knowledge that you had, did you make any disclosure yourself?"  BOA's counsel responded:  "I know that the issues were vetted and I'm confident that, you know, the obligations were faithfully discharged."  (Ex. 67 at 23-24).

They were indeed vetted.  Discovery revealed that BOA's business people consulted with BOA's lawyers on whether the information in BSAM's May 23 letter warranted disclosure to investors, and after those discussions, BOA did not disclose it.  (Foley at 692-93; Hentemann at 51-52; McLaughlin at 215-20).  In light of its acknowledged disclosure obligations, BOA's determination that it could market the CP without disclosing this information – in effect, an admission that the information was not material – is the clearest evidence of all that the health of the Funds was neither basic nor essential to this transaction.

On this record, plaintiffs also cannot show, as they must to prevail under the "superior knowledge" theory, that the defendants "knew" that BOA "was acting in reliance on mistaken knowledge regarding" the Funds' performance. *See Banque Arabe*, 57 F.3d at 155.  There is simply no evidence that BOA "acted" – *i.e.*, chose to pursue, approve, or enter into this transaction – "in reliance on" any facts or information, mistaken or otherwise, concerning the Funds' health, performance, or level of redemptions.  It therefore goes without saying that the defendants did not "know" that BOA was acting on the basis of mistaken knowledge about the Funds.  Nor is there any evidence suggesting that defendants had any such knowledge.  BOA's

inability to make this showing is an additional and sufficient reason to grant summary judgment dismissing the May 22 Fraud Claim.  *See, e.g., Banque Arabe*, 57 F.3d at 155-56.

## II.    THE REPO FRAUD CLAIM FAILS BECAUSE BOA CANNOT PROVE, NOR CAN IT RECOVER DAMAGES FOR, ALLEGED FRAUD IN CONNECTION WITH THE REPO FINANCING

### A.    The Repo Fraud Claim Fails Because BSAM Disclosed the EL Fund Redemption Requests Before BOA Extended Financing to the Funds

The Repo Fraud Claim rests on three legal theories:  (i) the same alleged duty to disclose based on "superior knowledge" that underlies the May 22 Fraud Claim, (ii) an alleged false representation arising under the Master Repurchase Agreement ("MRA") that the Funds had experienced no material adverse change in their financial condition "since the date of the most recent financial statements" shared with BOA, and (iii) an alleged duty by the defendants to "correct" that alleged false representation.  (Ex. 4 ¶¶ 86-93, 150-51; Ex. 68 at Annex I ¶ 5(a)). All three theories fail for the same reason:  By May 24, when the repo transaction closed (Exs. 36; 37), BOA knew about the current financial state of the Funds.  BOA thus cannot prove that the defendants concealed, or misrepresented, the Funds' financial condition.

Having made disclosure to BOA on May 23, BSAM, as of May 24, no longer had "superior knowledge."  And even if the defendants (as opposed to the Funds) had an obligation under the MRA to update BOA, and even if the receipt of redemption requests that had not yet come due constituted a "material change" in the Funds' "financial condition" – both of which the defendants dispute – the defendants satisfied any such obligation by their May 23 disclosure. [3]

---

[3] BOA has previously argued that even if the May 23 letter provided an update on the "financial condition" of the EL Fund, no such update or correction was provided as to the HG Fund.  But as noted above, redemption requests in that fund were much lower, and there is no evidence that as of May 23 – when redemption requests at the HG Fund still amounted to only about 15% of investor equity capital (Exs. 3, 69) – there was a comparable question as to whether the HG Fund would have to be liquidated or wound down.

Discovery has shown that none of the multiple individuals at BOA who received or were told about the May 23 letter forwarded it or otherwise communicated its contents to BOA's repo desk before it closed on the repo financing on May 24. (Malo at 133-34; Frisina at 205-06). But as described above, BOA's witnesses conceded this was BOA's own fault, and resulted from failures of communication between and among SSG, Risk – which oversaw the Repo desk – and the Repo desk itself. (*See supra* at 11, 13). ████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████ (Ex. 1 at 46). There is no evidence that BSAM, having addressed the letter to both SSG and BOA's legal department, knew or believed that the repo desk was or would be unaware of the information when it extended repo financing to the Funds on May 24. Nor can BOA be said to have "reasonably" relied on BSAM to make some additional disclosure directly to the repo desk when BOA has conceded its own communication failures caused the May 23 letter not to be brought to that desk's attention.

BOA cannot prove fraud by blaming BSAM for its own acknowledged blunders. As the discovery record confirms, BSAM disclosed developments at the EL Fund to BOA, and it did so *before* BOA extended repo financing to the Funds. Based on this undisputed timeline, BOA's theories of misrepresentation, duty to correct, and duty to disclose based on "superior knowledge" do not apply, and BOA cannot prevail on this claim.

### B.    BOA Already Compensated Itself for any Decline in Value of the Mezzanine Notes

The Repo Fraud Claim fails for the additional reason that BOA has no cognizable damages. BOA bought the Mezzanine Notes from the Funds on June 18 pursuant to the TPA. The price BOA paid is no different than what BOA – knowing substantial information by that

point about the Funds' uncertain prospects – determined to be the value of those notes as of that date.

As explained above (at 12), BOA's agreement on June 18 to purchase the Mezzanine Notes from the Funds at a $105 million discount off the par purchase price that the Funds had paid reflected BOA's assessment of their "fair value" or "fair market value." At the end of June, by which point BSAM had disclosed that it was suspending redemptions in both Funds, BOA "fair valued" the Mezzanine Notes for purposes of its quarterly reporting obligations, and confirmed that their fair value was the same as the purchase price, *i.e.*, the same $105 million discount off par. (Carp at 48-50; Barro Report at Ex. 17a.).

