UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

BANK OF AMERICA, N.A., *et al.*,

              Plaintiffs,

      -v-

BEAR STEARNS ASSET MANAGEMENT, *et al.*,

            Defendants.

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED SEP 0 3 2013

08 Civ. 9265 (AJN)

MEMORANDUM OPINION
AND ORDER

ALISON J. NATHAN, District Judge:

This cases arises from a transaction between Plaintiffs Bank of America and Banc of America Securities LLC ("BAS") (collectively "BOA"), and Defendant Bear Stearns Asset Management ("BSAM") in May of 2007. The transaction led to the creation of a "CDO-squared"—that is, a Collateralized Debt Obligation ("CDO") comprised of CDOs known as "the Issuer"—constructed out of Mortgage Backed Security ("MBS") assets taken from two of BSAM's funds. Following the default and liquidation of the two BSAM funds from which the Issuer's assets derived, BOA ultimately suffered billions of dollars in losses as a result of the transaction. BOA thereafter commenced the present action alleging that its losses from this transaction are attributable to a fraud perpetrated by BSAM and three of its former directors, Matthew Tannin, Ralph Cioffi, and Raymond McGarrigal (collectively "Defendants"). Plaintiffs

further allege that they suffered losses as a result of BSAM's alleged breach of a contract with Plaintiffs that facilitated the transaction and breach of its fiduciary duties owed to the Issuer.[1]

Following several years of discovery and two amended complaints, Defendants filed a motion for summary judgment seeking dismissal of all claims on January 11, 2013. (Dkt. No. 115).  Plaintiffs cross moved for summary judgment on Defendants' counterclaims on January 15, 2013. (Dkt. No. 123).  In conjunction with summary judgment briefing, the parties also filed competing *Daubert* motions.  (Dkt. Nos. 108, 110).

As discussed below, Defendants' *Daubert* motion to exclude the testimony of Dr. Mukesh Bajaj is granted.  Furthermore, because Plaintiffs cannot prove proximate cause without Dr. Bajaj's testimony, and because Plaintiffs' CDO-squared transaction fraud claim and breach of fiduciary duty claim fail for other separate reasons, Defendants' summary judgment motion is granted in its entirety and all four claims are dismissed.

## I.    STANDARD OF REVIEW

Summary judgment is properly granted when, after reviewing the evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000).  For summary judgment purposes, a genuine issue exists if the evidence is such that a reasonable jury could decide in the non-moving party's favor. *Id.*

---

[1] The breach of fiduciary duty claim was commenced by Bank of America as trustee to the Issuer.  Pursuant to a subsequent indenture, U.S. Bank National Association ("U.S. Bank") is presently trustee to the Issuer, and on July 6, 2012, the Court permitted U.S. Banks to be substituted in as the plaintiff for the breach of fiduciary duty claim. (Dkt. No. 91).

2

In a summary judgment setting, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted). "More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citations and quotation marks omitted).

## II.    BACKGROUND

This case involves a transaction in May of 2007 between BOA and BSAM that created a CDO-squared entity known as "the Issuer" that was to issue securities in the "aggregate principal amount" of at least $4 billion. (Def. 56.1 ¶ 7). The transaction, which was one of three that BOA had considered conducting with BSAM through negotiations commencing in January of 2007, constituted the largest CDO deal that BOA had ever done at that time. (Def. 56.1 ¶¶ 7, 16, 20). BOA's structured securities group ("SSG") was interested in the deal at least in part because BOA had been "trying to increase [its] role in the CDO business," which was becoming a very lucrative business for BAS, and SSG had a "mandate" to "improve the bank's standing in ABS CDO issuance in the lead tables and generate revenue." (Def. 56.1 ¶¶ 15, 16).

On March 9, 2007, BSAM and BAS entered into an Engagement Letter that outlined the principal terms of the transaction. (Ex 5). To proceed with this large a transaction, SSG had to

3

submit a "transaction approval package" ("TAP") and obtain sign-off from multiple departments throughout BOA. (Def. 56.1 ¶ 23).

The source of the assets making up the Initial Collateral that formed the Issuer's initial assets were two of BSAM's funds, the "High-Grade Structured Credit Strategies Enhanced Leverage Fund" ("EL Fund") and the "High-Grade Structured Credit Strategies Fund" ("HG Fund") (collectively, "the Funds"). The Funds' performance was not identified as one of the primary risks and was not mentioned anywhere in the TAP. (Def. 56.1 ¶ 25).

On May 22, 2007, "in order to facilitate the closing," BAS bought the Initial Collateral from the Funds for transfer to the Issuer at closing, which was scheduled for May 24. (Def. 56.1 ¶ 36). The CDO-squared purchased the Initial Collateral from BAS' warehouse on May 24, 2007, for the same prices (with an adjustment for accrued interest) that BAS had paid the Funds for those assets on May 22. (Def. 56.1 ¶ 37).

At the same time as this deal was being finalized, throughout May of 2007, news of negative return at the Funds corresponded with an increasing number of investors in the Funds seeking redemption requests for future redemption dates. By May 18, 2007, the Friday before the scheduled closing, requests for future redemptions, which would be payable over the next few months, had risen to $304.5 million in the EL fund (50% of investor equity capital) and $75.7 million in the HG fun (about 8% of investor capital). (Def. 56.1 ¶ 43). As of May 23, 2007, the day before the transaction closed, redemption requests at the HG fund were up to somewhere between 15% and 17% of investor equity capital. (Def. 56.1 ¶ 44).

At approximately 6:00 PM on May 23, 2007, Defendant Ralph Cioffi called Brian Foley, a BOA banker who was heavily involved in the deal, to tell him that a letter (the "May 23 Disclosure Letter") would be delivered shortly concerning redemption requests by investors at

4

either the EL Fund or one of BSAM's other funds. (Def. 56.1 ¶ 47).  Michael McLaughlin, head

of SSG for BOA, was in London at the time, but he received the BSAM letter from Sai Raman,

the head of BOA's Structures Derivatives Group by email.  In an email exchange, Raman and

McLaughlin called BSAM's May 23 Disclosure Letter "disturbing." (Def. 56.1 ¶ 53).  Raman

thought that Cioffi knew of the redemptions earlier and that he ought to have mentioned it. (*Id.*).

McLaughlin did not recall at his deposition reporting the letter to anyone (including his boss) or

discussing it with anyone other than Raman, and he did not contemplate calling off the deal or

postponing it at that time. (Def. 56.1 ¶ 55).  No disclosure about the developments at the Funds

was added to the Issuer's offering materials. (Def. 56.1 ¶ 60).

      After the deal closed on May 24, 2007, BAS served as the structuring agent, underwriter

and placement agent for the Issuer.  In addition, BAS, along with Citigroup Global Markets Inc.