By June 18, BOA knew and/or was on notice of the allegedly concealed information about the Funds' condition and prospects – including the possibility of similar difficulties at the HG Fund. Specifically, BOA knew about the suspension of redemptions at the EL Fund (Ex. 70); representatives from BOA had attended the June 14 repo counterparties meeting, where the discussion included performance issues at both Funds, anticipated significant redemptions at the HG Fund, heavy volumes of margin calls at both Funds, and a plan to sell assets from both Funds (*supra* at 12); BOA itself had proposed on June 15 that BSAM agree to suspend redemptions at the HG Fund as part of an agreement to unwind all of the repo positions (Ex. 71 at 819, #6); and the press was reporting on the difficulties the Funds were experiencing, including a *Wall Street Journal* article reporting on Merrill Lynch's intention to auction the seized assets and the possibility that the developments "may well mean the end of Mr. Cioffi's two funds." (Exs. 72, 73).

With all of this information, and ample opportunity to ask any questions, BOA purchased the Mezzanine Notes at a price consistent with what it determined the value of those assets to be

at that time.  By so doing, BOA compensated itself for any impairment of these notes attributable to market developments and/or the Funds' difficulties and assumed the risk of any further declines.  The Repo Fraud Claim accordingly must be dismissed.  *See Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, No. 95 Civ. 8450 (AGS) (THK), 1998 WL 422482, at *9 (S.D.N.Y. July 22, 1998) (dismissing fraud claim on summary judgment for failure to show any "cognizable damages").

III.   **BSAM DID NOT OWE THE ISSUER A FIDUCIARY DUTY OR BREACH ANY SUCH DUTY IN CONNECTION WITH THE PURCHASE OF THE INITIAL COLLATERAL**

     A.   **The Arm's-Length Stipulation Defeats the Claim of Fiduciary Duty vis-à-vis the Purchase of the Initial Collateral**

As this Court noted in ruling on Plaintiffs' motion to amend, in this case it is an "uncontested proposition that a fiduciary relationship cannot be created out of an arms-length transaction."  July 6, 2012 Order (Docket No. 91) 2 n.1.  *Accord e.g., In re Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield*, 276 F.3d 123, 130 (2d Cir. 2002); *Barrett v. Freifeld*, 64 A.D.3d 736, 739, 883 N.Y.S.2d 305, 308 (2d Dep't 2009).

The specific transaction as to which the Issuer alleges BSAM owed and breached a fiduciary duty is the "purchase [of] the initial $2.89 billion of Collateral."  (Ex. 4 ¶ 142.)  But the Offering Circular ("OC"), accurately summarizing the Collateral Management Agreement between the Issuer and BSAM (the "CMA"), says just the opposite:  The Issuer, along with BSAM and BOA, all agreed that "the Collateral Debt Securities purchased on the Closing Date by agreement . . . shall be deemed to be purchased on an 'arms-length' basis."  (Ex. 16 at 144; Ex. 6 § 5(c) at 9-10).  Accordingly, the Trustee/Issuer's claim that BSAM owed it a fiduciary duty in connection with that very same transaction fails for this reason alone.  *See Tradewinds Fin. Corp. v. Refco Sec., Inc.*, 5 A.D.3d 229, 230, 773 N.Y.S.2d 395, 397 (1st Dep't 2004)

(breach of fiduciary duty claim was properly rejected on defendants' summary judgment motion, where governing documents between parties "expressly provided" that relationship was "arm's length"); *Osan Ltd. v. Accenture LLP*, 454 F. Supp. 2d 46, 55 (E.D.N.Y. 2006) (finding no fiduciary duty where agreement between parties expressly stated that it was "negotiated and entered into . . . from arms-length bargaining positions").

>B.    **The April 30 Pricing Agreement Reinforces the Absence of any Alleged Fiduciary Duty or Breach in Connection with the Purchase of the Initial Collateral**

At oral argument before this Court, plaintiffs asserted that BSAM had a "fiduciary duty of offering the lowest possible price for the assets" comprising the Initial Collateral. (Ex. 74 at 4-5). But the undisputed record shows that a different mechanism for determining the prices of the Initial Collateral was specifically agreed upon by all parties and disclosed in the OC.

As part of the discussion of conflicts of interest in the OC,[4] it was clearly stated and disclosed that the parties had agreed that: (a) the price of the Initial Collateral was set by agreement as of April 30; (b) the Initial Collateral would be sold to the Issuer at closing on May 24 "for the same [April 30] price"; and, (c) because of "recently experienced price volatility due

---

[4] Because 100% of the Initial Collateral was being purchased from two hedge funds that BSAM managed, and sold into a new CDO[2] that BSAM also would be managing (following closing), there was the potential for conflicts of interest. The CMA and the OC contain several pages of disclosure of potential and actual conflicts of interest between BSAM and the Issuer. (Ex. 6 § 5; Ex. 16 at 45-48). In the CMA, the Issuer specifically "acknowledge[d] and consent[ed] to various potential and actual conflicts of interest that may exist with respect to the Collateral Manager as described [in the CMA] and in the Offering Memoranda." (§ 5(b).) While this consent does not "alter[] the duties or liabilities of the Collateral Manager" that are "expressly set forth" in the CMA (*id.*), it further reinforces the absence of a fiduciary relationship vis-à-vis the purchase of the Initial Collateral. *See Oddo Asset Mgmt. v. Barclays Bank PLC*, No. 109547/08, 2010 WL 8748135, at *7 (Sup. Ct. N.Y. County Apr. 21, 2010) (noting "that the offering documents received by plaintiff, describing the duties of the collateral managers, set out potential conflicts of interest on the part of the collateral managers which would be wholly inconsistent with the existence of a fiduciary duty"), *aff'd*, 19 N.Y.3d 584, 950 N.Y.S.2d 325 (2012).