("Citi") and Merrill Lynch Money Markets Inc. ("Merrill Lynch"), marketed the Issuer's "Super

Senior Notes." (Def. 56.1 ¶ 9).  BAS, along with the Issuer and other commercial paper dealers,

sold short-term commercial paper from the Issuer without disclosing to the third party investors

the information in BSAM's May 23 Disclosure Letter. (Def. 56.1 ¶ 60).  BAS agreed to

"purchase or provide protection in the form of a 2a-7 put," meaning that they agreed to buy back

up to $3.24 billion worth of Super-Senior Notes if they could not be sold to investors. (Def. 56.1

¶ 10).  For reasons that are not clearly before the Court, BAS halted any efforts to sell the

Issuer's long-term Mezzanine Tranches to third-party investors. (Def. 56.1 ¶ 59).  BAS received

a $15.4 million structuring fee upon closing. (Def. 56.1 ¶ 12).

      Before the transaction closed, it was agreed that one or more of the affiliates (including

the Funds) would purchase the Issuer's mezzanine notes and the preference shares at the CDO-

squared closing. (Ex. 5 ¶ 5(b)).  As a result, on May 24, 2007, the Funds purchased from the

Issuer approximately $700 million worth of mezzanine notes. In a "repo transaction" later that day, a separate division of BOA independently loaned the Funds the $700 million necessary to finance that purchase, thereby increasing BOA's overall exposure to the transaction. (*See* Def. 56.1 ¶ 65).

After the deal close, which was after the news of the Funds' redemptions was conveyed to BOA in a letter addressed to its legal department and after BOA then proceeded both with the CDO-squared transaction and with the unrelated repo transaction to finance the Funds' purchase of the Issuer's mezzanine notes, BOA's Brian Foley told Defendant McGarrigal that "BSAM as an institution and you personally, are excellent partners. I thoroughly enjoyed working with you and look forward to the next deal." (Exs. 38-39). SSG continued to invite BSAM and Defendant Cioffi to golfing events and dinners. (Exs. 40-43; Hentemann at Depo. 181; McDowell Depo. at 149-53).

A few weeks later, in June of 2007, the situation at the EL Fund grew dire, so dire, in fact, that redemptions were suspended. (Def. 56.1 ¶ 73). Several days after that, BOA issued a margin call, demanding that the Funds post additional collateral of $94 million to secure the May 24 repo transaction loan. (Def. 56.1 ¶ 74). The Funds failed to comply. (*Id.*).

On June 14, 2007, BSAM held a meeting with the Funds' repo counterparties, including representatives from BOA, at which it discussed performance issues at both Funds. (Def. 56.1 ¶ 75). On June 15, 2007, BOA proposed to "buy the entire repo portfolio" it had with the Funds, including the Mezzanine Notes from the CDO-squared pursuant to a transaction purchase agreement. (Def. 56.1 ¶ 76).

Redemptions at the HG Fund were suspended on June 30, 2007. (Def. 56.1 ¶ 80). On July 17, 2007, investors were told that there was "effectively no value left" in the EL Fund and

"very little value left" in the HG fund, and that BSAM would "seek an orderly wind-down of the Funds over time." (Def. 56.1 ¶ 81).

Beginning in mid-August 2007 and continuing through October 2007, BOA, pursuant to its commitment as a 2a-7 put provider, bought all of the commercial paper that had been issued by the Issuer. (Def. 56.1 ¶ 82). The Issuer's trustee declared an event of default in February of 2008 and auctioned off the collateral in December of 2008. (Def. 56.1 ¶¶ 83-84). At the auction, BOA purchased more than half of the collateral – 48 out of 84 bonds. (Def. 56.1 ¶ 82-84).

## III.   DISCUSSION

### A.  Plaintiffs Cannot Prove Proximate Cause

As discussed below, Plaintiffs, who must demonstrate loss causation as part of their burden of proving proximate cause, rely on the expert testimony of Dr. Mukesh Bajaj. But the Court concludes that Dr. Bajaj's testimony is inadmissible because his methodology is unreliable. In the absence of Dr. Bajaj's testimony, Plaintiffs cannot prove proximate cause and, as a result, all four claims must be dismissed. Moreover, Plaintiffs' CDO transaction fraudulent omission claim fails for the separate reason that there is no evidence from which a rational jury could find a duty to disclose. And Plaintiffs' breach of fiduciary duties claim fails because a contractual agreement stipulated that the transaction at issue was conducted at "arm's length."

#### 1.  Plaintiffs Must Prove Loss Causation

The Court concludes that this action must be dismissed because, based on the undisputed evidence, Plaintiffs are unable to prove how much, if any, of their damages can be traced to the ultimate disclosure of the information that Plaintiffs allege was wrongfully withheld. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

To establish proximate cause, Plaintiffs must show that the alleged non-disclosure caused their losses. *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (App. Div. 2002) (a plaintiff must "show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which the plaintiff complains (loss causation)."); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 196-97 (2d Cir. 2003); *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 352 (S.D.N.Y. 2010) ("Both the First Department and the Second Circuit have equated loss causation in a common law fraud claim with the 'proximate causation' requirement in other tort cases and in the federal securities context."). Plaintiffs must prove proximate cause for each of their claims. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and *proximately caused* his or her damages.") (emphasis in original); *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 465 (2d Cir. 1999) ("[W]here damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability."). For Plaintiffs to establish proximate cause, they must meet the loss causation standard articulated by the Second Circuit in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). (*See* Pl. Br. at 30; Opp. Br. at 37).

Plaintiffs asserted at oral argument that the Second Circuit's decision in *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007), has created "some doubt" as to the appropriateness of applying a loss causation standard under New York law, though Plaintiffs conceded that they have argued that they have met the loss causation standard set forth in *Lentell*. (7/10/13 Tr. at 56; Opp. Br. at 37). However, whatever confusion *Merrill* may have

8

engendered, the Court concludes that it is distinguishable because it was a case involving the sale of a business, not the sale of securities. The Second Circuit's criticism in *Merrill* of the district court's reliance on federal securities loss causation cases in the context of a business acquisition claim is not relevant to the present MBS dispute. As a result, the Court concludes that Plaintiffs must demonstrate loss causation in the manner proscribed by the Second Circuit in *Lentell*. That is, Plaintiffs must be able to prove that the "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173; *see also Laub*, 745 N.Y.S.2d at 536. In their brief opposing summary judgment, Plaintiffs concede this is precisely what the evidence "is supposed to" show in this kind of a case. (Opp. Br. at 37).

### 2. Dr. Bajaj's Expert Testimony is Excluded as Unreliable and Irrelevant

To meet their burden of proving loss causation, Plaintiffs proffer expert testimony from Dr. Mukesh Bajaj, who opines that BOA and the Issuer overpaid for the Initial Collateral by between $126.5 million and $489.8 million. (Bajaj Rep. ¶¶ 60-62). As discussed below, Dr. Bajaj's methodology is inherently unreliable because he measured dislocated, fire sale prices, thereby making it impossible to determine what amount, if any, of the losses he measured are attributable to the market's realization of the risks addressed in the May 23 Disclosure Letter as opposed to the effects of fire sales stemming from a liquidation of the Funds.