to . . . developments in the subprime mortgage markets," "[t]here can be no assurance that the price at which the Issuer purchases the initial portfolio of Collateral Debt Securities reflects the price at which such securities could be purchased or sold in the open market." (Ex. 16 at 46-47; *see also* Ex. 75). As contemplated by all parties, the CDO$^2$ in fact purchased the Initial Collateral at the agreed on April 30 prices.[5]

Given these facts, the Issuer (or its Trustee) cannot now prevail on a claim based on the theory that it placed its trust and confidence in, or reasonably relied on, BSAM to follow some other pricing protocol – such as ensuring that the prices for the Initial Collateral would be "as low as possible" and/or would be reset based on post-April 30 developments. *See AG Capital Funding Partners, LP v. State St. Bank & Trust Co.*, 11 N.Y.3d 146, 158, 866 N.Y.S.2d 578, 585 (2008) ("reliance" is an essential element of a fiduciary relationship); *United States v. Wolfson*, 642 F.3d 293, 295-96 (2d Cir. 2011) (same). *Compare People ex rel. Cuomo v. Coventry First, LLC*, 13 N.Y.3d 108, 115-116, 886 N.Y.S.2d 671, 675 (2009) (fiduciary duty adequately alleged where life settlement brokers held "themselves out as working to obtain the highest purchase price for their clients' policies" "in a manner that could be reasonably relied upon by the client").

C.  **No Written Agreement or Course of Dealing
    Between the Parties Gives Rise to a Fiduciary Duty**

Even if the Court looks further – to other documents or to the alleged "course of dealing" between BSAM and the Issuer (Ex. 4 ¶ 82) – there is no relationship and no contract language that gives rise to a fiduciary duty with respect to the purchase and pricing of the Initial Collateral.

"Generally, commercial transactions do not create fiduciary obligations, absent express language in the contract, or a prolonged prior course of dealings between the parties establishing the fiduciary relationship." *DFP Mfg. Corp v. Northrop Grumman Corp.*, No. 97-CV-4494,

---

[5] *Compare* Ex. 76 *with* Bajaj Appendix 1.

1999 WL 33458384, at *9 (E.D.N.Y. Mar. 23, 1999). *Accord Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 372 (S.D.N.Y. 2011), *aff'd*, No. 11-1657-CV, 2012 WL 2086297 (2d Cir. June 11, 2012). Also "[g]enerally, where parties have entered into a contract, courts look to that agreement 'to discover ... the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency.'" *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19-20, 799 N.Y.S.2d 170, 175 (2005). If the parties "do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." *Id.* (citations omitted).

Plaintiffs allege a fiduciary duty in part from an alleged "course of dealing" (Ex. 77, No. 7), but far from the "prolonged prior course of dealings" that the case law requires, discovery has revealed the absence of *any* direct dealings or "relation" between BSAM and the Issuer in connection with the pricing or selection of the Initial Collateral. Moreover, BSAM and the Issuer had no relationship or interactions *prior to* the selection and pricing of the Initial Collateral; indeed, the Issuer did not even exist on paper until the day BSAM and BOA agreed on the selections and prices for the Initial Collateral, April 30, 2007, and BSAM and BOA were not notified that the Issuer was "formed" until May 2, 2007. (Kesselman Supp. Rep. ¶ 3; Kesselman at 296-97; Ex. 78).

While a fiduciary duty can arise even outside of a contractual relationship creating one, *see* July 6, 2012 Order (Docket No. 91) at 2 n.1, some clearly defined relationship or extended "course of dealing" must pre-date the transaction(s) in question in order for such duty to exist. Here, there is none. *See, e.g., Green v. Beer*, No. 06 Civ. 4156, 2007 WL 576089, at *3 (S.D.N.Y. Feb. 22, 2007) ("the requisite high degree of dominance and reliance must have existed *prior to* the transaction giving rise to the alleged wrong, and not as a result of it.")

(quoting *Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v. Salomon Bros. Int'l Ltd.*, 674 N.Y.S.2d 648, 649 (1st Dep't 1998) (emphasis added)); *see also Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 594-95, 950 N.Y.S.2d 325, 331 (2012) (dismissing breach of fiduciary duty claim brought against collateral managers by mezzanine note holders in a structured security, primarily because such noteholders are creditors, but also because the noteholders had "no direct dealings" with the collateral manager and accordingly there was an "insufficient factual basis to establish a relationship of higher trust").[6]

It is only logical that no "course of dealing" or relationship existed between the Issuer and BSAM prior to the May 24 closing of the CDO², because the deal was – in the words of BOA's own CDO industry expert – "intended to be in essence a bilateral trade between BSAM and BAS." (Castro Report ¶ 29 & Dep. at 219-20). The process of creating the CDO² was an arm's-length negotiation between BSAM and BOA, in which the Issuer – not yet in existence – did not participate. (Kesselman Supp. Report ¶¶ 3-4; Kesselman at 296-97; Bajaj at 216-17).[7]

---

[6] While the *Oddo* decision also states in *dicta* that the collateral managers "may have owed fiduciary duties to the SIV-lites," 19 N.Y.3d at 593, 950 N.Y.S.2d at 331, that case dealt with assets that the collateral manager caused the SIV-lites to acquire well after closing and years after the collateral managers assumed a contractual responsibility to select assets for the SIV-lites. The facts here are very different, as the assets at issue were agreed to have been purchased on an "arm's-length" basis and were selected and priced by agreement between BSAM and BOA prior to the deal even closing and before the collateral manager had assumed its contractual responsibilities.