Dr. Bajaj concludes that BOA suffered between $126.5 million and $489.8 million in losses caused by disclosure of the supposedly concealed information regarding redemptions at the Funds that were at least partially addressed in the May 23 Disclosure Letter. (Bajaj Report ¶¶ 60-62). Dr. Bajaj comes to this conclusion after selecting three possible disclosure dates and measuring prices from sales before and after those dates. The problem is that the sales that Dr.

Bajaj studied as "pre-disclosure" sales were, by and large, those occurring before the Funds began to collapse and liquidate, while the sales that he measured as post-disclosure activity were, by and large, during the period of forced selling (and therefore dislocatedly low prices) stemming from the Funds' liquidation. As discussed below, this methodology is unreliable because the losses measured capture the effects of forced selling rather than the effects of disclosure.

To determine the amount of damages BOA supposedly suffered based on the market's realization of the risks allegedly withheld from BOA, Dr. Bajaj conducted an "event study" pursuant to which he engaged in a two-stage regression analysis. (Bajaj Rep. ¶¶ 54-55). First, Dr. Bajaj regressed discounts (i.e. the difference between the par value of the security and its trading price) observed in transactions between the Funds and BOA to determine a portion of an observed discount that cannot be attributed to a change in the representative market index or an asset's characteristics. Dr. Bajaj then conducted a "cross-sectional regression" to assess "the degree to which the Residual Discounts observed in the Funds' transactions could be further explained by the assets' structural features . . . or by the curative disclosure." (Bajaj Rep. ¶ 55). Through this process, Dr. Bajaj purports to have determined the "residual discount" of the assets purchased by the Issuer, that is, the difference between (1) their observed trading value and (2) their expected value based on the market index and the assets' characteristics.

Dr. Bajaj then took three dates during which, his analysis assumes, the markets became aware of the risks addressed in the May 23 Disclosure Letter that were supposedly theretofore undisclosed. These dates were June 6, 2007 (the date that his review of the literature indicates that the markets learned of hundreds of millions of dollars of redemptions at the EL Fund), June 27, 2007 (the date that investors learned that the Funds would suspend redemptions), and July

17, 2007 (the date that investors learned unequivocally of the Funds' liquidation). (Bajaj Report ¶¶ 21-23, 60-62).

After selecting these disclosure dates, Dr. Bajaj calculated the residual discounts for the assets based on transactions occurring before and after these selected disclosure dates in an attempt to determine the portion of the post-disclosure residual discount of the assets that could be attributable to the disclosure, as opposed to other factors. But the problem is that Dr. Bajaj effectively stacked the deck in favor of finding steep losses: while he purports to identify the portions of residual discounts that was due to the "disclosure" to the market of the information allegedly hidden from BOA prior to the May 23 Disclosure Letter, the events that serve as his "disclosure" dates were also events that triggered progressively worse fire sales during June and July of 2007. Accordingly, his methodology could better be described as identifying the portions of the residual discounts that was due to forced selling at dislocated prices caused by a flood of redemption requests at the Funds. This flaw renders Dr. Bajaj's methodology unreliable and inadmissible.

The problem with Dr. Bajaj's methodology has been addressed in case law and in previous testimony in other cases by Dr. Bajaj himself. The Second Circuit has instructed that "the damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of breach." *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990); *accord McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1310 (2d Cir. 1993) (same principle applied to fraud damages); *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (N.Y. 1996) (same). Because "fire sales" involve below-value sales, courts have found that they are not properly used to measure damages because they do not properly measure the fair market value of an asset at the time of a

breach or of a fraud. *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1370-71 (Fed. Cir. 2010). Dr. Bajaj himself concedes in his report that academic studies "have noted [that] sudden sales of a large quantity of assets are likely to occur at dislocated prices and cause severe losses to seller." (Bajaj Report ¶ 35). Dr. Bajaj further testified in another case that "the definition of fair market value as economists understand it requires you to determine what would the security trade at if the market were open and orderly and people were transacting voluntarily," i.e. not during a time of fire sales resulting in dislocated prices. *Litman v. United States*, 78 Fed. Cl. 90, 129 (Fed. Cl. 2007) (quoting Dr. Bajaj's deposition testimony). Indeed, in his prior testimony, Dr. Bajaj succinctly explained that fire sale prices are an inappropriate tool for measuring loss in value, testifying that an IPO price for a newly public company was "'more similar to a distressed seller being willing to sell at a fire-sale price;' therefore the transaction should not be the basis for determining the fair market value." 78 Fed Cl. at 129 (quoting Dr. Bajaj).

BOA argues rather unstrenuously in a footnote that it "likely would be entitled to the damages calculated by Dr. Bajaj even if they *were* based, in whole or in part, on fire sale prices." (*See* Opp. Br. at 20 n. 22). The cases cited by Plaintiffs for this proposition are inapposite. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538-39 (1994) addresses the meaning of "reasonably equivalent value" under the Bankruptcy Code. And *Boyce v. Soundview Technologies Grp., Inc.*, 464 F.3d 376, 387 (2d Cir. 2006) contains no holding supportive of Plaintiffs' assertion.

Beyond this unpersuasive footnote, BOA does not seriously contest the aforementioned body of law or this basic principle that fire sale prices should not be measured to determine losses in these kinds of circumstances. Instead, BOA argues, for purposes of this *Daubert* motion, that the prices assessed by Dr. Bajaj were not the result of "fire sales" and that his model did not include any price effects unrelated to BSAM's omissions. (*Daubert* Opp. Br. at 17-20;

SJ Opp. Br. at 37).  This position, though necessary for its attempt to salvage Dr. Bajaj's

testimony, conflicts with the position that BOA has consistently taken throughout this litigation.[2]

For example, BOA's counsel stated to this Court at oral argument on July 2, 2012, that "because

of the redemption requests, BSAM had to make fire sales of its remaining assets." (7/2/13 Tr. at

14).  Successive complaints, including the Second Amended Complaint, which was filed after

the close of almost all discovery, alleged that BSAM was "forced" in mid-June of 2007 to

"liquidate about $5 billion worth of the Funds' holdings," i.e. that there was a fire sale. (SAC ¶

104).  For this reason alone, some authority suggests that BOA is prevented by its statements in

court and its allegations in its pleadings from denying that the prices at which the Funds sold

their assets during liquidation were fire sale prices.  *See, e.g.*, *Clarke v. JPMorgan Chase Bank,*

*N.A.*, 2010 WL 1379778, at *14 (S.D.N.Y. Mar. 26, 2010); *In re Fosamax Prods. Liability Litig.*,

647 F. Supp. 2d 265, 276 (S.D.N.Y. 2009).

Moreover, BOA's proffered explanations for why the June and July sales by the Funds

were not fire sales are unconvincing.  BOA draws the Court's attention to a quote from

Defendant Matthew Tannin that a "June sale" was "something less severe than [that of] a forced

seller." (*Daubert* Opp. Br. at 18).  But that quote referred to a June 14 sale of the Funds' highest

quality MBS assets, which were not CDOs, and which were not included in Dr. Bajaj's analysis.