[7] Plaintiffs' industry expert Mr. Castro asserted in his supplemental report that, in his experience as a collateral manager, "I always believed that we had a fiduciary duty to an issuer as soon as we were engaged for a transaction, and certainly when selecting assets for that transaction, regardless of when a formal collateral management agreement was signed." (¶ 4). He further opined that in accumulating assets for a new CDO, "the collateral manager is acting on behalf of the issuer," and that "market participants expect a collateral manager" to acquire collateral "at a fair price." (¶ 5) To a large degree, this proffered testimony is inadmissible as it crosses the line from "industry practice" to effectively instructing the fact-finder as to a collateral manager's legal obligations. *See, e.g., United States v. Bilzerian*, 926 F.2d 1285, 1294-95 (2d Cir. 1991) (industry expert testimony must be "carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of

26

While one of BSAM's roles was to select the Initial Collateral, the selection was subject to BOA's review and approval.  Each and every security that BSAM proposed to be included in the Initial Collateral was disclosed to BOA; BOA had the opportunity to and did in fact get its own CDO traders' viewpoints on these proposed assets; as a result of BOA's feedback, certain assets BSAM had selected were removed from the list of initial collateral; BOA had its traders review BSAM's proposed prices; and BOA ultimately found BSAM's prices to be "appropriate" and agreed to use them.[8]  By April 30, 2007 – the day the deal was "priced"[9] – BSAM and BOA alone, operating at arm's length, with BOA as a check on BSAM's discretion, and with no involvement of the Issuer, had agreed on the selection and prices of the securities that would comprise the Initial Collateral.

This case is a far cry from the paradigmatic investment adviser fiduciary relationship, as discussed in New York cases, where a client entrusts an adviser with capital and relies on the adviser and its expertise to exercise discretion to invest and manage the assets on a going-forward basis.  *See, e.g., Palmetto Partners L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 808, 921 N.Y.S.2d 260, 265 (2d Dep't 2011); *Bullmore v. Ernst & Young Cayman Islands*,

---

the jury in applying that law to the facts before it").  But even if this testimony is admissible, Mr. Castro's general statements about what he believed and what market participants expected beg the question, which is whether BSAM, based on the specific facts leading up to the creation of *this* CDO², had or breached a fiduciary duty.

[8] *See* Exs. 79, 80, 81 (BOA email stating that BOA would "need to come to an agreement" with BSAM on prices for Initial Collateral); Foley at 751-54, 769-71 (describing this process); Ex. 75; Ex. 76; Skardon at 83-85 (confirming that BOA and BSAM "would have to agree to a price for each of these securities in order for it to go into the deal" and that BOA traders "reviewed the prices and found them to be appropriate").

[9] A CDO deal is "priced" in advance of closing when the parties agree to the size and price of each of the tranches of securities to be issued by the new CDO vehicle.  (Kesselman Report ¶ 36).  Here, at the same time the deal was "priced," the parties also agreed to the prices at which the underlying collateral would be sold to the new CDO².

45 A.D.3d 461, 462, 846 N.Y.S.2d 145, 147-48 (1st Dep't 2007).  None of these precedents

deals with the selection and pricing of initial collateral for a SPV like a CDO before a deal even

closes; nor do the precedents pertain to the unique and undisputed facts here surrounding the

purchase of the Initial Collateral, where two parties negotiated at arm's length over the

selections, pricing was according to an agreed and disclosed protocol, and the parties (including

the Issuer) all stipulated that these purchases would be considered to have been accomplished on

an "arm's length" basis.[10]

## IV.   ALL OF PLAINTIFFS' CLAIMS FAIL FOR LACK OF PROOF OF DIRECT AND PROXIMATE CAUSATION

All of plaintiffs' claims fail for lack of proof of causation because: (1) plaintiffs have

been unable to substantiate their core claim that the problems at the Funds, once revealed, caused

a market-wide decline in CDO asset values that directly and proximately impacted the CDO², (2)

the record shows, and BOA itself determined, that the value of the CDO² notes was impaired by

developments other than the collapse of the Funds (such as, *e.g.*, rising subprime mortgage

---

[10] The Trustee fares no better in its reliance on the CMA, which sets out the relationship between
BSAM and the Issuer.  The CMA was signed and took effect on May 24, 2007, weeks after the
selection and pricing of the Initial Collateral was settled by agreement, and it has no express
language creating a fiduciary duty. *See Intellivision*, 784 F. Supp. 2d at 372-73 (requiring
express language where there is a contract).  The CMA appointed BSAM as "Investment Adviser
and Manager with respect to the Collateral" (Ex. 6 § 2(a)), but no plausible reading of this
provision creates or reflects a retroactive fiduciary duty to the (then non-existent) Issuer in
selecting and pricing that collateral between late February and April 30, 2007.

Nor is the fiduciary duty claim saved by the Trustee's reliance on language in the Engagement
Letter that the Collateral Manager "will be solely responsible for, and independently make, all
investment . . . decisions (including, but not limited to, the initial selection and purchase of the
collateral)."  The Engagement Letter is dated March 7, before the Issuer even existed, and (of
course) the Issuer is not a party to it.  The critical language immediately preceding the above-
quoted future-looking description of BSAM's role makes clear that these anticipated roles and
obligations of the collateral manager would be "[p]ursuant to a collateral management agreement
. . . to be entered into between the Collateral Manager and the Issuer on or prior to the Closing
Date."  (Ex. 5 § 4(a)).  As noted above, the CMA was not executed until closing, May 24.

delinquency rates and other market-wide developments), and (3) plaintiffs cannot show that the allegedly concealed information concerning the Funds caused or increased the risks of default and/or non-payment that were the reasons for the impairment and failure of the $CDO^2$ securities and for plaintiffs' ensuing losses.