(Ex. 49; Bajaj Report Appx. 5 at 14-15).  Moreover, it was not until the day of Tannin's

statement when, as mentioned in Dr. Bajaj's report, events were set in motion that led to the

liquidations of the Funds. (*See* Bajaj Report ¶ 43 n.57).  Indeed, 68 out of the 74 CDO sales that

undergird Dr. Bajaj's analysis took place after June 14, 2007 (Bajaj Report Appx. 5), the point in

---

[2] Indeed, as discussed later in this opinion, BOA is not consistent even within its *Daubert* briefing.  While BOA
primarily argues that Dr Bajaj did not measure fire sales, in footnote 21 of its *Daubert* opposition brief, it asserts that
the evidence suggests fire sales beginning "weeks" before June 8, 2007.

time when the Funds had failed to convince their counterparties to forbear on their margin calls and were essentially forced into liquidation.

BOA further argues that sales occurring during the Funds' June and July 2007 liquidation were not fire sales because they did not involve "dislocated prices." (*Daubert* Opp. Br. at 18). BOA argues that there is a "lack of evidence" as to whether high value bidders were available to bid at the time of the mass auction, and therefore a question as to whether forced sales by the funds were at "fire sale" prices. (*Daubert* Opp. Br. at 19). Yet Dr. Bajaj's own report indicates that there would be difficulty selling off non-exchange-listed assets from the Funds and indicates that such a process would require the "sellers . . . [to] attract buyers who place progressively lower value on the securities." (Bajaj Report. ¶ 35). Dr. Bajaj noted that "academic studies" have mentioned that "sudden sales of a large quantity of assets are likely to occur at dislocated prices" and that such "a negative impact on structured finance asset prices would be exacerbated by the fact that the Funds would no longer remain large buyers of such assets." (Bajaj Report. ¶ 35). Thus, Dr. Bajaj's own report in this matter explains why the Funds' liquidation prices in June and July of 2007 involved "dislocated prices."

For his part, Dr. Bajaj was not able to testify as to whether the asset sales he analyzed were "forced" or at "fire sale prices." (Bajaj Depo. Tr. at 223-25). As BOA bears the burden of establishing by a preponderance of the evidence that its proffered expert testimony meets the admissibility requirements of Rule 702, *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007), given that its own expert could not testify one way or the other regarding whether the prices measured were fire sale prices, but that his report indicates why they were, and given that Plaintiffs' counsel has previously (and repeatedly) represented to the Court that they were, the

Court concludes BOA has failed to meet its burden of demonstrating the admissibility of Dr. Bajaj's testimony.

In an attempt to save Dr. Bajaj's testimony, BOA argues that his report factored out fire sale prices in two ways: (1) by controlling for movements in the ABX index, and (2) by comparing the prices before the disclosures with prices after the disclosures. (*Daubert* Opp. Br. at 19; 7/10/13 Tr. at 69:16-70:1). Neither of these arguments is persuasive. As for the first argument, the fire sale triggered by redemption requests was specific to the Funds. No market-wide index can control for such a discount. Plaintiffs' brief concedes this point implicitly, arguing that Dr. Bajaj "removed *market-wide* effects by controlling for movements in the ABX indexes." (Pl. *Daubert* Opp. Br. at 19) (emphasis added). Plaintiffs continue by arguing that because there is no challenge to Dr. Bajaj's studies' ability to factor out *market-wide* effects, there therefore "is no reasons to doubt that Dr. Bajaj reliably factored out *all* fire sale impacts, to the extent any existed." (*Id.*) (emphasis in original). But the latter conclusion does not follow from the former statement. As for Plaintiffs' second argument as to why Dr. Bajaj supposedly factored out the effects of fire sales, that Dr. Bajaj considered prices before and after forced selling began, such an analysis does not control for the fire sale, but rather captures the fire sale.

BOA separately argues, in a footnote, the unassailable point that Dr. Bajaj's use of fire sale prices is only problematic if the distressed sales occurred entirely on one side of the chosen disclosure date. (Pl. *Daubert* Opp. Br. at 20 n.21). This argument does not help Plaintiffs however, but instead merely explains precisely why Dr. Bajaj's methodology is unreliable. If the prices measured by Dr. Bajaj on both sides of his selected disclosure dates were both during fire sales, then theoretically it might be possible to measure a decline in value based on the disclosure because the prices measured on both sides of the disclosure date would be taken during the fire

15

sale free fall. But Dr. Bajaj did not choose such dates. Rather, as Appendix 5 to his report makes clear, at minimum three quarters of the sales measured by Dr. Bajaj to produce a pre-disclosure residual discount were prior to the initiation of the fire sale. (*See* Bajaj Report ¶ 43-48, Appx. 5). And 68 out of 74 of the "post disclosure" prices that he measured are after this liquidation fire sale was commenced. (*Id.* at Appx. 5). Plaintiffs argue in footnote 21, contrary to what they argue above the line in their brief, that evidence in the record suggests a fire sale commenced "weeks" prior to June 8, 2007. (Pl. *Daubert* Opp. Br. at 20 n.21). As an initial matter, the Plaintiffs must stretch the evidence in the record in representing that anyone asserted that *fire sales* began weeks prior to June 8, 2007. But even if the fire sale did commence "weeks" before June 8, 2007, over 300 of the 400 "pre disclosure" sales measured by Dr. Bajaj took place prior to that earlier date. Thus, the problem identified by Dr. Bajaj himself remains fatal to the reliability of his findings: the data that he measures and purports represent sales before and after disclosure are, in fact, measuring ordinary selling against forced selling.

In sum, Dr. Bajaj's measurement of losses based largely on prices from what Plaintiffs have consistently asserted are "fire sales," a description with which this Court agrees, renders his methodology unreliable and inadmissible. Without Dr. Bajaj's testimony, Plaintiffs cannot prove loss causation, and therefore cannot prove proximate cause. As a result, all of the claims are DISMISSED. Although the Court's inquiry could end here, because the parties have briefed additional issues, for the sake of completeness, the Court addresses those as well.

      B.  <u>BOA's First Fraud Claim (Claim II) Fails Because BOA Cannot Prove a Duty to Disclose</u>

BOA's second claim alleges that BSAM defrauded BOA by failing to warn BAS prior to the deal's closing that there were substantial redemptions at the Funds. As discussed below,

even independent of Plaintiffs' inability to prove proximate cause, the CDO transaction

fraudulent omission claim must be dismissed because there is no evidence from which a jury

could conclude that there was a duty on Defendants' part to disclose the redemptions at the

funds.

Under New York law, a plaintiff alleging fraud must prove five elements by clear and

convincing evidence: "(1) a material misrepresentation or omission of fact; (2) made by

defendant with knowledge of its falsity; (3) and intent to defraud; (4) reasonable reliance on the

part of plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.,* 443

F.3d 230, 234  (2d Cir. 2006). If, as in this case, a fraud is based on a failure to disclose, a

plaintiff must also prove that the defendant had a duty to disclose, a duty that "cannot arise

simply because two parties may have been on opposite sides of a bargaining table." *Brass v. Am.*

*Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  A duty may arise if a party "choos[es] to

speak," in which case they must speak truthfully about material issues. *Caiola v. Citibank, N.A.,*

*N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002). A duty may also arise if one party has superior

knowledge of information that is not readily available to the other party and the party possessing

the superior knowledge knows that the second party is acting on the basis of mistaken

knowledge. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d

146, 155 (2d Cir. 1995). BOA argues that there is room in the record for a jury to find that

Defendants had a duty to disclose the redemptions at the Funds based both on Defendants'

supposed decision to speak and the superior knowledge doctrine.  However, based on the

undisputed evidence and construing all reasonable inferences in BOA's favor, the Court

concludes Plaintiffs cannot prove this claim based on either theory of liability.