### A.  Plaintiffs Must Show that Each Alleged Legal Wrong Was a Direct and Proximate Cause of their Damages

The requirement that plaintiffs prove injury directly and proximately caused by defendants' conduct is common to all of their claims.[11]  Borrowing the language of federal securities fraud cases, New York state courts have emphasized that to prove direct and proximate cause on a claim alleging losses in the context of an investment in securities, a plaintiff must "show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) *and* that the misrepresentations directly caused the loss about which the plaintiff complains (loss causation)."[12]  Applying New York common law, the Second

---

[11] *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011) (citing *National Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages.")) (emphasis in original); *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 465 (2d Cir. 1999) (Sotomayor, J.) ("where damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability"); *Greenberg v. Joffee*, 34 A.D.3d 426, 427, 824 N.Y.S.2d 355, 356 (2d Dep't 2006) (breach of fiduciary duty must be "'direct and proximate cause of the losses claimed'") (citing *Laub v. Faessel*, 297 A.D.2d 28, 30, 745 N.Y.S.2d 534, 536 (1st Dep't 2002) (direct and proximate cause required for breach of fiduciary duty and fraud claims)); *Friedman v. Anderson*, 23 A.D.3d 163, 167, 803 N.Y.S.2d 514, 517 (1st Dep't 2005) ("To establish a fraud claim, a plaintiff must demonstrate that a defendant's misrepresentations were the direct and proximate cause of the claimed losses.").

For plaintiffs' fraud claims, direct and proximate cause must be proven by clear and convincing evidence. *E.g., Colavito v. New York Organ Donor Network, Inc.*, 438 F.3d 214, 222 (2d Cir. 2006).

[12] *See, e.g., Laub v. Faessel*, 297 A.D.2d 28, 31, 745 N.Y.S.2d 534, 536 (1st Dep't 2002) (emphasis added) (explaining that "loss causation is the fundamental core of the common-law

Circuit has explained that to prove proximate cause for a claim involving non-disclosure in the context of the purchase/sale of securities, a plaintiff must establish "a causal connection between defendants' non-disclosures and the subsequent decline in the value of [the] securities."[13]

Under the Second Circuit's loss causation case law, showing proximate cause requires proof "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, . . . *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (citation omitted, emphasis in original). "[A]n omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Id.* at 173 (emphasis in original). Stated differently, a plaintiff must prove "a causal connection between the concealed information . . . and the ultimate failure of the venture." *Emergent*, 343 F.3d at 198, or the "'harm actually suffered,'" *id.* at 199 (citation omitted). *See also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) (to show proximate cause, "the defendant must . . . show that the misstatements were the reason the transaction turned out to be a losing one").

In ruling on defendants' motion to dismiss, Judge Crotty explained that "loss causation . . . is the equivalent of the common law concept of proximate cause" and that for plaintiffs' "tort

---

concept of proximate cause"). *See generally Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 352 (S.D.N.Y. 2010) ("Both the First Department and the Second Circuit have equated loss causation in a common law fraud claim with the 'proximate causation' requirement found in other tort cases and in the federal securities context.").

[13] *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (discussing common law fraud claim, and citing *Citibank N.A. v. K-H Corp.*, 968 F.2d 1489, 1496-97 (2d Cir. 1992) (dismissing common law fraud claim where "the complaint does not detail how the alleged fraud directly and proximately resulted in Citibank's" injury)).

claims of fraud," the complaint had to show that "the loss was caused by the fraud and not by some intervening event." (Ex. 67 at 48 (citing *Lentell*, 396 F.3d at 194, and *Emergent Capital*, 343 F.3d at 197)). While Judge Crotty also stated, in discussing the sufficiency of the complaint at the pleading stage, that loss causation was not "a required element of breach of contract" (*id.*), as a matter of proof at the summary judgment stage, plaintiffs must come forward with evidence "that the breach [of contract] *directly and proximately* caused" the damages they claim, because damages not "directly traceable to the breach, or . . . the result of *other intervening causes, . . .* cannot be allowed." *National Mkt. Share*, 392 F.3d at 525-26 (emphasis in original) (explaining that "principles of legal causation" "exist to restrict liability in contract as well" as in tort). *See also Carco Group, Inc. v. Maconachy*, 383 F. App'x 73, 75 (2d Cir. 2010) ("The district court should have . . . engaged in a proximate cause analysis to show that the breaches caused some loss [and] . . . then discussed potential intervening causes that might have broken the link between [defendant's] breach and any damages suffered."). Here, where plaintiffs' breach of contract claim and tort claims all allege damages in connection with the purchase of securities, all arise out of the same allegedly concealed information about the Funds, and all rely on the same expert damages analysis, the required proof of causation necessarily should be the same across all claims, whether analyzed under the label "direct and proximate cause" or "loss causation."[14]

---

[14] Plaintiffs previously cited *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007), to suggest that its breach of contract claim is not governed by the loss causation standard in federal securities claims. (Ex. 82 at 12 n.11). *Merrill Lynch* involved New York common law fraud and breach of contract claims in connection with the sale of a business, and misrepresentations about the business's key personnel and financial performance. It was in that very different *non-securities* context – where it was assumed the parties placed value on the business's "intrinsic qualities" – that the Second Circuit criticized Judge Baer's reliance on federal securities loss causation cases and focused instead on the damages question of whether the plaintiff had acquired "an asset at a price that exceeded its true value." *Id.* at 182-83. As

31

Strict application of these causation requirements is necessary because legal remedies for securities-related losses should be available "not to provide investors with broad insurance against market losses" – as plaintiffs seek here – but only "to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

> **B.**   **Plaintiffs Are Unable to Show that the Revelation of Information About the Funds Caused a Market-Wide Decline in CDO Prices; BOA's Own Documents Show Its Damages Are Attributable to the Market-Wide Collapse, Not Disclosures of Difficulties at the Funds**

In their original complaint, in the SAC, and in BOA's brief opposing our motion to dismiss ("MTD Opp."), plaintiffs described the risk that was concealed as follows (here, summarizing their position to Judge Crotty):

> What we have said is that the risk that they concealed, which was the imminent implosion of this fund, when it materialized, as it did, set off the following chain of demonstrable and well-pleaded events. First, it flooded the market with thinly traded assets, driving down the price of that class of assets; second, it withdrew from the market those two massive hedge funds that were preemptively large consumers of this thinly traded set of assets; and finally, it demolished or substantially damaged the standing and reputation of BSAM as an asset manager, and that reputation was critical to the marketability of the securities that were backed by assets managed by an active manager like BSAM.