17

1.   BSAM Never Chose to Speak and Never Assumed an Obligation to Speak
Fully

Plaintiffs argue that BSAM chose to speak during a pre-closing due-diligence phone call

held on May 21, 2007, and that BSAM at that time assumed the responsibility to speak fully and

truthfully regarding the redemptions at the Funds.  One of BOA's witnesses described the

resulting May 21 phone call as "cookie cutter" and "standard," lasting less than one half hour

and with no one from SSG included.  (Austen Depo. at 71-73, 81-84).  The problem is that BOA

has presented no evidence that Defendants chose to speak on this phone call in a manner that

would have required them to further disclose the redemption requests at the Funds.

BOA primarily relies on an agenda for the May 21 phone call that was drafted by BAS

and delivered to BSAM on May 18, 2007.  (Ex. 28).  The agenda contains five points: (1)

Business Strategy, (2) Program Administrator, (3) Program Administration, (4) Program

Launch/Funding Expectations, and (5) Other.  Under each of those five points are between two

and ten sub-points.  One of the two sub-points listed under "Other" is "Any other remaining

material information not yet disclosed?"  (Ex. 28).

BOA asserts that this catchall "remaining material information" provision under the

"other" prong in the agenda for the phone call indicates that Defendants spoke about material

information but did not speak truthfully because it did not discuss the heavy redemptions at the

Funds.  As discussed below, BOA waived this theory of liability by failing to raise it prior to its

opposition brief on its summary judgment motion, and even if it were not waived, the undisputed

evidence leaves no room for a rational juror to find liability on this theory.

i.      Plaintiffs Waived Their "Chooses to Speak" Argument

18

BOA waived its "chooses to speak" theory of liability by failing to raise it prior to summary judgment. Successive complaints, including one permitted by the Court to be filed after the close of all discovery related to this claim, assert that this fraud claim is premised upon the superior knowledge doctrine. The "chooses to speak" theory of liability was raised in Court filings for the first time in BOA's opposition brief on the motion to for summary judgment. But Fed. R. Civ. P. 9(b) requires fraud to be pled with particularity. Thus, although not a new "claim" pursuant to Rule 15, this new theory was not pled as required by Rule 9(b) and is therefore waived. *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 550 (S.D.N.Y. 2009) (finding new theory of fraud liability waived because not pleaded in complaint with particularity as required by Rule 9(b)) (emphasis in original); *cf. Lyman v. CSX Transp. Inc.*, 364 F. App'x 699, 702 (2d Cir. Feb. 8, 2010) (unpublished) (Calabresi, Raggi, Cudahy) (not abuse of discretion for district court to decline to consider new theory of negligence liability raised for first time in opposition to summary judgment given absence of motion to amend). A finding of waiver is especially appropriate given that this "agenda" for the May 21 phone call was created by BOA and was in BOA's possession prior to their commencement of the present lawsuit. It is not a document that only turned up during discovery.

BOA asserted at oral argument that waiver is inappropriate because, based on a response to an interrogatory served on BOA during discovery, this theory of liability comes as no surprise to Defendants. In support of their argument that the Court should consider whether there was an unfair surprise, BOA urged the Court to consider the Second Circuit's decision in *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006). What *Greenidge* says, however, is that a district court need not consider a new claim when there has not been a motion to amend. *Id.* ("[A] district court does not abuse its discretion when it fails to grant leave to amend a complaint

19

without being asked to do so."). In this case, the Court granted BOA leave to file its Second
Amended Complaint on July 6, 2012, (Dkt. No. 91), after the parties had completed all discovery
related to this claim. BOA did not seek leave to add a "chooses to speak" theory of liability at
that time. Thus, if the Court were to construe BOA's brief in opposition to summary judgment
as implicitly seeking leave to amend its complaint yet again, the Court would deny it. Such a
request would be unfairly prejudicial at this late time in light of this Court's prior post-discovery
and pre-summary judgment grant of leave to amend. It was at that time that BOA could have
sought to amend this claim to put its adversary on notice as to this theory of liability. BOA
chose not to do so. There is a limit on the extent to which Plaintiffs may continuously "move the
ball" with their pleading to survive succeeding dispositive motions. Plaintiffs have surpassed
that limit in this case.

        ii.      Even if not Waived, the Theory Fails on the Merits

      Even if BOA had not waived this theory of liability, the claim would still fail because
there is no evidence in the record to demonstrate that anyone from BSAM actually chose to
speak. No witness recalls if anything actually *was discussed* with respect to item 5, the
"remaining material" information agenda item. (Austen Depo. at 77-84, 133-35; Fleming Depo.
at 256-65; McGarrigal Depo. at 171-72; Tannin Depo. at 295-305). At base, all that BOA is
pointing to is a general provision in an agenda item that BOA itself wrote, without any evidence
that the agenda item was addressed. That is evidence of BOA speaking, but it is not evidence of
BSAM speaking. As there is no evidence that BSAM chose to speak or did speak, there can be
no finding of an obligation on BSAM's part to speak fully and truthfully.

      In further support of their assertion that Defendants chose to speak, Plaintiffs point to the
deposition testimony of Patrick Fleming. But Fleming testified that he did not recall what was

said on the phone call and speculated that there was "probably" talk "about the assets and the

personnel and the BSAM team." (Ex. 183 at 210). Similarly, the deposition testimony of

Matthew Tannin contains no testimony regarding anyone from BSAM speaking about anything

in particular on the phone call. (Ex. 204 at 142-48, 296-97, 304).

In short, because there is no evidence of anyone from BSAM addressing the agenda item

or otherwise speaking about the conditions at the Funds, or addressing anything else that would

have required disclosure of the redemptions at the Funds, there is no evidence from which a

rational jury could find liability for fraud based on BOA's "chooses to speak" theory.

> 2. Plaintiffs' Superior Knowledge Argument Fails in Light of the Undisputed
>    Evidence

In further support of this fraud claim, BOA argues that there is room in the record for a

jury to conclude that Defendants knew that BOA was relying on misinformation about the state

of the Funds, in particular the redemptions, and that such information was material to the deal.

The Court disagrees, concluding that the superior knowledge doctrine only applies to

information that is basic to the deal and that the only rational conclusion based on the undisputed

evidence is that the information disclosed in the May 23 Disclosure Letter was not basic to the

transaction.