(Ex. 67 at 28. *See also* Ex. 14 ¶¶ 112-116; Ex. 82 at 25-26 (arguing that there was nothing "far-fetched about the collapse of the Funds having a market-wide impact" and that the "market-wide decline" was "caused by the spectacular collapse" of the BSAM Funds). And in sustaining

---

Judge Pfaelzer recently explained in analyzing causation on a New York common law fraud claim involving RMBS, the Second Circuit's discussion of damages under New York common law in *Merrill Lynch* should not be read as eliminating the separate and additional black-letter requirement of showing direct and proximate cause. *Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, No. 2:11-CV-07165-MRP, 2012 WL 1798997, at *6 (C.D. Cal. Feb. 17, 2012). Nor should *Merrill Lynch* be read as overruling the applicability of direct and proximate cause or loss causation analysis to common law claims involving the purchase/sale of securities.

plaintiffs' claims on the motion to dismiss, Judge Crotty summarized plaintiffs' allegations by explaining that "[t]he subject of the fraud was the erosion of the subprime mortgage-backed collateralized securities market.  Bank of America alleges that its losses were at least partially caused by the decline in the market."  (Ex. 67 at 49).

By the time expert discovery was completed, it was clear plaintiffs could not substantiate their allegation that the collapse of the Funds caused a market-wide decline in CDO asset values that directly impacted the CDO$^2$ and its constituent assets.  Plaintiffs' expert economist, Dr. Mukesh Bajaj, and his team spent *6000 hours* working on this matter over more than three years (Bajaj at 7-9); yet, as to plaintiffs' core causation theory, he testified that while there "may have been" a market-wide impact from the collapse of the Funds, he and his team did not measure any such impact and he could not say whether or not any such impact was significant.  (Bajaj at 7-9, 238-40.  *See also* Bajaj Rebuttal Report ¶ 23 (denying that he claimed "the Funds' announcements also adversely affected aggregate conditions")).  Indeed, Dr. Bajaj conceded that disclosure of the Funds' difficulties to the market had no price impact on CDO sales by BOA itself (Bajaj Rebuttal Report ¶ 26), further demonstrating the absence of any causal link between the collapse of the Funds and any market-wide deterioration in the value of CDOs or MBS.

BOA's failure to substantiate its core causation theories is unsurprising given BOA's own contemporaneous valuations of the CDO$^2$, which are irreconcilable in their timing and their rationale with the proposition that the revelation of the Funds' difficulties directly and proximately caused a decline in value of the CDO$^2$.  Specifically, after the CDO$^2$ closed and as news of the Funds' difficulties became public, BOA began to value its exposures to the Super-

Senior and Mezzanine Notes for purposes of financial reporting.[15]   BOA's conclusion (before it

found itself in a litigation posture): the Super-Senior Notes retained 100% of their face value

through August 15, 2007, over two months after the June 7 announcement of the suspension of

redemptions at the EL Fund and a month after the July 17 announcement that the Funds had lost

all or nearly all of their value and would be shutting down.  (Ex. 84 and Carp at 83-84).  Even as

late as September 30, 2007 – well after BOA had to begin buying back the Super-Senior Notes –

BOA had taken only $73 million in fair valuation write-downs on the Super-Senior Notes.  As of

that same date, September 30, BOA was still projecting "no cash flow shortfalls for the super

senior tranche."  (Carp at 238-41; Ex. 59 at BOA-BSAM 00840267; Ex. 84).[16]

In addition to this temporal disconnect between the Funds' collapse and BOA's write-

downs, none of BOA's discussions, analyses, or models relating to valuing its exposure to the

$CDO^2$ during this time period included or reflect the collapse of the Funds as an input or

consideration.  To the contrary, BOA consistently pointed to market-wide developments relating

---

[15] Because BOA believed "current market prices [we]re distressed, not indicative of true value,"
and BOA did "not believe that the current market [wa]s an active market with willing buyers and
sellers," BOA (unlike its damages expert in this case) calculated the fair value of the $CDO^2$
tranches by using "internal models which incorporate expected cash flows of the underlying
collateral" to estimate the "proceeds that would be received from the sale of the CP and
mezzanine securities."  (Ex. 83).

[16] These contemporaneous valuations stand in stark contrast to the litigation calculations of
plaintiffs' damages expert, Dr. Mukesh Bajaj, who asserted in his report that after the final July
17 announcement about the Funds, the damages on the Super-Senior Notes attributable to the
revelation of the Funds' problems and not to any market-wide declines were between $375
million and $394 million.  (Bajaj Report, Appx. 7-B).