> i. The Duty to Disclose Applies Only to Facts Basic to the Transaction

As an initial matter, the Court agrees with Defendants that, as described in the

Restatement (Second) of Torts § 551(2)(e), the superior knowledge doctrine only applies in a

case like this to the extent that undisclosed facts are "basic to the transaction." As a comment on

§ 551(2)(e) further explains:

> A basic fact is a fact that is assumed by the parties as a basis for the transaction
> itself.  It is a fact that goes to the basis, or essence, of the transaction, and is an

important part of the substance of what is bargained for or dealt with. Other facts
may serve as important and persuasive inducements to enter into the transaction,
but not go to its essence. These facts may be material, but they are not basic.

Restatement (Second) of Torts § 551(2)(e) cmt. (j).

BOA argues that the requirement stated in the Restatement that omitted information be
basic to the transaction is not a requirement of New York law, as construed by the Second
Circuit. However, in *Brass v. Am. Film Techs.*, the Second Circuit cited to § 551 of the
Restatement repeatedly when discussing the superior knowledge doctrine. *Brass*, 987 F.2d at
151-52. Though the Second Circuit never explicitly quoted the "basic" language from the
Restatement, it quoted a New York case that discussed the doctrine as requiring disclosure of
"basic factual assumptions" when disclosure would be reasonably expected. *Id.* (quoting *Gaines
Serv. Leasing Corp. v. Carmel Plastic Corp.*, 432 N.Y.S.2d 760 (N.Y. Civ. Ct. 1980)). In light
of *Brass*, the Restatement (Second) of Torts, and case law from New York, the Court concludes
that, in the context of a business transaction, the superior knowledge doctrine only applies to
facts that are "basic to the transaction."

          ii.     No Rational Juror Could Conclude That the Undisclosed Information was
                  Basic to the Transaction

BOA provides no evidence indicating that the redemptions at the Funds, which occurred
during what one of BOA's own bankers referred to as a "volatile" market, and which BOA never
disclosed to investors to whom BOA sold commercial paper from the Issuer post-closing, were
"basic" to the deal. BOA does not point to any testimony, either in deposition or declaration
form, from any of its witnesses attesting that the level of redemptions at the Funds was basic to
the transaction. There is no evidence of BOA inquiring about such information, or including

such information in the risk section of the offering materials.  There are no internal BOA documents indicating that this information was basic to the transaction.

Indeed, contrasting with the absence of any evidence affirmatively indicating that the undisclosed redemptions at the Funds were basic to the transaction, substantial evidence indicates that they were not.

For example:

- The term sheet for the offering does not mention the Funds (Ex. 65);

- The TAP, "BAS' internal approval document," contained no background on the EL fund and little information on the HG Fund (Ex. 8);

- The Funds' performance, current condition, and future prospects were not mentioned either in the risk section or anywhere else in the TAP (Ex. 8); and

- The "Greenlight Request" on February 15, pursuant to which BOA's structured security group sought and obtained approval to proceed with the deal, did not mention the Funds.  (Ex. 15).

Moreover, BOA's post-transaction behavior strongly suggests that it did not view the redemptions at the Funds as either basic or even material information.  After redemptions at the Funds were disclosed in the May 23 Letter, BOA sold hundreds of millions of dollars of commercial paper from the CDO-squared without disclosing to the purchasers any of the developments at the EL Fund outlined in the May 23 Disclosure Letter.  (Def. 56.1 ¶ 59).  They did so even though their own compliance officer testified that as the placement agent on a private offering, BOA had "a reasonable obligation to determine" that the documents shown to purchasers "contain[ed] all material facts and circumstances about the security, and that the issuer ha[d] disclosed everything as appropriate." (Maddox at 52).  And another BAS marketing witness testified that "we have a certain obligation to be sure that the private placement

memorandum is complete and we didn't omit any material information." (Austen at 66-67). BOA's decision to sell the commercial paper to third party investors without informing those investors about the redemptions at the EL Fund comes very close to constituting a concession that those redemptions were not viewed as basic or material at the time of the transaction.

BOA claims that it was forbidden from disclosing the information about Fund redemptions to parties to whom it sold commercial paper because of the confidentiality provision in the Engagement Letter. But that provision states that either party "may disclose" information "that is required to be disclosed pursuant to law." At oral argument, BOA's counsel indicated that it need not have disclosed material information to investors to whom it sold the commercial paper because the commercial paper was backed up by the 2-a7 put. (7/10/13 Tr. at 51:9-19). But the Court knows of no authority, and BOA has not provided any, indicating that the disclosure requirements provided for in the securities laws need not be complied with in situations where the purchaser has the remedy of invoking a 2a-7 put some time in the future.

BOA also argues that it tried to get BSAM to disclose the Fund information to purchasers of the commercial paper "but BSAM didn't do it." But all that is in the record is that BOA's Brian Foley "believed" that he told "deal counsel" for BSAM that "we needed to disclose something." The BOA business people inquired of their lawyers before choosing not to include this information. (*See* Pl. 56.1 ¶ 64; McLaughlin Depo. at 215-220). No evidence in the record supports BOA's argument that it tried to get BSAM to disclose information about redemptions in the Funds and that BOA only failed to make such disclosures itself because of BSAM.

BOA argues in its opposition brief that the term sheet and other offering materials emphasized that BSAM was the manager and that any information detracting from BSAM's reputation was basic to the transaction. This theory of liability—based on material relevant to

24

BSAM's reputation—differs from the superior knowledge allegations in the Second Amended

Complaint, which refer repeatedly and exclusively to the Funds' "financial condition," and not to

BSAM's general reputation.[3] (SAC ¶ 64, 128-29; *see also* Dkt. No. 35 at 14 n.15). As with the

theory of liability based on the May 18 agenda item, this theory was waived. *See* Section

"III.B.1.i" above.

In short, in light of the undisputed evidence and drawing all reasonable inference in favor

of BOA, the Court concludes that there is no evidence from which a rational jury could conclude

that there was a duty on the part of Defendants to disclose the redemptions at the Funds. As a

result, separate and independent from the Court's conclusion regarding loss causation, Claim II

must be dismissed.

### C.  The Breach of Fiduciary Duty Claim Must Be Dismissed

Plaintiffs' breach of fiduciary duty claim (Claim III), asserted by U.S. Banks as

successor-in-interest to Bank of America as the trustee to the Issuer, also fails as a matter of law

because the Collateral Management Agreement ("CMA") governing BSAM's role as collateral

manager to the Issuer contained a waiver of fiduciary duties with respect to the transaction at

issue.  Plaintiffs are therefore precluded from pursuing this claim.

The undisputed facts pertinent to this claim are as follows. On March 9, 2007, BSAM

and BAS executed an Engagement Letter stating that BSAM had engaged BOA "to structure and

market the transaction and that BSAM would serve as 'Collateral Manager' for the Issuer,

meaning that BSAM would be responsible for selecting, acquiring, managing, and monitoring

---

[3] Allegations relating to BSAM's reputation are contained in the successive complaints because they are germane to the breach of contract claim.  Defendants do not seek summary judgment on that claim on grounds independent of Plaintiffs' inability to prove proximate cause.

the Issuer's portfolio of Collateral."  (Ex. 5).  The Engagement Letter stated that the role of

BSAM as "Collateral Manager" would be "pursuant to a collateral management agreement in

form and substance satisfactory to the Collateral Manager, the Issuer, and BAS, to be entered

into between the Collateral Manager and the Issuer on or prior to the Closing Date."  (Ex. 5 ¶

4(a)).