Similarly, as of June 29, 2007, BOA valued the Mezzanine Notes at the same price BOA paid for
them on June 18, 2007, and as of July 31, 2007, valued the Mezzanine Notes at $70 million less
than it paid for them.  (Ex. 84; Carp at 80-82).  Dr. Bajaj, on the other hand, asserts in his report
that BOA's damages on the Mezzanine Notes, again after the final July 17 announcement about
the Funds and purportedly attributable only to the Funds' problems and not any marketwide
declines, are between $87 million and $91 million.  (Bajaj Report, Appx. 7-B).

to the credit quality of the collateral underlying the $CDO^2$ as the cause of the deteriorating value of the $CDO^2$, including the Super-Senior Notes.  These market-wide developments to which BOA attributed its write-downs included housing price declines, greater than expected losses in subprime mortgages, ratings downgrades, and early events of default; they did not include the collapse of the BSAM Funds.  (*E.g.,* Ex. 1 at 11, 16-31; Ex. 60 at 9, 13-19; Carp at 109-11, 138; Ex. 86; Carp at 225-232; Ex. 58; Ex. 59 at p. 6; Carp at 248-55; Carp at 257-62; Ex. 87; Carp at 281-82; Ex. 88; Ex. 89; Ex. 90).  In addition, the timing of BOA's write-downs relating to the $CDO^2$ was consistent with BOA's write-downs on a large number of other non-BSAM super-senior and CDO and MBS exposures that BOA held (*e.g.,* Exs. 91, 92, 96, 93, 94, 95), as well as consistent with the timing of what BOA's documents described as similarly timed write-downs on CDOs and MBS at other banks and investment firms across Wall Street (*e.g.,* Ex. 60 at 22; Ex. 1 at 33-35).

BOA's contemporaneous explanations as to the timing and causes of these write-downs, in contrast to its after-the-fact litigation position, make perfect sense, as they coincide with the credit/housing/mortgage/financial crisis that began in the summer of 2007. *See* Barro Report at 5-17; *King County, Wash. v. IKB Deutsche Industriebank AG,* 708 F. Supp. 2d 334, 341-42 & n.55 (S.D.N.Y. 2010) ("In the summer and fall of 2007, the United States housing market suffered an unprecedented number of mortgage delinquencies and foreclosures.  These defaults, in turn, forced the value of the securities backed by subprime mortgages downward and led investors to flee financial products based upon them.").  BOA's public filings similarly describe this market-wide crisis, noting that the second half of 2007 saw "extreme dislocations" in the "subprime mortgage[ ] and commercial paper markets," resulting in the downgrading of CDO ratings, "widening of credit spreads" in the CDO space, and losses to BOA "associated with [its]

exposures" to these securities. (Ex. 85 at 10-11). BOA attributed losses in the CDO and subprime space to "a sharp rise in defaults on subprime mortgages and worries about the potential fallout." (*Id.*). In other documents, BOA described delinquency rates on subprime loans that were increasing "faster than projections," leading to "massive ratings downgrades" on subprime ABS and CDOs that were "unprecedented and beyond the market's expectation." (Ex. 1 at 23; Ex. 58; Ex. 59 at 6). "These actions," according to BOA's December 2007 Board presentation, "resulted in unexpected risks that neither the market or the rating agencies had modeled in determining CDO values." (Ex. 1 at 24).

Surveying these macroeconomic environment and market-wide developments that coincided with the CDO[2] and its eventual demise, economist Robert Barro of Harvard University, a defense expert in this case, concluded:

> Bank of America's losses on the May 2007 CDO-squared deal stemmed from the perfect storm of adverse economic conditions related to the U.S. Great Recession of 2007-2009. Equally problematic for the deal was the unprecedented collapse of U.S. housing prices, which caused widespread delinquencies and defaults on residential mortgages, particularly for subprime mortgages. The resulting reductions in value of mortgage-backed securities led to diminished valuations of the collateral for the CDO-squared deal and led eventually to the liquidation of the CDO-squared . . . . Bank of America's losses on the CDO-squared deal cannot reasonably be attributed to the Bear Stearns Funds . . . . Given the events that developed in the macroeconomic environment between May 2007 (when the CDO-squared deal closed) and November 2008 (when the CDO-Squared deal was liquidated), the CDO-squared deal would have been impaired whether or not the [Funds] suspended redemptions and then liquidated in June/July 2007."

(Barro Report at 2-3, 5-17). Plaintiffs' experts offer no direct critique or rebuttal to this section of Professor Barro's report. Indeed, when plaintiffs' expert Dr. Bajaj was asked whether BOA would have suffered the same losses even if he assumed the Funds had not collapsed, he responded: "I think its losses would have been about what they turned out to be." (Bajaj at 253-54; *see also id.* at 254-55).

The record thus leads to three interrelated conclusions fatal to plaintiffs' claims on the issue of direct and proximate causation. The first is that there is no proof to directly and proximately connect the allegedly concealed information with the ultimate failure of the CDO². *Emergent*, 343 F.3d at 198. The second is that the impairment in value and losses from the CDO² transaction would have occurred whether or not the Funds received redemption requests and eventually collapsed. *See Lentell*, 396 F.3d at 175 (loss causation requires plaintiff to show that they "would have been spared all or an ascertainable portion of that loss absent the fraud"); *cf. Pesa v. Yoma Dev. Group, Inc.*, 18 N.Y.3d 527, 532, 942 N.Y.S.2d 1, 3 (2012) ("damages for breach of contract are not recoverable where . . . the transaction would have failed, and the damage would have been suffered, even if no breach occurred"). The third is that because this is a case "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors" and on other similar BOA investments, "the prospect that [BOA's] loss was caused by the fraud" alleged not only "decreases," it fails. *Gelt Funding Corp.*, 27 F.3d at 772; *see also id.* at 769 ("[W]hen factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions."); *National Mkt. Share*, 392 F.3d at 525-26 (breach of contract damages not "directly traceable to the breach, or . . . the result of *other intervening causes,* . . . cannot be allowed") (emphasis in original).

### C.   Plaintiffs' Damages Expert Cannot Cure the Failure of Proof on Direct and Proximate Cause

Unable to substantiate their original theory of direct and proximate cause, plaintiffs instead rely on an expert analysis that, as we argue in our *Daubert* motion, is improperly based on speculation about an altogether different question: how much less BOA and the Issuer might have paid for the Initial Collateral had they been told of the Funds' difficulties earlier and had

37

negotiated with BSAM to pay lower prices for those assets. While a properly conducted and reliable event study is one mechanism that can be used to prove loss causation in a securities fraud case by linking curative disclosures to drops in the price of the relevant security, *see, e.g., Scallio v. Tyco Int'l*, No. 03 Civ. 7770, 2012 WL 2861340, at *3 (S.D.N.Y. July 9, 2012) (citing cases), as we argue in our *Daubert* motion, Dr. Bajaj's untested application of this kind of analysis in the context of hedge funds being forced to liquidate illiquid CDO holdings suffers from multiple fatal flaws and should be excluded.