On May 24, 2007, the date that the Issuer was created, a CMA was executed between the

Issuer and BSAM.  The CMA called for BSAM to be the Issuer's "investment advisor and

manager with respect to the Collateral."  (Ex. 6 ¶ 2(a)).  The CMA provided that BSAM would

"effect the [Issuer's] acquisition" of collateral and "cause" the Issuer's trustee "to acquire" such

collateral.  (Ex. 6 at 3-4).  The Offering Circular ("OC") summarizes the CMA as requiring the

Collateral Manager, BSAM, to cause the acquisition on the initial collateral on an "arm's length"

basis.  (Ex. 16 at 144).

Paragraph 5(c) of the CMA, which falls within the "Conflict of Interest" section of the

agreement, states that:

> The Collateral Manager may direct the Trustee to acquire a Collateral
> Debt Security or Eligible Investment from, or sell or assign a Collateral
> Debt Security or Eligible Investment to, the Collateral Manager or any of
> its Affiliates as principal or any account or portfolio managed or advised
> by the Collateral Manager or any of its Affiliates as principle . . . on
> condition that (i) the board of directors of the Issuer has received from the
> Collateral Manager such information relating to such acquisition or sale as
> the board of directors may reasonably require and has approved such
> acquisition or sale and the price in advance, and . . . . provided, for the
> sake of clarity, that **any such transaction shall nevertheless be
> conducted on an arm's-length basis and on terms as favorable to the
> Issuer as would be the case if it were not with a Collateral Manager
> Party . . . The Issuer agrees that the conditions set forth in this
> paragraph are met with respect to the Collateral Debt Securities**

> **purchased by the agreement among the Issuer, the Collateral**
> **Manager and an affiliate of the Placement Agent on the closing date.**

(Ex. 6 at 9-10).

The plain reading of this provision is that the last sentence (beginning "[t]he Issuer agrees . . . .") is a stipulation by the Issuer that the "Collateral Debt Securities purchased" by the Issuer on May 24, 2007—which is what this claim is all about—were purchased at an "arms-length basis and on terms as favorable to the Issuer as would be the case if it were not with a Collateral Manager Party." This was necessary because BSAM, which was the collateral manager of the Issuer, was also the manager of the Funds, and owed duties to those Funds. The CMA therefore deems the selection and purchasing of the collateral to be at arm's length so as to waive any conflict of interest that might otherwise exist for purposes of this transaction.

Because no fiduciary duty can arise out of a transaction conducted on an arm's length basis, *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002); *Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 372-73 (S.D.N.Y. 2011); *Maalouf v. Salomon Smith Barney, Inc.*, 2003 WL 1858153, at *4 (S.D.N.Y. Apr. 10, 2003), Section 5(c) serves to stipulate away any fiduciary duties owed to the Issuer relating to the selection of collateral.

Plaintiffs argue that Section 5(c) was only intended to insure that BSAM sold the collateral to the Issuer at then-prevailing fair market prices. But that is not how the stipulation is written. In unambiguous language, Section 5(c) states that the entire transaction is as favorable to the Issuer as one occurring on an arm's length basis. The stipulation therefore covers more than just pricing. Furthermore, BOA's attempt to differentiate between the stipulation as relating to price of the collateral rather than to selection of the collateral is opaque. One cannot determine the fair price of an asset placed into the Issuer without also considering what the

27

selected asset actually is. In an arm's length transaction, such as the Issuer stipulated was occurring with respect to the transaction by which it acquired collateralized debt securities on the closing date, once the selection changes, the prices will change accordingly. Thus, arguing that Section 5(c) only addresses price but not collateral selection does not get BOA very far. In any event, Section 5(c) is not so limited.

Plaintiffs argue in their brief that Section 5(c) "is not a get-out-of-jail-free card for . . . egregious self-dealing." (Opp. Br. at 29). The Court agrees. Nothing in Section 5(c) bars, for example, a fraud claim based on alleged misrepresentations by BSAM to the Issuer at the time that the collateral was transferred. Such claims are frequently brought between parties who have transacted at arm's length. Section 5(c) is, however, a clear agreement by the Issuer that it engaged in the transaction acquiring its initial collateral on terms as favorable as those that would have occurred had the transaction been conducted between parties negotiating at arm's length. As a matter of law, no *fiduciary* duties can exist in such circumstances. *In re Mid-Island Hosp., Inc.*, 276 F.3d at 130; *Intellivision*, 784 F. Supp. 2d at 372-73; *Maalouf*, 2003 WL 1858153, at *4.

Plaintiffs finally argue that language from Section 5(b) of the agreement prevents the conclusion that Section 5(c) constituted a stipulation by the Issuer that the May 24 transaction by which it took its initial collateral was at arm's length. Section 5(b) states, in part, that "nothing in this Section 5 shall be construed as altering the duties or liabilities of the Collateral Manager as *expressly* set forth herein." (Ex. 6 at 9) (emphasis added). But the CMA does not *expressly* state that BSAM owed the Issuer "fiduciary duties." Rather, assuming *arguendo* that BSAM generally owed fiduciary duties to the Issuer, such fiduciary duties would have arisen out of (1) a course of dealings between BSAM and the Issuer and (2) other language in the CMA detailing

actions that BSAM was to perform for the Issuer, which may have impliedly created fiduciary duties. Given the absence of any "express" statement in the CMA that BSAM owed the Issuer fiduciary duties, Section 5(b) is of no aid to Plaintiffs.

> D. Questions of Fact Exist as to Whether the Repo Agreement Was Binding as of May 23

BSAM has argued that the repo fraud claim must be dismissed on summary judgment because there was full disclosure in the form of the May 23 Disclosure Letter prior to the closing of the repo transaction. However, in light of testimony by BSAM's employee that a "binding agreement" had been reached prior to the disclosure, (Ex. 199 at 256-57), the Court would conclude that questions of fact exist with respect to whether this claim is viable. However, as discussed, in light of BOA's inability to prove loss causation, the motion for summary judgment is granted with respect to this claim as well.

> E. Apportionment of Damages

Finally, even if Plaintiffs were able to prove proximate cause for fraud or breach of contract (which they cannot, as discussed in Section "III.A.2" above), they still would not be able to prove apportionment of damages between their claims. That is because their only evidence as to such apportionment is Dr. Bajaj's study, which, for purposes of apportioning damages between the commercial paper notes and the mezzanine tranches, relies on an unfounded assumption. So, for example, if Plaintiffs were to prevail on their breach of contract claim and not on their repo fraud claim, there would be no stable or reasonable basis for ascertaining how much, if any, damages arose from that claim.