But even if Dr. Bajaj's analysis were to be found reliable and admissible, it does not alter the analysis on direct and proximate causation. Dr. Bajaj queried whether plaintiffs might have paid lower prices for the Initial Collateral if they had been told earlier of the difficulties facing the Funds. The proper question is instead whether those allegedly concealed risks, when they materialized, were, at least in part, the direct and proximate cause of the CDO² losing value and becoming an impaired, failed venture that cost plaintiffs money.

BOA's damages theory circumvents this question and would effectively write direct and proximate cause out of the equation. Every investor in a CDO or other MBS who alleged that misrepresentations or omissions induced them into purchasing the securities could argue that, but for those misrepresentations or omissions, they would have paid less, and accordingly, when the investment later lost value – *regardless of the reason* – they would have lost less. But that is little more than "but for" or transaction causation. *See, e.g., Emergent Capital*, 343 F.3d at 197. The law requires more – not just that the omissions caused the plaintiff to enter into the transaction, but that the omissions concealed a  risk that directly and proximately caused at least some part of the eventual failure of the investment. *See Laub v. Faessel*, 297 A.D.2d at 31-32, 745 N.Y.S.2d at 536-37 (affirming dismissal of fraud and breach of fiduciary duty claims on

summary judgment where investment advisor lied about his qualifications and competence, because, regardless of whether plaintiff could prove the misrepresentations induced his investments, plaintiff had no proof that the "misrepresentations concerned the financial condition of any of the companies whose stock he recommended" or that the misrepresentations – "rather than market forces" – "directly and proximately caused his investment losses"). *See also ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC*, 50 A.D. 3d 397, 399, 858 N.Y.S.2d 94, 95 (1st Dep't 2008).

Consistent with the analysis of causation in *Laub*, courts considering issues of direct and proximate cause or loss causation in the context of MBS and/or CDOs have looked for a direct connection between the concealed or misrepresented information and the risk of default or non-payment on the securities at issue. Where the alleged fraud goes to the legitimacy or truthfulness of the assigned ratings,[17] or to whether underwriting standards intended to control the quality of the underlying collateral (mortgage loans) had been followed,[18] those claims have been allowed to proceed in the face of arguments that the credit/housing/mortgage/financial crisis was fully to blame for plaintiffs' losses. In such cases, the courts have found, the securities at issue were plausibly alleged to have been impaired by the claimed fraud.

Whether or not plaintiffs in those cases ultimately prevail as a matter of proof, this case is fundamentally different, and that is one of many reasons why plaintiffs' expert analysis misses the mark. Here, there is simply no evidence of a direct and proximate link between the allegedly

---

[17] *See, e.g., Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508 (SAS), 2012 WL 3584278, at *19-20 (S.D.N.Y. Aug. 17, 2012) (summary judgment); *King County, Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d at 338-44 (motion to dismiss).

[18] *See, e.g., Dexia Holdings, Inc. v. Countrywide Fin.*, 2012 WL 1798997, at *6 (motion to dismiss); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 293-96, 928 N.Y.S.2d 229, 235 (1st Dep't 2011) (motion to dismiss).

untimely disclosure of problems facing the BSAM Funds on the one hand, and what in fact led to downgrades, defaults, diminished cash flows, and the ultimate failure of the collateral underlying the CDO² and the CDO² itself, on the other hand. *See, e.g., In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511-12 (2d Cir. 2010) (affirming dismissal of securities fraud claims on summary judgment where plaintiffs' expert event study failed to establish the requisite causal link). BOA's unsubstantiated leap is simply too large.

## Conclusion

For the reasons set forth above, the defendants respectfully request that the Court grant summary judgment in their favor dismissing all claims in the Second Amended Complaint.[19]

---

[19] Plaintiffs' claims for fraud and breach of fiduciary duty also include aiding and abetting allegations. To the extent the underlying claims or primary violations fail for the reasons set forth above, the aiding and abetting claims fail as well. See e.g., *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 531 (S.D.N.Y. 2011) ("It is fundamental that a defendant cannot be liable for aiding and abetting unless there is a primary wrong to aid and abet.").

Dated: New York, New York
     December 21, 2012

KRAMER, LEVIN, NAFTALIS &
FRANKEL, LLP


By:____/s/ Barry H. Berke____
     Barry H. Berke
     Eric A. Tirschwell
     Marjorie E. Sheldon
     Jason Moff


1177 Avenue of the Americas
New York, N.Y. 10036
(212) 715-9100
*Counsel for Defendant*
*Bear Stearns Asset Management Inc.*


HUGHES HUBBARD & REED LLP


By:____/s/ Marc Weinstein____
     Marc Weinstein

One Battery Park Plaza
New York, N.Y. 10004
(212) 837-6400
*Counsel for Defendant Ralph Cioffi*


DRISCOLL & REDLICH


By:____/s/ Catherine L. Redlich____
     Catherine L. Redlich


521 Fifth Avenue, Suite 3300
New York, N.Y. 10175
(212) 986-4050
*Counsel for Defendant Raymond*
*McGarrigal*


BRUNE & RICHARD LLP


By:____/s/ Nina M. Beattie____
     Nina M. Beattie

One Battery Park Plaza
New York, N.Y. 10004
(212) 668-0315
*Counsel for Defendant Matthew Tannin*


41