To determine which of Plaintiffs' supposed damages are attributable to their breach of contract claim versus their repo fraud claim, Dr. Bajaj was "instructed by counsel to assume that

absent the alleged failures to disclose, the parties would have entered into a 'but-for' CDO-squared transaction that would have been identical to the actual CDO-squared transaction, except that the Collateral Assets' aggregate value absent the non-disclosures would not have been overvalued." (Bajaj Report ¶ 64).  The fatal flaw, however, is that there are *no* facts in the record that could lead a reasonable juror to conclude that such a counterfactual scenario would have occurred.  Because Dr. Bajaj's opinions were premised upon an unfounded assumption, his conclusions will not be helpful to the finder of fact.  *See generally Davis v. Carroll*, --- F. Supp. 2d ---, 2013 WL 1285272, at *26 (S.D.N.Y. Mar. 29, 2013) (expert opinion excluded as unreliable because, *inter alia*, it was based on assumptions that "lack *any* basis in the record") (emphasis in original); *Stewart v. Estate of Sugar Hill Music Pub. Ltd.*, 2013 WL 1405422, at *1 (Apr. 8, 2013) (*Daubert* challenge granted and testimony excluded in part because the expert's testimony was based on an "unexplained assumption").

Pressed to support its contention that the counterfactual scenario that Plaintiffs' counsel instructed Dr. Bajaj to assume is a reasonable assumption as to how the parties would have proceeded if there had been complete disclosure at an earlier time, Plaintiffs at oral argument pointed to paragraph 132 of their 56.1 counterstatement.  That paragraph asserts that had BOA known of the Funds' redemption notices, "it would have declined to enter into the CDO-squared transaction or done so only on materially different terms."  As an initial matter, even if there were support in the record for the proposition that BOA would have proceeded with the transaction on "materially different terms," that is a far cry from evidence indicating any likelihood at all that the parties would have engaged in the transaction in the manner assumed by Dr. Bajaj.  "Materially different terms" has broad meaning, and might include engaging in a

transaction involving different collateral, less collateral, or collateral securitized in a completely different manner.

Moreover, the deposition testimony relied upon in support of this proposition does not support Plaintiffs assertion in its 56.1 statement that the deal would have moved forward on "materially different terms," nor does it support the likelihood or even plausibility of the "but-for" scenario assumed by Dr. Bajaj's report. (*See* 7/10/13 Tr. at 61:10-23; Pl. 56.1 Counterstatement ¶ 132). First, the deposition testimony of Sai Raman and Ardavan Nozari cited by Plaintiffs says nothing about how the transaction would have proceeded in a full disclosure world. (Ex. 201, Raman Depo. at 241, 246, 281; Ex. 198, Nozari Depo. at 314). Second, Justin Dash of Bank of America testified that "[i]f we received the [May 23 Disclosure Letter] before" BOA had acquired the initial collateral, "our decision wouldn't have been merely should we close the deal and take the super senior back or not close the deal and have the raw assets. It would have been more along the lines of should we close the deal at all." (Ex. 182, Dash Depo. at 413). Dash's speculation does not support a reasonable inference that the counterfactual relied upon by Dr. Bajaj would have occurred.

The absence of any evidence to support the counterfactual scenario that Plaintiffs' counsel instructed Dr. Bajaj to assume is striking given the large amount of discovery conducted in this case. Defendants' *Daubert* motion, which raised this issue, was submitted on November 30, 2012. (Dkt. Nos. 110). Plaintiffs had time prior to their opposing this motion, and prior to opposing Plaintiffs' January 11, 2013 summary judgment motion, to obtain a declaration or an affidavit from at least one person at BOA or elsewhere indicating that such a scenario was likely. They did not do so. Plaintiffs did not submit articles, studies, or deposition testimony that might support the possibility of the scenario that they instructed Dr. Bajaj to assume.

Lacking evidence to support Dr. Bajaj's assumption, Plaintiffs attack a straw man, arguing that they should not be forced to find testimony from a BOA employee that, in the hours before the close of the deal, the employee contemplated what they would have done in a world of earlier disclosure. (7/10/13 Tr. at 72:16-73:6). But the Court is not looking for testimony from an individual at BOA that that individual actually contemplated, before the deal closed, what they would have done if they knew about the redemptions earlier. Instead, some evidence is required suggesting that the assumption upon which Dr. Bajaj's opinions regarding apportionment of damages between the tranches are premised is a reasonable estimation as to what would have happened in a full disclosure world. There is no such evidence in the record from which this inference may reasonably be drawn.

Because they have no evidence to support the likelihood of the scenario assumed by Dr. Bajaj, all that Plaintiffs are left to argue is that any scenario is possible, and that the scenario assumed by Dr. Bajaj's report is a sensible possibility. But that is not enough. *See Brown*, 654 F.3d at 358 (party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation.") (quoting *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)). BOA bears the burden of proving that the foundation of their expert's testimony is reliable and that the testimony is relevant to the task at hand. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). BOA cannot meet that burden simply by proffering that anything is possible and that the assumption upon which its expert relies in apportioning damages may be remotely possible. There must be some basis in the factual record from which this inference may be drawn. None can be found in this record.

Given the Court's conclusion that Dr. Bajaj's testimony on apportionment of the damages between the tranches is premised on an assumption as to the parties' actions in a full disclosure

32

world that is unsupported by any evidence in the record from which a rational jury could

conclude that the parties would have so acted, his conclusions are irrelevant to the fraud and

breach of contract claims. *See Davis*, 2013 WL 1285272, at *26; *Stewart*, 2013 WL 1405422, at

*1.

Thus, in the event of a trial, were Plaintiffs to prevail on claims involving one of the large

tranches but not the other (for example, if they prevailed on their breach of contract claim but not

on their repo fraud claim), there is no reliable or admissible evidence indicating how any

damages should be awarded for that claim.  Plaintiffs argue in a footnote in their brief that they

do not need the portion of Dr. Bajaj's testimony that is dependent upon the unfounded

assumption because, assuming that they are able prove proximate cause (which they are not, as

discussed in Section "III.A" above), the wrongdoer rule would entitle them to the benefit of any

uncertainty that exists as to how to measure damages.  (Pl. *Daubert* Opp. Br. at 16 n.18).  But

under the wrongdoer rule, a plaintiff who prevails in a breach of contract action must still

demonstrate a "stable foundation for a reasonable estimate as to damages."  *Boyce v. Soundview

Tech. Grp., Inc.*, 464 F.3d 376, 392 (2d Cir. 2006) (internal quotation marks omitted).  Without

the portion of Dr. Bajaj's expert testimony that is premised on an unfounded assumption,

Plaintiffs have no "stable foundation" for any "reasonable" estimate as to how to apportion

damages between the tranches.  And the unfounded assumption itself cannot serve as a

"reasonable" basis for making an estimate.

### F.  Defendants' Counterclaim is Dismissed as Moot

Because Plaintiffs' claims are all dismissed, Defendants' counter claim for contribution is

dismissed as moot.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment and to exclude the expert testimony of Dr. Mukesh Bajaj are both GRANTED and all four claims are dismissed. Remaining pending motions are denied as moot and the Clerk of Court is instructed to close this case.

      SO ORDERED.

Dated: September 3, 2013
      New York, New York

                                    ALISON J. NATHAN
                             United States District Judge